Richard D. McCune (SBN 132124)
rdm@mccunewright.com
David C. Wright (SBN 177468)
dcw@mccunewright.com
Steven A. Haskins (SBN 238865)
sah@mccunewright.com
Mark I. Richards (SBN 321252)
mir@mccunewright.com
**McCUNE LAW GROUP, APC**
3281 Guasti Road, Suite 100
Ontario, California 91761
Telephone: (909) 557-1250
Facsimile: (909) 557-1275

Bryan L. Clobes *Pro Hac Vice*
bclobes@caffertyclobes.com
**CAFFERTY CLOBES
MERIWETHER & SPRENGEL LLP**
205 North Monroe Street
Media, PA 19063
Telephone: (215) 864-2800
Facsimile: (215) 864-2810

[*Additional Counsel Listed on the Signature Panel*]

Attorneys for Plaintiffs and the Putative Class

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM LESSIN, CAROL SMALLEY, et al., on behalf of themselves and all others similarly situated,<br><br>                Plaintiffs,<br><br>        v.<br><br>FORD MOTOR COMPANY, a Delaware Corporation; and Doe 1 through 10, inclusive,<br><br>                Defendant. | Case No. 3:19-cv-01082-AJB-AHG<br><br>(Consolidated with No.3:19-cv-02229-AJB-AHG)<br><br>**REDACTED PUBLIC FILING**<br><br>**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**<br><br>Hearing Date:    TBD<br>Hearing Time:    TBD<br>Courtroom:        4A<br>Judge:      Hon. Anthony J. Battaglia |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

## TABLE OF CONTENTS

*Page*

I       INTRODUCTION ................................................................................................1

II      FACTS ...............................................................................................................2

    A.     The Class Vehicles Share a Common Design and Suspension Defect..........2

    B.     Ford's Common Knowledge and Deception....................................................3

    C.     NHTSA's Investigation of the P131 ...............................................................5

    D.     The P356 and P473 Models Exhibit Oscillation ............................................6

    E.     Ford Designs the P558 Model .........................................................................6

    F.     P558 Buyers Overwhelm Ford with Complaints About "Death Wobble" .....9

    G.     Ford Quietly Releases a Larger Damper and Lowers Caster Settings..........12

    H.     Proposed Field Remedy for the Defect .........................................................12

    I.     Common Damages to All Class Members .....................................................13

III     PLAINTIFFS ...................................................................................................14

    A.     William Lessin (CA) ......................................................................................14

    B.     Patrick and Sheri Powers (CA) .....................................................................15

    C.     Carol Smalley (CA)........................................................................................15

    D.     Lloyd Atterson (AZ).......................................................................................17

    E.     Brad Nielsen (CO)..........................................................................................17

    F.     David Appel (IL) ............................................................................................18

    G.     John Kigin (IN) ..............................................................................................19

    H.     Suzanne Hamilton (ME).................................................................................20

    I.     Steven Selgado (NM) .....................................................................................20

    J.     Roger Saddler (OH)........................................................................................21

    K.     Caroline McGee (TX) ....................................................................................22

1

**TABLE OF CONTENTS (cont.)**

2

*Page*

3        L.    David Huffstetler (SC) ...................................................22

4   IV   LEGAL STANDARD ................................................................23

5   V    ARGUMENT.............................................................................24

6        A.    The Proposed Class Satisfies the Rule 23(a) Threshold Requirements for

7             Class Certification ......................................................................24

8             1.    The Class Is Sufficiently Numerous ...................................24

9             2.    The Class Satisfies Commonality .......................................24

10            3.    Plaintiffs' Claims Are Typical of the Class .........................25

11            4.    The Class Is Adequately Represented ................................26

12       B.    The Class Satisfies the Requirements of Rule 23(b)....................27

13            1.    Common Questions of Fact and Law Predominate ............27

14            2.    The Defect Existence Is Subject to Common Proof ...........28

15            3.    Ford's Omissions Are Established by Common Proof.......29

16            4.    The Materiality of the Defect Is Subject to Common Proof...............30

17            5.    Damages Can Be Demonstrated Through Common Evidence .........31

18            6.    A Class Action Is A Superior Method for Resolving the Litigation ..33

19  VI   CONCLUSION.........................................................................35

20

21

22

23

24

25

26

27

28

Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Class Certification
Case No. 3:19-cv-01082-AJB-AHG

# TABLE OF AUTHORITIES

*Page(s)*

Cases

*Alger v. FCA US LLC*,
    334 F.R.D. 415 (E.D.Cal. 2020)......................................................................25

*Amchem Prod., Inc. v. Windsor*,
    521 U.S. 591 (1997)........................................................................................34

*Bailey v. Rite Aid Corp.*,
    338 F.R.D. 390 (N.D.Cal. 2021) ....................................................................32

*Bank of Am. Home Affordable Modification Prog. (HAMP) Contract Litig.*,
    MDL No. 10-2193-RWZ, 2013 WL 4759649 (D.Mass. 2013) ............................35

*Benson v. Newell Brands, Inc.*,
    No. 19 C 6836, 2021 WL 5321510 (N.D.Ill. Nov. 16, 2021) ................................35

*Blackie v. Barrack*,
    524 F.2d 891 (9th Cir. 1975) ..........................................................................24

*Briseno v. ConAgra Foods, Inc.*,
    844 F.3d 1121 (9th Cir. 2017) ........................................................................35

*Brummett v. Skyline Corp.*,
    No. C 81-0103-L(B), 1984 WL 262559 (W.D.Ky. 1984).................................29

*Butler v. Sears, Roebuck and Co.*,
    727 F.3d 796 (7th Cir. 2013) ..........................................................................28

*Chamberlan v. Ford Motor Co.*,
    223 F.R.D. 524 (N.D.Cal. 2004) ....................................................................26

*Chapman v. Gen'l Mot. LLC*,
    No. 2:19-CV-12333-TGB-DRG, 2023 WL 2746780
    (E.D.Mich. Mar. 31, 2023)........................................................................26, 35

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013)....................................................................................32, 33

*Cruson v. Jackson Nat'l Life Ins. Co.*,
    954 F.3d 240 (5th Cir. 2020) ..........................................................................29

*Davidson v. Apple, Inc.*,
    Case No. 16-CV-04942-LHK, 2018 WL 2325426 (N.D.Cal. May 8, 2018).........30

*Dzielak v. Whirlpool Corp.*,
    Civ. No. 2:12–89 (KM)(JBC), 2017 WL 6513347 (D.N.J. Dec. 20, 2017)............34

**TABLE OF AUTHORITIES (cont.)**

*Page(s)*

*Ebin v. Kangadis Food Inc.*,
   297 F.R.D. 561 (S.D.N.Y. 2014) ................................................................ 28

*Falco v. Nissan N. Am. Inc.*,
   No. CV 13-00686 DDP (MANx), 2016 WL 1327474 (C.D.Cal. Apr. 5, 2016) ..... 32

*Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*,
   326 F.R.D. 592 (N.D.Cal. 2018) ......................................................... 25, 31

*Flynn v. FCA US LLC*,
   327 F.R.D. 206 (S.D.Ill. 2018) .............................................................. 28

*Grays Harbor Adventist Christian Sch. v. Carrier Corp.*,
   242 F.R.D. 568 (W.D.Wash. 2007) ........................................................ 35

*Guido v. L'Oreal, USA, Inc.*,
   Nos. CV CV 11–1067 CAS (JCx), CV 11–5465 CAS (JCx),
   2013 WL 3353857 (C.D.Cal. July 1, 2013) .............................................. 30

*Hadley v. Kellogg Sales Co.*,
   324 F.Supp.3d 1084 (N.D.Cal. Aug. 17, 2018) ........................................ 33

*Hofmann v. Dutch LLC*,
   317 F.R.D. 566 (S.D.Cal. 2016) ............................................................ 27

*Howard v. CVS Caremark Corp.*,
   628 F.App'x 537 (9th Cir. 2016) ........................................................... 23

*id.*; *Siqueiros v. Gen'l Mot., LLC*,
   No. 16-cv-07244-EMC, 2022 WL 74182 (N.D.Cal. Jan. 7, 2022) .................. 32

*In re Arris Cable Modem Consumer Litig.*,
   327 F.R.D. 334 (N.D.Cal. 2018) ............................................... 29, 30, 32, 33

*In re Checking Account Overdraft Litig.*,
   281 F.R.D. 667 (S.D.Fla. 2012) ............................................................ 28

*In re ConAgra Foods, Inc.*,
   90 F.Supp.3d 919 (C.D.Cal. 2015) .................................................... 30, 31

*In re FCA US LLC Monostable Elec. Gearshift Litig.*,
   334 F.R.D. 96 (E.D.Mich. 2019) ...................................................... 30, 31

*In re MyFord Touch Consumer Litig.*,
   46 F.Supp.3d 936 (N.D.Cal. 2014) ........................................................ 31

*In re N. Dist. of Calif., Dalkon Shield IUD Prods. Liab. Litig.*,
   693 F.2d 847 (9th Cir. 1982) ............................................................... 26

# TABLE OF AUTHORITIES

*Page(s)*

*In re NJOY, Inc. Consumer Class Action Litig.*,
120 F.Supp.3d 1050 (C.D.Cal. 2015)..................................................24

*In re Takata Airbag Prods. Liab. Litig.*,
No. 15-MD-02599, 2023 WL 4925368 (S.D.Fla. June 20, 2023), *as modified*,
2023 WL 5626562 (S.D.Fla. Aug. 24, 2023) .........................................25

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs. & Prods. Liab.
MDL*,
No. 8:10ML2151 JVS (FMOx), 2012 WL 7802852 (C.D.Cal. Dec. 28, 2012) .....34

*James v. Uber Techs., Inc.*,
338 F.R.D. 123 (9th Cir. 2010)..........................................................24

*Just Film, Inc. v. Buono*,
847 F.3d 1108 (9th Cir. 2017) .......................................................25, 26

*Keegan v. Am. Honda Mot. Co., Inc.*,
838 F.Supp.2d 929 (C.D.Cal. 2012) ...............................................30, 31

*Keegan v. Am. Honda Motor Co.*,
284 F.R.D. 504 (C.D.Cal. 2012).....................................................25, 29

*Kumar v. Salov N. Am. Corp.*,
Case No.: 14-CV-2411-YGR, 2016 WL 3844334 (N.D.Cal. July 15, 2016) .........31

*Marsikian v. Mercedes-Benz USA, LLC*,
No. CV 08-4876 AHM (JTLx), 2009 WL 8379774 (C.D.Cal. May 4, 2009) ........31

*Mazza v. Am. Honda Motor Co.*,
666 F.3d 581 (9th Cir. 2012)............................................................24

*Mednick v. Precor, Inc.*,
320 F.R.D. 140 (N.D.Ill. 2017) ........................................................35

*Miller v. Ford Mot. Co.*,
620 F.Supp.3d 1045 (E.D.Cal. 2022) .................................................31

*Miller v. Fuhu Inc.*,
No. 2:14-cv-06119-CAS-AS, 2015 WL 7776794 (C.D.Cal. Dec. 1, 2015) ..........33

*Moore v. Ulta Salon, Cosmetics & Fragrance, Inc.*,
311 F.R.D. 590 (C.D.Cal. 2015).......................................................33

*Mui Ho v. Toyota Mot. Co.*,
931 F.Supp.2d 987 (N.D.Cal. 2013)...................................................31

*N. Cypress Med. Ctr. Operating Co., Ltd. v. Aetna Life Ins. Co.*,
898 F.3d 461 (5th Cir. 2018) ..........................................................30

v

# TABLE OF AUTHORITIES

*Page(s)*

*Nguyen v. Nissan N. Am., Inc.,*
    932 F.3d 811, 821 (9th Cir. 2019) ...............................................26, 32, 33

*Nuwer v. FCA US LLC,*
    No. 20-60432-CIV, 2023 WL 2388353 (S.D.Fla. Feb. 3, 2023) .......................26

*Parkinson v. Hyundai Motor Am.,*
    258 F.R.D. 580 (C.D.Cal. 2008).........................................................29

*Parsons v. Ryan,*
    754 F.3d 657 (9th Cir. 2014) ............................................................25

*Petersen v. Costco Wholesale Co.,*
    312 F.R.D. 565 (C.D.Cal. 2016)..........................................................28

*Quackenbush v. Am. Honda Motor Co., Inc.,*
    No. 20-05599, 2021 WL 6116949 (N.D.Cal. Dec. 27, 2021) ....................29, 33

*Rai v. Santa Clara Valley Transp. Auth.,*
    308 F.R.D. 245 (N.D.Cal. 2015) .........................................................34

*Rikos v. Procter & Gamble Co.,*
    No. 1:11-cv-226, 2014 WL 11370455 (S.D.Ohio June 19, 2014) .......................34

*Rosen v. J.M. Auto, Inc.,*
    270 F.R.D. 675 (S.D.Fla. 2009)..........................................................25

*Salas v. Toyota Mot. Sales, U.S.A.,*
    No. CV 15-8629 FMO (Ex), 2019 WL 1940619 (C.D.Cal. Mar. 27, 2019)...........33

*Scott v. Calif. Forensic Med. Grp.,*
    No. 216CV03084DSFRAOX, 2020 WL 10501243 (C.D.Cal. Sept. 30, 2020)26, 27

*Shields v. Bridgestone/Firestone, Inc.,*
    232 F.Supp.2d 715 (E.D.Tex. 2002) ....................................................32

*Sloan v. Gen'l Mot. LLC,*
    287 F.Supp.3d 840 (N.D.Cal. 2018)......................................................30

*Speerly v. Gen'l Mot., LLC,*
    343 F.R.D. 493 (E.D. Mich. 2023).................................................28, 29, 31

*Spence v. Glock, GES.m.b.H.,*
    227 F.3d 308 (5th Cir. 2000) ............................................................35

*Steigerwald v. BHH, LLC,*
    CASE NO. 1:15 CV 741, 2016 WL 695424 (N.D.Ohio Feb. 22, 2016)................35

vi

# TABLE OF AUTHORITIES

*Page(s)*

*Tait v. BSH Home Appliances Corp.*,
289 F.R.D. 466 (C.D.Cal. 2012)........................................................*passim*

*Torres v. Mercer Canyons Inc.*,
835 F.3d 1125 (9th Cir. 2016) ..............................................................25

*Tyson Foods, Inc. v. Bouaphakeo*,
577 U.S. 442 (2016)......................................................................28, 29

*United Steel, Paper & Forestry, Rubber, Mfg. Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO, CLC v. ConocoPhillips Co.*,
593 F.3d 802 (9th Cir. 2010) ...............................................................23

*Vine v. PLS Financial Services, Inc.*,
331 F.R.D. 325, 337 (E.D.Tex. 2019) ................................................28, 29

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011)......................................................................33, 34

*Wolin v. Jaguar Land Rover N. Am., LLC*,
617 F.3d 1168 (9th Cir. 2010) ........................................................*passim*

*Yamada v. Nobel Biocare Hldg. AG*,
275 F.R.D. 573 (C.D.Cal. 2011).............................................................25

Rules

Fed. R. Civ. P.Rule 23(a)....................................................................28

Fed. R. Civ. P. 23(a)(1) ......................................................................25

Fed. R. Civ. P. 23(a)(2).......................................................................25

Fed. R. Civ. P. 23(b) .........................................................................33

Fed. R. Civ. P. 23(b)(3)....................................................................33, 43

Other Authorities

2 Newberg on Class Actions § 4:47 (6th ed.) ..........................................33

# I    <u>INTRODUCTION</u>

On January 5, 2020, Kara Damori, a Ford F-250 "Super Duty" owner from Wyoming, sent an email to William Clay Ford, Ford's executive chairman and the great-grandson of company founder Henry Ford. She thundered that her family's truck had "become almost undriveable, instantly [going] into a death wobble every time I drive over a bridge or drive over a bump on the interstate . . . ."[1] The "death wobble" Ms. Damori referenced is every bit as scary as it sounds. The wheels tramp back and forth on the pavement, creating a shake and rumble in the cab. The steering wheel oscillates, pulling back and forth (often violently) as the driver attempts to control the vehicle, itself a difficult task when the truck is shaking violently.

Ms. Damori must have been shocked that Ford would sell her family a vehicle that would place it in such peril. But surely, Ms. Damori would have been even more shocked to find out how much Ford knew before she even sent her email. As it turns out, Ford had known for decades that its Super Duty trucks had a propensity to Death Wobble under common road conditions. Ford could not find a solution for all that time, and so it hid the problem as best it could: Even a formal National Highway Traffic Safety Administration investigation, opened after dozens of complaints about the Death Wobble, ended when Ford claimed the problem would be solved by the red herring of increasing tire pressure.

When it was sent, Ms. Damori's email was just the latest complaint out of thousands made over the years about the Death Wobble. But what was different was the email's recipient—the direct descendent of the company's famed founder. It was only after Ms. Damori elevated the issue to Henry Ford's scion that Ford finally abandoned piecemeal measures and public obfuscation to address the Death Wobble's root causes. It did so too late, however, for Ms. Damori, Plaintiffs, and thousands of other purchasers to whom Ford knowingly sold defective vehicles. They now seek the damages resulting from Ford's

---

[1] Declaration of David C. Wright ("Wright Decl."), Ex. 1.

Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Class Certification
Case No. 3:19-cv-01082-AJB-AHG

actions. Class certification is the most efficient and appropriate way for all affected truck owners to obtain relief.

## II    FACTS

**A.    The Class Vehicles[2] Share a Common Design and Suspension Defect**

Ford uses a "monobeam" axle on F-250 and F-350 4x4 "Super Duty" trucks, which rigidly connects the two front wheel and tire assemblies. Wright Decl., Ex. 2 at 95:22-96:12, 118:22-120:23; Declaration of Peter J. Leiss ("Leiss Decl."), Ex. 1, ¶ 16. When one wheel encounters a road impact, it excites tramp in the axle. *Id.*, ¶¶ 24-26. The resulting camber change induces steering torque due to the gyroscopic effect of the rotating wheels and tires. *Id.*, ¶¶ 25, 60. Because the wheels are connected, the gyroscopic effect is additive, causing vertical and lateral forces to react through the tires. *Id.*, ¶ 25. When these forces are underdamped, "shimmy" results.[2] *Id.* Shimmy is self-sustaining and only the driver can eliminate it, usually by reducing the vehicle's speed. *Id.*, ¶¶ 26-28; Wright Decl., Ex. 3 at 73:13-74:4; Ex. 4.

Ford has been aware of shimmy in its trucks for decades, even though REDACTED [black redaction bar] *Id.*, Ex. 3 at 85:10-86:17, 87:7-23, 88:11-19, 105:7-23; Ex. 5 at 112:3-18, 125:8-8, 138:1-13. Not only is shimmy uncomfortable for the driver and passengers, it poses a danger by initiating a loss of control that makes steering and acceleration a danger. Leiss Decl., Ex. 1, ¶¶ 113-121; Declaration of Francisco Biondi ("Biondi Decl."), ¶¶ 22, 24, 27-38. It also poses a surprise and a distraction, requiring drivers to direct their attention to the oscillation itself. *Id.*, ¶¶ 19-22, 24-25, 27-38; Leiss Decl., Ex. 1, ¶¶ 116-117. These dangers are compounded by the shimmy's sudden, unannounced onset. Biondi Decl., ¶¶ 16, 22, 25, 28.

Ford installs a steering damper[3] on each Super Duty vehicle for the purpose of

---

[2] The proposed Class and Class Vehicles are defined in the motion for class certification this brief supports.

[3] A steering damper is a shock absorber allowing for similar damping forces to ensure that steering efforts are similar when turning right or left. Because it is installed horizontally,

preventing shimmy.[4] Wright Decl., Ex. 6 at 62:7-63:1; Ex. 3 at 77:17-24. Ford changed the damper's placement beginning with its 2005 model year vehicles. *Id.*, Ex. 2 at 120:24-121:7; Leiss Decl. Ex. 1, ¶ 48. Before 2005, Ford had mounted the damper on the axle. *Id.* But Ford REDACTED Wright Decl., Ex. 2 at 137:5-139:3; Ex. 4. Rather than locate the damper above or behind the tie-rod, Ford moved the damper between the draglink and frame, away from the axle and less likely to be effectively dampen the forces created by the monobeam axle. Leiss Decl., Ex. 1, ¶ 48. And, in fact, at least one engineer at the time concluded that the new damper would REDACTED Wright Decl., Ex. 7. Instead, it was a REDACTED *Id.*

**B.   Ford's Common Knowledge and Deception**

Ford has spent nearly two decades covering up the Death Wobble and its root causes, misleading thousands of truck owners as a result. The cover-up survived four generations of F-series Super Duty trucks: the P131 (comprised of MY 2005-2007 vehicles), the P356 (MY 2008-2010 vehicles), the P473 (MY 2011-2016 vehicles), and the P558 (MY 2017-2019 vehicles). While each generation had a few minor differences, all shared the same defect—an insufficient damping system—causing the same shimmy effect. Leiss Decl., Ex. 1, ¶ 48. Therefore, each generation had the defect in common. *Id.*, ¶¶ 15-16, 20-28.

Ford redesigned the vehicles' front suspension in anticipation of the 2005 model year. Wright Decl., Ex. 7; Ex. 2 at 59:3-20. As it approached this redesign, Ford knew that shimmy had been a problem on previous F-series lines and could be again. *Id.*, Ex. 8 at 41:15-42:24; Exs. 9, 10. The shimmy was REDACTED though Ford REDACTED

---

air bubbles can be introduced into the damper's main body. When air is present, the damper may have little to no damping effect, a phenomenon called damper lag. A damper with lag is akin to an undamped steering system, which allows shimmy to occur. Leiss Decl., Ex. 1, ¶ 26.
[4] The Ford F-150 uses an independent front suspension, and Ford has received no reports of shimmy on it at all. *Id.*, Ex. 2 at 102:6-8.

1   **REDACTED** [5] *Id.*, Exs. 10, 11. It did know, however, that the dampers

2   were failing. *Id.*, Exs. 12, 13, 14. By May 2004, Ford was discovering a **REDACTED**

3   **REDACTED** *Id.*, Ex. 15. The failed damper increased the propensity for shimmy, in

4   turn causing additional misalignment of various parts of the suspension system. *Id.*, Exs.

5   12, 13, 16.

6       Reports of oscillation began immediately after Ford began selling the P131. By

7   January 2005, shimmy complaints were so voluminous that one engineer **REDACTED**

8   **REDACTED** *Id.*, Exs. 19, 20. Ford

9   issued a TSB in October 2005, but did not warn the public or cover the costs of repair.[6] *Id.*,

10  Exs. 21A, 21B, 22. Ford also began tracking online comments about shimmy. *Id.*, Ex. 23.

11      These reports convinced Ford engineers developing the succeeding P356 **REDACTED**

12  **REDACTED** [7] *Id.*, Ex. 24

13  **REDACTED**

14  **REDACTED** ); Leiss Decl., Ex. 1, ¶¶ 24, 131-138. Switching was **REDACTED**

15  **REDACTED**

16  **REDACTED** Wright Decl., Exs. 25, 26, 27, 28. **REDACTED** included improvement in

17  **REDACTED** *Id*. But while Ford's engineers **REDACTED**

18  **REDACTED** *Id.*; *see also id.*,

19  Ex. 29 at 209:20-212:15; Ex. 30. Ford had little evidence to support these concerns,

20  particularly among non-commercial purchasers.[8] *Id.*, Exs. 26, 28. Nevertheless, Ford opted

21  to continue using the existing monobeam axle suspension design.[9]

22

23

---

24  [5] Ford employees do not uniformly **REDACTED** .
    *See id.*, Ex. 2 at 79:17-82:15; Ex. 5 a ;
    Ex. 17 at 145:22-148:16; Ex. 18 at 20:23-23:1, 55:20-56:17.

25  [6] A TSB is a direct communication between a manufacturer and service centers describing
    a specific problem with a vehicle, usually with an explanation for correcting the issue.

26  [7] An independent front suspension, or "short/long arm" (SLA) design, allows each wheel

27  to respond independently to roadway undulations and impacts. Leiss Decl., Ex. 1, ¶¶ 24,
    131-138. Automobiles with an SLA suspension generally do not experience shimmy. *Id.*
    [8] Ford did not ask any non-commercial custom

28  [9] As late as May 2022, Ford engineers were **REDACTED** .
    *Id.*, Exs. 27, 31; *see also* Leiss Decl., Ex. 1, ¶¶

As shimmy complaints increased, Ford issued six successive TSBs addressing Death Wobble, with the purpose of managing the crisis while minimizing warranty expenses. The first TSB (04-26-01), issued in 2004, called for inspecting the Tenneco steering damper but only authorized replacement (with the same defective damper) if it was leaking. *Id.*, Ex. 32. The next TSB, 05-22-01, recommended reducing the front caster. *Id.*, Ex. 22. When this proved ineffective, Ford directed technicians to adjust the tire pressure to specification and conduct an unspecified "road test." *Id.*, Ex. 33. Unless shimmy was detected on this "road test," no additional inspection or repairs were performed, thereby reducing the number of vehicles requiring warranty repairs.

In March 2007, Ford finally recommended replacing all Tenneco dampers with a new damper developed for the P356 (and regardless of whether or not the OEM damper was leaking), but only if the technician could replicate a shimmy event during the still unspecified road test. *Id.*, Ex. 34. Two months later, TSB 07-10-10 removed all explicit references to the part numbers for the P356 damper and frame bracket, making it more difficult to understand that it called for a damper replacement. *Id.*, Ex. 35. While each TSB contained slightly different ways to address shimmy, they shared three things in common: 1) each limited the opportunity for repair on vehicles falling outside Ford's limited warranty period; 2) none disclosed the Death Wobble to Super Duty owners; 3) and each applied only to the narrow category of Super Duty owners reporting a previous shimmy experience to an authorized Ford dealer.

## C.    NHTSA's Investigation of the P131

In 2007, the National Highway Traffic Safety Administration (NHTSA) had already received dozens of complaints about shimmy, causing it to open an investigation. *Id.*, Ex. 36; *see also* Leiss Decl., Ex. 1, ¶ 41.[10] NHTSA's testing demonstrated that damper

---

[10] Ford had received 1,863 complaints and information regarding three crashes caused by the shimmy when the NHTSA investigation began. Leiss Decl., Ex. 1, ¶ 41.

functionality contributed significantly to the shimmy.[11] *Id.*, ¶ 42-44. But implementing a permanent fix for the suspension system would have been time-consuming, expensive, and potentially embarrassing. Wright Decl., Exs. 37, 38. As a result, Ford shifted the blame to truck owners, claiming they were "intentionally lowering the tire pressures" on their vehicles, thereby causing the shimmy. *Id.*, Ex. 37. It adopted this position even though it was conducting, at the same time as the NHTSA investigation, at least a partial silent recall of the OEM Tenneco dampers. *Id.*, Ex. 34. Despite recognizing the inadequate damper's role in causing the Death Wobble, Ford was at the same time representing to NHTSA and truck owners that the Death Wobble's root cause was inadequate tire pressure and lack of adequate maintenance by Super Duty owners. *Id.*, Ex. 37. Indeed, the NHTSA investigation resulted in Ford merely sending owners a notice about the "importance of maintaining proper tire pressure to prevent shimmy." *Id.*, Ex. 39. Nevertheless, only months after placating NHTSA, Ford was again discussing oscillation, precisely because Ford had avoided addressing the root causes of shimmy. *Id.*, Ex. 40.

**D.     The P356 and P473 Models Exhibit Oscillation**

Ford decided to change the steering damper's manufacturer for the P356, switching from Tenneco to Tokico, a Hitachi subsidiary. *Id.*, Ex. 41. The change led to fewer shimmy reports, though some reports continued. *Id.*, Ex. 42. The same was true of the P473, though reports increased in 2011. *Id.*, Ex. 43. Ford had already dismissed NHTSA by blaming tire pressure, so it continued to fault REDACTED *Id.*, Ex. 44. While the Hitachi dampers performed better within the vehicles' warranty period, Ford was well aware that its trucks would exhibit strong oscillation events REDACTED *Id.*, Ex. 45.

**E.     Ford Designs the P558 Model**

---

[11] Subsequent analysis suggests that the shimmy had multiple influences including scrub radius, design choices, steering box mesh load, and ball joint and tie rod friction. Leiss Decl., Ex. 1 at ¶ 46. But ineffective system damping is ultimately what causes these forces to result in shimmy. *Id.*

6

1    In 2011, Ford readied another Super Duty redesign, this time for the P558 (MYs

2  2017-2019). Overall, the P558 front end re-design proved to be ▮▮▮▮▮▮ *Id.*, Ex. 46. Ford

3  had to address multiple issues, pushing the shimmy even further down the priority list than

4  usual. *Id.*, Ex. 6 at 35:15-36:7. For instance, in September 2012, Ford's ▮▮▮▮▮▮▮▮

5  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

6  ▮▮▮▮▮▮▮▮▮▮▮ *Id.*, Exs. 47, 48. Slow progress increased development costs and

7  led to at least one ▮▮▮▮▮▮▮▮ over its progress. *Id.*, Ex. 49. On top of this, Ford

8  elected to return to Tenneco for damper production, despite its history of ▮▮▮▮▮▮

9  ▮▮▮▮▮ *Id.*, Ex. 50; Ex. 2 at 237:12-239:15. But Ford was behind on development and

10  did not have time for Hitachi to provide certain data. As a result, Ford selected Tenneco to

11  supply the P558 damper, with one executive ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

12  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.*, Ex. 51, 52.

13    Ford ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ For

14  example, Ford began ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

15  ▮▮. *Id.*, Exs. 53, 54, 55. This prompted one engineer to complain that Ford needed ▮▮▮▮

16  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id.*, Ex. 56. As he put it, ▮▮▮

17  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

18  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

19  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[12] *Id.*

20    A ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ followed. *Id.*, Ex. 57. Soon

21  thereafter, a Ford executive stated that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

22  and remarked that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.*, Ex. 58. Still, a Ford

23  employee observed that ▮▮▮▮▮▮▮▮▮▮▮▮

24  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.*, Exs. 59, 60.

25    By May 2015, the team ▮▮▮▮▮▮▮▮▮▮▮▮ *Id.*, Exs.

26  61, 62. But it was not going to simply ▮▮▮▮▮▮ because Ford was using the same systems

27

28  _____

[12] ▮en increased reports of shimmy arose in 2017, Ford claimed the problem was ▮▮▮▮
▮▮▮ *See, e.g., id.*, Ex. 148.

7

in the P558 as it had in the P473. Wright Decl., Ex. 65. One engineer groused that ██████

██████████████████████████████████████████████████████████████

██████ *Id.*, Ex. 63. Ford reviewed **REDACTED**██████████

████████████████████████ *Id.*, Ex. 64; *see also* Leiss Decl., Ex. 1, ¶¶ 38-

39. Engineers **REDACTED**████████████████████████████████

████████████████████████████ *Id.*, Exs. 66, 67. But having been

ordered to move it away from the axle, **REDACTED**██████████

██████████████ [13] *Id.*, Exs. 68, 69, 70.

On July 6, 2015, Ford management announced **REDACTED**██████

██████████████ *Id.*, Ex. 71. But the July deadline also slipped. One engineer, noting

that **REDACTED**██████████████████████████████████████████

████████████████████████ *Id.*, Ex. 72. Unfortunately,

the design changes Ford made to the front suspension more likely induced shimmy than

prevented it. Leiss Decl., Ex. 1, ¶¶ 39-43. So it was unsurprising when a P558 test driver

in August 2015 reported that **REDACTED**██████████████████

██████████████████████████████████████ Wright Decl., Ex.

73. Internal test drivers similarly complained about **REDACTED**██████

**REDACTED**████████████████████ and **REDACTED**██████████ *Id.*,

Ex. 74. But Ford moved forward with production anyway. *Id.*, Ex. 75.

Ford even **REDACTED**██████████████████. In December 2015, an engineer

noted that **REDACTED**██████████████ *Id.*, Ex. 76. Soon thereafter, the P558's

lead Vehicle Dynamics engineer expressed concern **REDACTED**██████

████████████████████████████████████████████████████[14]

*Id.*, Ex. 77. And test drivers continued to report **REDACTED**████ and **REDACTED** through early

---

[13] Tire pressure was not identified as a root cause of Death Wobble in the P558, though
Ford cannot show that P131 truck owners had lower rates of compliance with Ford's tire
pressure recommendations than any other generation of **REDACTED**██████████████
████████████████████████

1   2016. *Id.*, Exs. 78, 79, 80, 81, 82. Ford rushed REDACTED

2   . *Id.*, Ex. 83. By March 2016, Ford knew REDACTED

3   *Id.*, Ex. 88.

4   **F.    P558 Buyers Overwhelm Ford with Complaints About "Death Wobble"**

5       When Ford began selling the P558 later that year, reports of oscillation began

6   flooding in. In February 2018, Ford promoted reports of REDACTED to REDACTED

7   *Id.*, Ex. 89. Soon thereafter, Ford added REDACTED

8

9   *Id.*, Ex. 17

10  at 183:12-184:13, 204:2-16; Exs. 90, 91.

11      The CCRG discussion reinforced Ford's internal familiarity with what was already

12  a long-standing problem. One individual confirmed that REDACTED had REDACTED

13  *Id.*, Exs. 92, 93. Engineers rediscovered a REDACTED

14  *Id.*, Ex. 94. Another engineer

15  REDACTED . *Id.*, Ex. 95; *see also* Leiss Decl. Ex. 1,

16  ¶¶ 131-138. And another acknowledged REDACTED

17  Wright Decl., Exs. 96, 97. So, the problem got worse. *Id.*, Exs. 98, 99,

18  100. One dealer reported that REDACTED

19  *Id.*, Ex. 101. REDACTED

20  *Id.*, Ex. 102.

21      Ford did attempt to REDACTED

22

23

24  *Id.*,

25  Exs. 93, 103, 104. Indeed, this was the exact problem Ford's engineers identified but had

26  failed to address prior to production. *See infra* p.8.

27      By April 2018, REDACTED

28  Wright Decl., Ex. 105. Ford intended to REDACTED



9

1   REDACTED

2   ███████████ But Ford also recognized REDACTED

3   ███████████   *Id.*, Ex. 106; Ex. 6 at 42:16-43:7.

4        In August 2018, Ford initiated its "interim" plan by issuing the first of several TSBs

5   acknowledging "sustained steering wheel oscillation" in certain 2017-2018 model vehicles.

6   Id., Ex. 107. Though Ford internally recognized REDACTED

7   ████████, TSB 18-2268 directed dealers to address Death Wobble complaints by replacing

8   existing dampers with a new Tenneco damper manufactured after May 2018. *Id.* Ford failed

9   to disclose the inherent flaws in this ████ or that TSB 18-2268 was an "interim"

10  containment action. Meanwhile, Ford dealers and customers REDACTED

11  ███████████████████   *Id.*, Exs. 108, 109.

12       Ford decided to REDACTED

13  but continued to conceal this information from current owners and prospective buyers. *Id.*,

14  Ex. 110. In September 2019, Ford instructed dealers to address customer complaints by

15  installing Tenneco damper HC3Z-3E651-D but failed to disclose REDACTED

16  ███████████████████   *Id.*, Ex. 111.

17  Nevertheless, Ford continued to receive reports of Death Wobble. One Ford manager

18  reported REDACTED

19  ███████████████   *Id.*, Ex. 103. Overall, approximately REDACTED

20  ███████████████████

21  ███████████   *Id.*, Ex. 112.

22       This progression of misleading TSBs reveals the same strategy Ford used to avoid

23  NHTSA scrutiny a decade earlier. At this point, Ford again issued TSBs calling for

24  inspection of the OEM Tenneco steering dampers, but authorizing replacement only if lag

25  was observed ***and*** the owner had made no aftermarket modifications. *Id.*, Exs. 113, 114.

26  When these remedies proved ineffective, Ford issued superseding TSBs calling for a

27  damper replacement (with a re-designed Tenneco damper), but only after the owner paid

28  to remove all after-market modifications to the chassis, suspension, and steering systems.

---

10

Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Class Certification
Case No. 3:19-cv-01082-AJB-AHG

*Id.*, Exs. 115, 116. And after all that, Ford issued superseding TSB 19-2392, finally instructing dealers to wait on any damper installation until a newly designed Hitachi damper became available. *Id.*, Ex. 117. Again, Ford (1) sought to avoid paying for repairs on vehicles falling outside Ford's limited warranty period; 2) did not disclose the known Death Wobble problem to Super Duty owners; 3) and only applied resolutions to Super Duty owners who reported a shimmy experience to an authorized Ford dealer.

Ms. Damori's January 2020 email finally changed Ford's piecemeal approach to the Death Wobble, but too late for most Super Duty buyers. *Id.*, Ex. 118; Ex. 17 at 255:9-256:9. As of March 2020, Ford had received nearly REDACTED ███████████ ████████████████████████████ *Id.*, Ex. 119. At the same time, it had calculated ██ █████████████████████████████████████ *Id.*

In April 2020, more than 15 years after Ford first learned about the propensity of its Super Duty trucks to experience Death Wobble, Ford introduced "Customer Satisfaction Program 2N04" (CSP 2N04) acknowledging to owners for the first time that the Death Wobble was the result of inability of the equipped steering damper to prevent shimmy and offering to replace the damper for those who experienced the oscillation and requested the change, while extending the warranty on the damper to cover future events. *Id.*, Ex. 120. Those seeking a replacement damper would receive part number KC3Z-3E651-B, the damper Hitachi had manufactured for the P473. *Id.*, Ex. 121. As a result, consumer complaints to NHTSA decreased, though they continued at a relatively high rate.[15] *Id.*, Exs. 42, 43. Moreover, Ford's 2020 and 2021 F-250 and F-350 trucks—manufactured and produced with KC3Z-3E651-B as a production part—continued to experience substantial

_____

[15] Using the same search terms Ford has internally used to identify shimmy-related NHTSA complaints, 4,951 complaints have been identified in the NHTSA database as pertaining to Class Vehicles and were received between March 10, 2005 and September 7, 2023. Of those complaints, 771 pertained to the P131, 242 to the P356, 1,183 to the P473, and 2,755 to the P558. Wright Decl., ¶ 9.

1   numbers of oscillation-related warranty claims. *Id.*, Exs. 146, 150. Dealers and customers

2   were concerned KC3Z-3E651-B was ███REDACTED███ particularly because owners with

3   the new damper continued experiencing the Death Wobble. *Id.*, Exs. 122; 123.

4        Because of the ongoing complaints, NHTSA continued to pressure Ford, and it could

5   no longer shift the blame. It finally had to accept the reality its customers had been trying

6   to communicate for nearly two decades: the Death Wobble was caused by a defect Ford

7   had too long ignored.

8   **G.   Ford Quietly Releases a Larger Damper and Lowers Caster Settings**

9        Ford ███REDACTED███

10   ███████████████████████████ *Id.*, Ex. 124. KC3C-3E651-DF, which Ford

11   internally called its ███REDACTED███ [16] This damper is larger than previous models,

12   is equipped with a sump cap, and appears more capable of dampening throughout its design

13   life, in contrast to earlier, inadequate versions used on the Class Vehicles. Leiss Decl. Ex.

14   1, ¶¶ 85, 102.

15        Ford also found that the front axles for the P558 Class Vehicles had been built to the

16   high side of the specification window for caster angle, which increased the vehicle's

17   propensity for shimmy. *Id.*, ¶ 88. For the 2020 F-250/350s, Ford reduced caster beyond

18   even what earlier TSBs had recommended. *Id.* Again, Ford failed to notify Class Vehicle

19   owners and its dealers of the need for further caster reduction to prevent shimmy.

20        Even so, Ford has not disclosed to the public that the earlier, smaller diameter

21   dampers and caster settings on previous vehicle models and recommended as a fix in CSP

22   2N04 have been (and still are) ineffective, nor has it made truck owners whole for

23   knowingly selling defective vehicles with an increased propensity for shimmy.

24   **H.   Proposed Field Remedy for the Defect**

25        While it remains to be seen whether Ford's ███REDACTED███ damper will withstand

26   the test of time, Mr. Leiss's independent testing indicates that the damper is sufficiently

27

28

---

[16] *See* Wright Decl., Exs. 147, 148.

Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Class Certification
Case No. 3:19-cv-01082-AJB-AHG

1  capable of damping oscillations and preventing air from entering the pressurized tube and

2  creating lag. *Id.*, ¶¶ 99-112. Moreover, it appears that NHTSA has received no Death

3  Wobble complaints for the 2022 and 2023 4x4 F-250s and F-350s, many of which

4  utilized the REDACTED damper as a production part. *See* Wright Decl., Ex. 124.

5       To make the REDACTED damper available as a service part for the 2005-2021 F-

6  250 and F-350 4x4 vehicles, Ford has created a service kit (brackets, fasteners, bolts,

7  etc.). Accordingly, Mr. Leiss has identified the replacement and use of Ford's kitchen

8  sink damper service kit and caster adjustments as a feasible and adequate remedy to

9  resolve the Suspension Defect in the Class Vehicles. Leiss Decl., Ex. 1, ¶¶ 139-141.

10  **I.   Common Damages to All Class Members**

11       While the defect is the same in all Class Vehicles—Ford's damping system

12  insufficiently dampens the forces created by the monobeam axle—more shimmy incidents

13  were reported within the Class Vehicles' 3-year/36,000-mile warranty period for the P131

14  and the P558. Wright Decl., ¶ 9; Exs. 43, 44. Nevertheless, both the P356 and P477 also

15  exhibited shimmy, but particularly after the warranty expired. Wright Decl., Ex. 104

16  REDACTED

17  ); Leiss Decl., Ex. 1, ¶¶ 50-51. This was the case despite

18  Ford's REDACTED

19  *Id.*, ¶¶ 39, 47, 127-128.

20       Plaintiffs have retained multiple experts to calculate class-wide damages. One

21  methodology is that the Class can recover on a benefit-of-the-bargain basis. These damages

22  make the Class whole by restoring the difference between the amount purchasers paid for

23  the vehicle, and its actual market value with the defect intact. Declaration of Edward

24  Stockton ("Stockton Decl."), Ex. 1, ¶¶ 15-17, 37, 41. Mr. Stockton can calculate these

25  damages in the context of a "repair cost model" (or "RCM"), which calculates purchasers'

26  overpayment in the context of the cost to remedy the Defect at acquisition. *Id.*, ¶¶ 10, 40-

27  56. After a competent repair is identified, Mr. Stockton estimates the parts and labor costs

28  of repair. *Id.*, ¶¶ 11, 40-56. He can then calculate Class members' economic harm. *Id*.

As an alternative, Plaintiffs have retained Steven Gaskin and Colin Weir to conduct a conjoint analysis to assess overpayment damages—i.e., the reduction in economic value to purchasers resulting from the defect's non-disclosure prior to purchase. *See* Declaration of Steven Gaskin ("Gaskin Decl."), ¶¶ 7-11; Declaration of Colin Weir ("Weir Decl."), Ex. 1, ¶ 15. Conjoint analysis enjoys wide use and acceptance in marketing and economics. It presumes that the market value for a product is driven by the features, or descriptions of features, embodied within the product. *See* Gaskin Decl., ¶ 16; Weir Decl., Ex. 1, ¶ 16-19. In a conjoint analysis, consumers are shown sets of product profiles with varying features and asked to indicate their preferred product profile. *See* Gaskin Decl., ¶¶ 16, 19-23. They are then asked to indicate how much they would pay for a given set of features. *Id*., ¶ 16. After their study is complete, consumer responses can be assessed to determine the market value consumers will ascribe to a truck without the defect as compared to a truck with the defect disclosed before their purchase. *See id.*, ¶¶ 2, 8-11, 16-24; Weir Decl., Ex. 1, ¶¶ 16-19, 32, 55-59. They can then calculate the impact on economic value that consumers would assign to a truck with the defect, as opposed to a truck without the defect. *Id.*

### III      PLAINTIFFS

**A.      William Lessin (CA)**

Plaintiff William Lessin purchased a new 2011 Ford F-250 in June 2010. Wright Decl., Ex. 126 at 12:6–22. Though Mr. Lessin did internet research and test drove several F-250 vehicles, no one informed him about the defect or the Death Wobble before his purchase. *Id.* at 53:23–54:19.

Lessin first experienced the Death Wobble in early 2015. *Id.* at 53:23–54:19; 78:6–15. After his truck began to shake, he slowed its speed to 40-45 mph, to "settle[] out" the oscillation. *Id.* at 66:9–67:5. According to Mr. Lessin, a retired truck driver, it was the first time he experienced an oscillation in any vehicle. *Id.* at 72:19–22. A dealer inspected the vehicle but could not duplicate the issue. *Id.* at 75:13–76:2.

Lessin encountered the wobble "six to eight" additional times before visiting a second Ford dealer. *Id.* at 80:19–81:10. In each case, Lessin was forced to slow to 35 or 40

mph to stop the wobble. *Id.* at 89:15–18. In April 2018, a technician told him "you've got the death wobble" and that other trucks had similar "issues." *Id.* at 98:21–99:19. Several suspension components—specifically, the track bar bushing and the steering damper— had also worn out. *Id.* Mr. Lessin ultimately paid to replace the vehicle's front suspension tie, steering damper, and ball joints. *Id.*

Mr. Lessin returned a few days later after another incident. *Id.* at 102:6–20. The dealer could not diagnose the problem. In June 2018, Mr. Lessin reported another experience of Death Wobble. As a result, he paid to replace the front shock absorber assembly. *Id.* at 112:16–113:9. But the Death Wobble continued. *Id.* at 124:15–125:13.

## B.   Patrick and Sheri Powers (CA)

On July 1, 2019, Patrick and Sheri Powers[17] purchased a 2019 F-250 in Vista, California. Wright Decl., Ex. 127 at 49:9-50:9. In October 2019, Patrick experienced the Death Wobble. *Id.* at 79:5–80:8. In January 2020, after a long wait for the parts, North County Ford installed a new steering stabilizer. *Id.* at 84:19–85:5.

Soon thereafter, Sheri experienced the Death Wobble. *Id.,* Ex. 128 at 56:7-61:11. After an inspection, a service technician verified the Death Wobble's existence and informed them that Ford would replace the steering damper, but the part was backordered. *Id.*, Ex. 127 at 90:21–94:4. It was finally replaced in January 2021. *Id.* at 93:19–25.

In September 2021, Patrick again experienced the Death Wobble, causing vibrations so intense he veered into the middle of the road. *Id.* at 95:1–96:3, 96:22–97:21, 100:3–5. He attempted to brake, but doing so only exacerbated the problem. Instead, he controlled the vehicle by letting the vehicle coast. *Id.* at 97:22–98:23. Unfortunately, the Death Wobble recurred a few minutes later. *Id.* at 100:6–23. After this event, Ford replaced several key suspension parts. *Id.* at 106:7–108:19.

## C.   Carol Smalley (CA)

Plaintiff Carol Smalley and her husband purchased a "Certified Pre-Owned" 2009

---

[17] The Powers have divorced since the events of this case. To distinguish between them, their first names are used. No disrespect is intended.

Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Class Certification
Case No. 3:19-cv-01082-AJB-AHG

Ford F-250 in 2012. Wright Decl., Ex. 129A at 13:8–23; 63:20–24. Prior to the purchase, Ms. Smalley reviewed the truck's window sticker, which advertised the vehicle's features, and relied on it. *Id.* The window sticker omitted all information about any defects. *Id.* at 74:19-75:3, 76:7–14. Ms. Smalley also spoke with a sales representative. *Id.* at 77:8-11, 159:6–18. No one informed Ms. Smalley of the Suspension Defect's existence prior to, or even after, her purchase. *Id.*

Between March 2012 and May 2014, Ms. Smalley's truck exhibited the Death Wobble at least eight times. *Id.* at 110:20–111:24. She describes it as a "violent shaking that you can't really control very easily." *Id.* at 15:16–24. When she took the vehicle for service, she was told that low tire pressure caused the Death Wobble. *Id.* at 115:1–20.

In February 2016, Ms. Smalley returned to obtain a specific diagnosis of the Death Wobble but the dealership could not replicate the problem. *Id.* at 120:20–121:8; 122:3-23; 124:15–24. Nevertheless, it continued to occur from time to time until she returned for service in March 2017. *Id.* at 128:16–130:13. During that visit, the technician said her brakes and rotor had caused the shaking. *Id.*

Two years later, after another Death Wobble occurrence, Ms. Smalley took the vehicle to a different dealer. *Id.* at 135:24–137:4. It removed the vehicle's upper and lower ball joints, dust seals, and track bar, installed new hub seals, replaced the steering damper, inserted a new suspension bar, and performed an alignment. *Id.* at 139:10–18. For these repairs, Ms. Smalley paid $2,296.16. Wright Decl., Ex. 129B.

Still, the Death Wobble persisted. A few months later, Ms. Smalley took the vehicle to a third-party, Auburn Auto 'N Smog. *Id., Ex.* 129A at 139:19–141:15. It found the ball joints completely missing. *Id.* at 139:24–140:13. Ms. Smalley returned to Auburn Ford to complain. *Id.* at 141:11–143:3. Auburn Ford removed the left front hub and axle, installed a snap ring, and reinstalled the parts. But Mr. Smalley returned the vehicle to Auburn Auto 'N Smog and was told Auburn Ford installed the parts wrong. *Id.* at 142:1–12. Even after the parts were installed properly, the Death Wobble continued. *Id.* at 149:9–16; 150:9–20.

---

Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Class Certification
Case No. 3:19-cv-01082-AJB-AHG

**D.    Lloyd Atterson (AZ)**

Plaintiff Lloyd Atterson purchased a used 2017 Ford F-350 in January 2018 from a Ford dealership. Wright Decl., Ex. 130 (Atterson Dep.) at 19:22–20:11. No one mentioned the Suspension Defect, nor was Mr. Atterson informed about the Suspension Defect prior to, or any time after, his purchase.

In April 2018, Mr. Atterson experienced the Death Wobble. *Id.* at 44:7–45:14. He reported that "the front end just shook violently. I was immediately scared. . . . I'm a Vietnam veteran, combat veteran, and I have been scared many times. But I have never been scared like I [was] with that truck. . . . I couldn't even control the steering wheel." *Id.* at 44:17–45:1, 69:18–71:13. The next morning, he took the Vehicle for service but the technician could find "nothing wrong." *Id.* at 82:11–83:12. He returned the next day to be told again that nothing was wrong. *Id.* at 89:10–25. Mr. Atterson then called Ford Customer Service, who advised him to obtain service at another dealership. *Id.* at 90:22–92:9. The new dealer verified Mr. Atterson's concern and adjusted the caster and toe, charging him $233.46. *Id.* at 90:22–92:9, 109:15–111:8.

Nevertheless, the truck continued to wobble. *Id.* at 111:13–112:2. In August 2019, Mr. Atterson bought a new Ford steering stabilizer, paying $155.10. *Id.* at 119:24–121:10. Ford later informed him that previous out-of-pocket costs for the steering linkage system could be reimbursed and sent a $215.10 check for the stabilizer. *Id.* at 145:12–23. But Ford denied Mr. Atterson's reimbursement for the camber adjustment. *Id.* at 153:20–25. After installing the stabilizer, Mr. Atterson had no further problems before he sold it in 2021, though he used it far less than he had before. *Id.* at 159:18–160:24.

**E.    Brad Nielsen (CO)**

Mr. Nielsen purchased a new 2017 Ford F-250 in Longmont, Colorado. Prior to his purchase, Mr. Nielsen researched materials available on Ford and Ford dealership websites and spoke to representatives at the Longmont Ford dealership. Wright Decl., Ex. 131A at 73:8–74:22; 75:15–76:13. Ford's website and the dealer representatives failed to inform Mr. Nielsen about the Suspension Defect at any time before or during his purchase.

---

17

Mr. Nielsen first experienced the "Death Wobble" in January 2019 on a two-lane Colorado road. *Id.* at 96:10-23. Unaware of the Suspension Defect, Mr. Nielsen assumed he had blown a tire because described, "the whole truck shakes violently … your seat and wheels and everything is shaking." *Id.* at 99:1–19. The event lasted for five to ten seconds until Mr. Nielsen was able to safely reduce speed to under 40 miles per hour. *Id.* at 99:19–24. In January 2019, Mr. Nielsen presented his vehicle to an authorized dealer. The service technician verified the shaking, specifically referencing the "Death Wobble" in his notes. *Id.* at 107:16–108:4; *see* Ex. 131B. The technician also identified excessive play in the vehicle's front suspension parts, including a new drag link and spindle rods. Ex. 131B. Mr. Nielsen's warranty covered the replacement of these parts. *Id.*; Ex. 131A at 110:18–21. The repairs, however, failed to resolve the Suspension Defect, which Mr. Nielsen experienced on at least four other occasions. Ex. 131A at 119:4–120:4.

## F.    David Appel (IL)

In January 2019, Plaintiff David Appel purchased a certified, pre-owned 2017 Ford F-250 from a Ford dealer in Illinois. Wright Decl., Ex. 132A at 23:16–24:5. Prior to his purchase, Mr. Appel reviewed the Ford website prior to purchasing his vehicle. *Id.* at 80:3-17. He also spoke to a salesman before purchasing the vehicle, which had been the prior owner had returned. Mr. Appel was told Ford had been through the vehicle with a "fine-tooth comb to make sure there was nothing wrong with it." *Id.* at 84:5-12.

Mr. Appel first experienced the Death Wobble in November 2019. *Id.* at 102:9–17. He explained that "you'll hit a bump and the whole front end starts vibrating side to side. And it usually—it doesn't stop until you drop way below the highway speeds you're traveling at." *Id.* at 32:5–12. In December 2019, he presented the vehicle to a certified service provider. *Id.* at 111:8–112:17. The technicians determined that the problem was covered by a TSB recommending a damper replacement, but the part was back ordered. *Id.* at 112:21–113:19. Because of the danger the Death Wobble posed, Mr. Appel ordered the damper himself and paid for the repairs. *Id.* at 118:18–120:8, 126:11–128:7. But a few months later, he again experienced the Death Wobble. In April 2020, he again replaced the

18

damper, this time with Ford's "redesigned" damper (part number KC3Z-3E651-B) pursuant to Ford's customer satisfaction program. *Id.* at 140:14–141:24; *id.*, Ex. 132B.

In March 2021, Mr. Appel experienced the Death Wobble and presented the vehicle to another Ford service center. Wright Decl., Ex. 132A at 145:5–25, 151:6–23. The technician determined that a worn-out draglink and trackbar caused the Death Wobble, replacing them at a cost of $474. *Id.* at 154:12-154:22; *id.*, Ex. 132C. Despite these repairs, Mr. Appel continued to experience the Death Wobble. *Id.*, Ex. 132A at 157:13–17.

**G.    John Kigin (IN)**

Plaintiff John Kigin purchased a used 2017 Ford F-250 from an authorized Ford dealership in Indiana. Prior to his purchase, Mr. Kigin reviewed the sticker Ford placed in the vehicle's glove box, which advertised its various features. Wright Decl., Ex. 133A at 111:15-113:13; Ex. 133B. He relied on the sticker's representations when purchasing the vehicle. *Id.*, Ex. 133A at 113:22-114:7. He also looked at the truck's owner manual before purchasing the truck. *Id.*

Mr. Kigin experienced the Death Wobble for the first time in September 2019. *Id.* at 173:15–174:9. The truck began to shake so hard he thought "something was going to fly off [the] truck." *Id.* at 174:15–177:6. The shaking only stopped after he lowered the truck's speed to 15-20 miles an hour, then pulled over to the side of the road and stopped. *Id.* at 180:14–181:6. He experienced the Death Wobble at least twice more in the next two months. *Id.* at 184:23–188:14, 206:12–207:21.

At this point, he purchased and self-installed a new steering damper at a Ford dealer's recommendation. *Id.* at 217:4–219:19. Nevertheless, the Death Wobble occurred again in July 2020. *Id.* at 222:20–23. In August 2020, he presented the vehicle to a certified dealer. Following a test drive and inspection, a technician verified the Death Wobble and determined that the steering stabilizer and two front shocks needed replacement. *Id.* at 227:21–229:19. During that visit, the mechanic working on the truck told Mr. Kigin that he was familiar with the Death Wobble. *Id.* at 229:2–16. But Mr. Kigin was required to pay for the repairs because they came outside his warranty period. *Id.* at 237:14–239:11.

**H.      Suzanne Hamilton (ME)**

In May 2018, Plaintiff Susanne Hamilton purchased a new 2017 Ford F-250 from an authorized Ford dealership in Maine. She first experienced the "Death Wobble" in November 2019 while driving to Florida. Wright Decl., Ex. 134 at 90:23–92:4. She explained that "the truck gave a little – like a little bump as it went over the – from one type of pavement to the suspension spread pavement; and it immediately started shaking and rattling; and it – it shifted away to my right; and I remember being absolutely petrified because I had no idea what it was." *Id.* at 96:18–101:15. She reported having "no control" and not knowing "exactly what to do." *Id.*

After experiencing the Death Wobble, Ms. Hamilton complained at Al Packer Ford in Palm Beach, Florida, while obtaining an oil change. *Id.* at 112:22–115:20. Al Packer Ford claimed to have never heard of the problem and offered no solution for it. *Id*. On December 7, 2020, Ms. Hamilton again presented the Vehicle to Al Packer Ford after another experience with the Death Wobble. *Id.* at 133:25-136:11. This time, technicians replaced the vehicle's steering damper. *Id.* at 139:4-141:15.

**I.      Steven Selgado (NM)**

In May 2018, Plaintiff Steven Selgado purchased a new 2018 Ford F-250 from an authorized Ford dealership in Albuquerque, New Mexico. Wright Decl., Ex. 135A at 63:7–20. In winter 2020, Mr. Selgado experienced the Death Wobble. *Id.* at 110:10–21. He described the experience as "the vehicle [] vibrating, like the steering wheel and the whole front end. It just started shaking really bad, and I had to decelerate and pull over to the right until it stopped." *Id.* at 111:7–24.

A few weeks later, Mr. Selgado presented his vehicle to a Ford service center. *Id.* at 123:21–124:14. A technician drove it and stated that "when going over bumps [the] steering wheel would shake aggressively." *Id.* at 136:9–137:10. The technician determined that the problem was caused by a drag link with "excessive play." *Id*.

In July 2022, Mr. Selgado continued to experience the Death Wobble and again presented his truck to Rich Ford. *Id.* at 159:3–162:5; *id.*, Ex. 135B. Rich Ford confirmed

20

Mr. Selgado's concerns and determined that the steering damper exhibited "excessive play." *Id.* As a result, Rich Ford installed a new steering damper under Ford's customer satisfaction program 2N04, using Ford's latest version of its large diameter steering damper (part number KC3Z 3E651). *Id.* Rich Ford also determined that the truck's tie-rod ends were worn and replaced those parts for $865.32. *Id.* Since the large diameter steering damper was installed and the tie-rod ends replaced, Mr. Selgado has not experienced the Death Wobble. *Id.*, Ex. 135A at 166:11–20.

## J.    Roger Saddler (OH)

In January 2018, Mr. Saddler purchased a certified used 2015 F-250 from an authorized Ford dealer. Prior to purchasing the Vehicle, Mr. Saddler reviewed the window sticker, which advertised the vehicle's features, and relied on its representations. Wright Decl., Ex. 136 at 120:2-10; 128:2-129:15. The window sticker did not describe any defects. Mr. Saddler also spoke with one or more sales representatives regarding the vehicle's features and relied on those as well. *Id.* at 130:11-131:4. No one informed Mr. Saddler about the Suspension Defect prior to, or any time after, his purchase.

Almost immediately after his purchase, Mr. Saddler began experiencing the Death Wobble. *Id.* at 144:4-145:3. In March 2018, his vehicle was serviced at a dealer in Cincinnati, Ohio. *Id.* at 158:17-159:24. The technician removed the front wheels and sway bar, then removed and replaced the drag link. He then adjusted the steering wheel, re-installed the sway bar, and replaced the front wheels, pursuant to the vehicle warranty. *Id.* at 160:23-161:21, 170:13-171:12. Despite these changes Mr. Saddler continued to experience the Death Wobble and returned his vehicle for additional service. *Id.* at 214:24-217:1. But this did not fix the problem. *Id.* at 225:23-230:1.

In September 2018, Mr. Saddler traded in his F-250 for a new 2019 F-350. *Id.* at 231:18-233:3. At the time, sales representative told him that the 2019 F-350 "doesn't have [the death wobble] problems at all." *Id.*; *see also id.* at 242:20-25. Nevertheless, he again experienced the Death Wobble. *Id.* at 252:21-253:18. In July 2020, Mr. Saddler took his 2019 F-350 in for service and was notified his vehicle qualified for Ford's new customer

Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Class Certification
Case No. 3:19-cv-01082-AJB-AHG

satisfaction program for 2017-2019 F-350 Vehicles. *Id.* at 262:9-24. Still, he continued to experience the Death Wobble. *Id.* at 263:13-264:4. As a result, he traded in the F-350 for a GMC truck in January 2021. *Id.* at 327:12-15.

**K.    Caroline McGee (TX)**

In February 2018, Plaintiff Caroline McGee and her husband purchased a new 2018 F-250 in Texas. Wright Decl., Ex. 137 at 59:13-17. Prior to her purchase, Mrs. McGee reviewed its window sticker and relied on it when purchasing the vehicle. *Id.* at 84:17-19. Mrs. McGee and her husband also spoke with Daniel Banda, a sales representative at Jim Bass Ford, about the vehicle's reliability and attributes. *Id.* at 73:15–24.

In March 2018, Mrs. McGee experienced the Death Wobble. *Id.* at 132:20-133:11. In April 2018, she took her vehicle for service. *Id.* at 140:12-14. When she recounted her experience, Ms. McGee was told she had experienced the "death wobble." *Id.* at 144:7–19. The Ford service center verified her concerns and replaced the steering damper assembly under warranty, but the Death Wobble returned. *Id.* at 145:5–23.

In August 2018, the McGees took the Vehicle to Discount Tire because they read the Death Wobble could be caused by the truck's tires. *Id.* at 148:24-149:14. Discount Tire informed them the tires were out of "round." *Id.* at 158:24–159:2. They bought new tires, but still, the Death Wobble persisted. *Id.* at 168:22–169:3. On October 17, 2018, Mrs. McGee again sought service on the vehicle. *Id.* at 178:8–10. The dealer inspected the Vehicle's tires, set tire pressures, and replaced the steering damper, but the Death Wobble continued. *Id.* at 179:23–25; 180:22–181:12. In April 2019, Mrs. McGee again presented the vehicle for service and installed a new steering damper. *Id.* at 192:8–19; 194:8–12, 194:16-196:1. Again, the Death Wobble persisted. In February 2020, Mrs. McGee tried again with the dealer. *Id.* at 213:22–213:4. This time, the dealer installed a new steering damper (part no. KC3Z3E651-B) under warranty. *Id.* at 213:15–21.

**L.    David Huffstetler (SC)**

In December 2017, Plaintiff David Huffstetler purchased a new Ford 2017 F-250 in South Carolina. Prior to his purchase, Mr. Huffstetler reviewed the window sticker and

22

relied on it when purchasing the vehicle. Wright Decl., Ex. 138A at 116:11-117:5. The sticker omitted all information about defects. *Id.* at 117:17-118:20. Mr. Huffstetler also spoke with one or more sales representatives at Palmetto Ford regarding the vehicle's features, but none informed Mr. Huffstetler about defects. *Id.* at 138:5–139:7, 139:14-20.

On May 28, 2020, Mr. Huffstetler took the vehicle to the dealer complaining about the Death Wobble. Wright Decl., Ex. 138B. Technicians verified his complaints and installed a new steering damper. In December 2020, he again experienced the Death Wobble. *Id.*, Ex. 138A at 174:6-14. As a result, he lost control of the vehicle, causing the front left tire to collide with a center median barrier. *Id.* at 175:11-21. After a vehicle inspection, the dealership told Mr. Huffstetler that repairs were unwarranted because the steering components were normal. *Id.* at 185:11-17. The technicians recommended that Mr. Huffstetler pay to replace the vehicle's tires, but failed to explain how doing so would remediate the Death Wobble. *Id.* at 184:20-185:10.

## IV    LEGAL STANDARD

Class certification requires that a plaintiff satisfy Rule 23(a)'s requirements: numerosity, commonality, typicality, and adequacy of representation. *See United Steel, Paper & Forestry, Rubber, Mfg. Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO, CLC v. ConocoPhillips Co.*, 593 F.3d 802, 807 (9th Cir. 2010). If the plaintiff satisfies these prerequisites, he or she must also satisfy at least one prong of Rule 23(b).

Rule 23(b)(3) provides for certification where common questions of law or fact "predominate over any questions affecting only individual members," and "a class action is superior to other available methods of adjudication." When determining whether a class action is superior, the Court must consider (1) the class members' interests in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already begun by or against class members; (3) the desirability (or undesirability) of concentrating the litigation of the claims in the particular forum; and (4) the likely difficulties in managing a class action. *See Howard v. CVS Caremark Corp.*, 628 F.App'x 537 (9th Cir. 2016).

## V    <u>ARGUMENT</u>

### A.    The Proposed Class Satisfies the Rule 23(a) Threshold Requirements for Class Certification

The proposed class satisfies Rule 23(a)'s requirements for class certification because it is sufficiently numerous and the claims of class members are based on Ford's common fraudulent scheme against the entire class.

#### 1.    The Class Is Sufficiently Numerous

A class action may proceed when "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). In general, courts find numerosity satisfied when a class includes at least 100 members. *See James v. Uber Techs., Inc.*, 338 F.R.D. 123, 130–31 (9th Cir. 2010). Ford sold over 767,000 class vehicles in the states where certification is sought over the Class Period. *See* Weir Decl., Ex. 1, ¶ 54.

#### 2.    The Class Satisfies Commonality

Commonality requires that a plaintiff demonstrate existing "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Not all questions of law and fact need be common to satisfy the rule. The existence of "shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." *See In re NJOY, Inc. Consumer Class Action Litig.*, 120 F.Supp.3d 1050, 1096 (C.D.Cal. 2015). Commonality thus poses a "limited burden," only requiring a "single significant question of law and fact." *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 589 (9th Cir. 2012).

It does not matter whether the plaintiffs can prove their allegations at the class certification stage, or even that evidence may arise suggesting the original certification decision was incorrect. *See Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1173 (9th Cir. 2010) (citing *Blackie v. Barrack*, 524 F.2d 891, 901 (9th Cir. 1975)). In *Wolin*, for example, a class of vehicle owners "easily" satisfied commonality because the complaint set forth multiple issues common to the class, including the defect's existence, the defendant's awareness of the alleged defects, and the defendant's concealment scheme.

24

Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Class Certification
Case No. 3:19-cv-01082-AJB-AHG

*Id*.; *see also Keegan v. Am. Honda Motor Co*., 284 F.R.D. 504, 524 (C.D.Cal. 2012). Here, as in *Wolin*, each Class member's claim shares a common factual basis, because each owns (or leases) a Class Vehicle subject to the Suspension Defect.

Because the Suspension Defect is uniform (see Leiss Decl., Ex. 1, ¶¶ 18-28), every class member has suffered the resulting economic loss caused by overpaying for their vehicles *See* Weir Decl., Ex. 1, ¶ 53; Gaskin Decl., ¶¶ 53-58; Stockton Decl. Ex.1, ¶¶ 10-11. Plaintiffs therefore satisfy the commonality requirement regarding the cause of their damages. *See Tait v. BSH Home Appliances Corp*., 289 F.R.D. 466, 474–75 (C.D.Cal. 2012) (finding commonality "[b]ecause the claims of all prospective class members involve the same alleged defect"); *Alger v. FCA US LLC*, 334 F.R.D. 415, 423–24 (E.D.Cal. 2020); *Yamada v. Nobel Biocare Hldg. AG*, 275 F.R.D. 573, 578 (C.D.Cal. 2011) (finding commonality where class claims "involve[d] the same device with the same alleged defect, marketed using the same alleged material omissions and misrepresentations, and covered by the same warranty").

### 3. Plaintiffs' Claims Are Typical of the Class

Rule 23(a)'s typicality prerequisite requires that the representative plaintiffs' claims are "reasonably coextensive with those of absent class members." *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1116 (9th Cir. 2017) (citing *Parsons v. Ryan*, 754 F.3d 657, 685 (9th Cir. 2014)). The typicality inquiry asks "whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiff, and whether other class members have been injured by the same course of conduct." *Id*. (quoting *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1141 (9th Cir. 2016)). The typicality standard is "permissive" in nature. *See Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*, 326 F.R.D. 592, 595 (N.D.Cal. 2018).

Typicality is satisfied here because each Plaintiff alleges the same defect as Class members. *See In re Takata Airbag Prods. Liab. Litig.*, No. 15-MD-02599, 2023 WL 4925368, at *5–6 (S.D.Fla. June 20, 2023), *as modified*, 2023 WL 5626562 (S.D.Fla. Aug. 24, 2023); *Rosen v. J.M. Auto, Inc.*, 270 F.R.D. 675, 682 (S.D.Fla. 2009). They also

Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Class Certification
Case No. 3:19-cv-01082-AJB-AHG

incurred the same damages in the form of the cost of repair necessary to restore their vehicles to a condition absent the Defect.[18] *See* Stockton Decl. Ex. 1, ¶¶ 10-11; Leiss Decl., Ex. 1, ¶¶ 139-141. Each Plaintiff brings the same legal claims arising from Ford's common scheme, and because those claims are identical to those of the proposed class members, they satisfy the typicality requirement. *See Chamberlan v. Ford Motor Co.*, 223 F.R.D. 524, 526–27 (N.D.Cal. 2004) ("[T]he typicality requirement is satisfied because the named plaintiffs and the members of the proposed class 'all have claims arising from the [same] fraudulent scheme.'"); *Just Film*, 847 F.3d at 1118 (certifying a class because typicality requires that the "plaintiff endured a course of conduct directed against the class").

### 4.    The Class Is Adequately Represented

The adequacy requirement demands that the representative parties "fairly and adequately" protect class interests. "Representation is 'adequate' when class counsel "is qualified and competent, the representative's interests are not antagonistic to the interests of absent class members, and it is unlikely that the action is collusive." *Scott v. Calif. Forensic Med. Grp.*, No. 216CV03084DSFRAOX, 2020 WL 10501243, at *3 (C.D.Cal. Sept. 30, 2020) (citing *In re N. Dist. of Calif., Dalkon Shield IUD Prods. Liab. Litig.*, 693 F.2d 847, 855 (9th Cir. 1982)). All three requirements are satisfied here.

First, both law firms seeking appointment as Class Counsel are qualified. Both firms have played leading roles in major automotive class action litigations, including serving on steering committees and lead counsel committees. *See* Wright Decl. at ¶¶ 5-6; Declaration of Alex Lee ("Lee Decl."), ¶¶ 10-11. In these and other cases, counsel have vigorously prosecuted and protected class members' interests by conducting considerable pre-filing investigation, retaining and preparing expert witnesses, handling discovery, and responding to various dispositive motions. *See* Wright Decl. at ¶¶ 5-6; Lee Decl., ¶¶ 6-8.

---

[18] *See Nguyen*, 932 F.3d at 819; *Nuwer v. FCA US LLC*, No. 20-60432-CIV, 2023 WL 2388353, at *2–3 (S.D.Fla. Feb. 3, 2023) ("Courts in this district and elsewhere have accepted Stockton's repair-cost methodology as a means of proving benefit-of-the-bargain damages."); *Chapman v. Gen'l Mot. LLC*, No. 2:19-CV-12333-TGB-DRG, 2023 WL 2746780, at *19–20 (E.D.Mich. Mar. 31, 2023).

Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Class Certification
Case No. 3:19-cv-01082-AJB-AHG

Proposed Class Counsel has spent considerable time and resources prosecuting this case. They have defended against numerous motions to dismiss, defended the Plaintiffs' depositions, propounded written discovery, responded to written discovery for each named Plaintiff, retained and worked with Plaintiffs' experts, and assisted in bringing to light this concealed defect. Wright Decl., ¶ 8. They will continue their hard work going forward.

Furthermore, Plaintiffs' interests align with those of absent class members. Plaintiffs align with the absent class members because they suffered the "same unlawful conduct" and "substantially similar injuries as a result." *Scott*, 2020 WL 10501243, at *3. Plaintiffs own the same Class Vehicles with the same defect, which Ford concealed from all class members. Because Plaintiffs have experienced the same unlawful conduct and resulting loss, and seek the same relief as absent class members, they adequately represent the class and its interests. Accordingly, the second adequacy element is satisfied.

Finally, Plaintiffs must show an absence of "actual fraud, overreaching, or collusion." *Hofmann v. Dutch LLC*, 317 F.R.D. 566, 573 (S.D.Cal. 2016). In a consumer protection class action, plaintiffs can demonstrate that the action is brought in good faith by showing that they and class members "share the common goal of protecting consumer's rights. . . ." *Id.* Plaintiffs seek to protect consumer interests by obtaining compensation for the known defect. *See Tait*, 289 F.R.D. at 477–78.

**B.     The Class Satisfies the Requirements of Rule 23(b)**

Rule 23(b)(3) allows class certification when "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); *see generally* 2 Newberg on Class Actions § 4:47 (6th ed.). Both questions of law and fact predominate here.

**1.     Common Questions of Fact and Law Predominate**

A class may be certified if "questions of law or fact common to the members of the class predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). A question is common "where 'the same evidence will suffice for each member

to make a *prima facie* showing, [or] the issue is susceptible to generalized, class-wide proof.'" *Vine v. PLS Financial Services, Inc.*, 331 F.R.D. 325, 337 (E.D.Tex. 2019) (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016)). Common questions predominate "[w]hen one or more of the central issues in the action are common to the class…even though other important matters will have to be tried separately, such as damages or some affirmative defense peculiar to some individual class members.'" *Tyson Foods*, 577 U.S. at 453 (citations omitted).

Furthermore, there is little difference in the state laws governing Plaintiffs' claims. *See Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561, 570 (S.D.N.Y. 2014); *In re Checking Account Overdraft Litig.*, 281 F.R.D. 667, 680-81 (S.D.Fla. 2012) (certifying creation of thirteen subclasses to address variations in state laws among various states). As demonstrated in the accompanying charts, each state's unfair competition and warranty laws are similarly broad and incorporate key legal similarities. *See* App'x A, B; *see also Speerly v. Gen'l Mot., LLC*, 343 F.R.D. 493, 510–12, 518–22 (E.D. Mich. 2023).[19] Any remaining differences in the law are immaterial or can be managed through subclasses. *See Petersen v. Costco Wholesale Co.*, 312 F.R.D. 565, 582 (C.D.Cal. 2016) (certifying class where Plaintiffs proposed nine single-state subclasses where there was "smaller breadth of difference" between the laws of the proposed state subclasses"); *Butler v. Sears, Roebuck and Co.*, 727 F.3d 796, 801–02 (7th Cir. 2013) ("Complications arise from the design changes and from separate state warranty laws, but can be handled by the creation of subclasses."); *Flynn v. FCA US LLC*, 327 F.R.D. 206, 226 (S.D.Ill. 2018).

### 2.    The Defect Existence Is Subject to Common Proof

Plaintiffs allege the Class Vehicles are defective because the damping system insufficiently eliminates shimmy. Leiss Decl., Ex. 1, ¶¶ 26-27, 58, 66, 81, 95. The nature

---

[19] Plaintiffs with pending common law fraudulent concealment claims can also show reliance by establishing materiality with common proof, and therefore their claims are appropriate for class treatment as well. *See supra* Part V.B.4.

Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Class Certification
Case No. 3:19-cv-01082-AJB-AHG

and existence of the defect predominates over all other questions here.[20] *Vine*, 331 F.R.D. at 337. Plaintiffs will use common evidence, including documents, depositions, and records of Class Vehicle inspections, to show the defect is common to all Class Vehicles at the point of sale. *Parkinson*, 258 F.R.D. at 594 ("[P]laintiffs' central common question is whether the 2003 manual-transmission Tiburon suffered from a flywheel defect."); *In re Arris Cable Modem Consumer Litig.*, 327 F.R.D. 334, 361 (N.D.Cal. 2018) ("Plaintiffs' burden is to establish that the existence of the defects is subject to common proof, and that such common questions predominate over individual questions."); *Cruson v. Jackson Nat'l Life Ins. Co.*, 954 F.3d 240, 253 (5th Cir. 2020) (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016)) (common questions exist where "the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof" (alteration in original)). The fact that the defect exists in multiple design generations does not prevent certification, because "the question is not whether every single aspect of the design is common—only those aspects that allegedly caused the problem." *Speerly*, 343 F.R.D. at 525.[21]

### 3.    Ford's Omissions Are Established by Common Proof

Plaintiffs' claims rest on omissions and actions taking place on a common basis toward all Class Vehicle purchasers. *Tait*, 289 F.R.D. at 474. Ford determined that warning consumers about the shimmy would harm vehicle sales. Therefore, it omitted key information about the Suspension Defect from truck owners and the public. To compound the problem, Ford misled the public by claiming that tire pressure was the root cause of the problem on the P131 model. Wright Decl., Exs. 139, 140. If Ford had disclosed the information, consumers would have received the information through communications with dealer sales agents and a nationwide advertising campaign designed to reach most

---

[20] Courts often find that common factual issues predominate in class action cases involving defective automobiles. *See Wolin*, 617 F.3d at 1173; *Keegan*, 284 F.R.D. at 532–34; *Parkinson v. Hyundai Motor Am.*, 258 F.R.D. 580, 596–97 (C.D.Cal. 2008).
[21] *See also Quackenbush v. Am. Honda Motor Co., Inc.*, No. 20-05599, 2021 WL 6116949, at *4 (N.D.Cal. Dec. 27, 2021); *Brummett v. Skyline Corp.*, No. C 81-0103-L(B), 1984 WL 262559, at *3 (W.D.Ky. 1984).

Americans, similar to Ford's (mis)information campaign to educate truck owners about tire pressure. *See Sloan v. Gen'l Mot. LLC*, 287 F.Supp.3d 840, 875–76 (N.D.Cal. 2018); *Keegan v. Am. Honda Mot. Co., Inc.*, 838 F.Supp.2d 929, 961 (C.D.Cal. 2012). Ford's disclosures would also have been effective on the window sticker, on Ford's website, or on dealer websites. *See In re Arris*, 327 F.R.D. at 366; *Davidson v. Apple, Inc.*, 2018 WL 2325426, at *19 (N.D.Cal. May 8, 2018); *Guido v. L'Oreal, USA, Inc.*, 2013 WL 3353857, at *11-13 (C.D.Cal. July 1, 2013).

### 4.    The Materiality of the Defect Is Subject to Common Proof

The Defect's materiality can also be resolved through common proof. A duty to disclose an omitted fact exists "when the defendant has exclusive knowledge of material facts not known or reasonably accessible to the plaintiff." *See, e.g.*, *Tait*, 289 F.R.D. at 481. An omission's materiality is evaluated "by considering common proofs, without involving the circumstances of any of the prospective class members' individual transactions" because the objective "reasonable consumer" standard applies to each of the states at issue here. *In re ConAgra Foods, Inc.*, 90 F.Supp.3d 919, 983, 996 (C.D.Cal. 2015) (holding that plaintiffs could demonstrate reliance "by showing that a reasonable person would have considered the defendant's representation material"); *In re FCA US LLC Monostable Elec. Gearshift Litig.*, 334 F.R.D. 96, 115–17 (E.D.Mich. 2019) (collecting cases); *see also N. Cypress Med. Ctr. Operating Co., Ltd. v. Aetna Life Ins. Co.*, 898 F.3d 461, 474 (5th Cir. 2018) ("Material means a reasonable person would attach importance to and would be induced to act on the information in determining his choice of actions in the transaction in question." (citations and quotations omitted)).

There are at least three sources of evidence demonstrating materiality to an objectively reasonable consumer. First, evidence shows that consumers complained both to Ford directly and the NHTSA's consumer complaint database about the Death Wobble. Exs. 19, 20, 36. Thousands of Ford owners have submitted shimmy-related complaints to the NHTSA complaint database across all generations. *See supra* n.14; Wright Decl., ¶ 9. Second, there is evidence that Ford's dealers were concerned about oscillation reports

affecting sales. *Id.*, Exs. 141, 142. And third, Plaintiffs can combine existing qualitative evidence with a consumer survey.[22] *See* Gaskin Decl., ¶¶ 19, 52-58.

Common evidence will also show that Ford concealed information about the Suspension Defect and its safety risks to consumers. And consumers not only report safety risks resulting from the defect, but they report accidents as well. *Id.*, Exs. 143, 144, 145; *see also Mui Ho v. Toyota Mot. Co.*, 931 F.Supp.2d 987, 997 (N.D.Cal. 2013); *Keegan*, 838 F.Supp.2d at 943 (citing *Marsikian v. Mercedes-Benz USA, LLC*, No. CV 08-4876 AHM (JTLx), 2009 WL 8379774, at *6–7 (C.D.Cal. May 4, 2009); *Miller v. Ford Mot. Co.*, 620 F.Supp.3d 1045, 1068–69 (E.D.Cal. 2022).

This case turns on an objective inquiry into the materiality of Ford's omission, which is susceptible to classwide proof. *See Speerly*, 343 F.R.D. at 521–22. A classwide inference of deception can be made because individual proof of each class member's reliance is not required to demonstrate the violation of any consumer protection laws at issue.[23]

### 5. Damages Can Be Demonstrated Through Common Evidence

Plaintiffs' experts and the evidence demonstrate class-wide liability for damages. For example, vehicles are unmerchantable when they are unsuitable for their ordinary or intended use – "not just to provide transportation but rather safe, reliable transportation." *In re MyFord Touch Consumer Litig.*, 46 F.Supp.3d 936, 980 (N.D.Cal. 2014). Whether class vehicles are suitable to provide safe, reliable transportation, whether they are unreasonably dangerous, and whether a reasonable consumer would have purchased or would have paid less for a Class Vehicle had the Defect been disclosed "all are objective inquiries susceptible to generalized, class-wide proof, on a common basis applicable to all class vehicles, without regard to the individual circumstances of the buyers." *FCA Monostable*, 334 F.R.D. at 113 (internal quotation marks and citation omitted).

---

[22] *See Fitzhenry-Russell, Inc.*, 326 F.R.D. at 614 ("[P]laintiffs are aided in demonstrating materiality by defendant's internal documents.") (citing *Kumar v. Salov N. Am. Corp.*, 2016 WL 3844334, at *8 (N.D.Cal. July 15, 2016)).

[23] California's consumer protection statutes require reliance by the named plaintiff, but whether reliance is reasonable is determined by an objective standard. *See ConAgra*, 90 F.Supp.3d at 982-983.

Here, the defect presents an unreasonable safety risk by producing violent oscillations at normal highway speeds, which results in a startle response from the driver and his or her distraction from the primary task of driving. Biondi Decl. ¶¶19-22, 24, 27-38. Those who have not experienced the shimmy previously may not know how to respond correctly or safely, which can lead to a collision. *See id.*; Leiss Decl., Ex. 1, ¶¶ 116-117. Plaintiffs can also show that the oscillations are material to consumers' purchasing decisions, through expert testimony and evidence of complaints to Ford. *See* Gaskin Decl., ¶¶ 19, 52-58; *see also* Wright Decl., ¶ 9; Exs. 122, 123, 146, 149.

Furthermore, each class member's economic damages are subject to common proof and calculation, even if the final amounts deviate among class members. *See Bailey v. Rite Aid Corp.*, 338 F.R.D. 390, 408 (N.D.Cal. 2021) ("A plaintiff seeking certification under Rule 23(b)(3) must show that damages are capable of measurement on a class-wide basis, and such calculations 'need not be exact.'") (citing *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013)); *In re Arris*, 327 F.R.D. at 349 (certifying class because defects caused plaintiffs to purchase products for more than if the defect had been disclosed). Here, Plaintiffs can demonstrate that Class members overpaid for their vehicles and suffered economic harm as a result.

To calculate the resulting economic injury, Mr. Stockton can calculate the average cost required to conform the vehicles to the value purchasers believed they were receiving in the price tendered upon purchase. *See Falco v. Nissan N. Am. Inc.*, No. CV 13-00686 DDP (MANx), 2016 WL 1327474, at *12 (C.D.Cal. Apr. 5, 2016); *Nguyen v. Nissan N. Am., Inc.,* 932 F.3d 811, 821 (9th Cir. 2019). To determine the cost of repair, Mr. Stockton will rely on documents and information produced by Ford, in addition to the expert testimony of Mr. Leiss, who has identified the defect and a competent repair for it (Leiss Decl., Ex. 1, ¶¶ 139-141; Stockton Decl., Ex. 1, ¶¶ 11, 51, 59). *See id.*; *Siqueiros v. Gen'l Mot. LLC*, No. 16-cv-07244-EMC, 2022 WL 74182, at *10 (N.D.Cal. Jan. 7, 2022) (finding an expert can rely on the defendant's estimates); *see also Shields v. Bridgestone/Firestone, Inc.*, 232 F.Supp.2d 715, 719 n.2 (E.D.Tex. 2002) (recognizing that replacement costs,

"diminution in value," and "excessive sums paid for the products in relation to their true value" are "readily calculable"). Similar models have been accepted in automotive cases. *See, e.g., Quackenbush*, 2021 WL 6116949, at *7; *Salas v. Toyota Mot. Sales, U.S.A.*, No. CV 15-8629 FMO (Ex), 2019 WL 1940619, at *12 (C.D.Cal. Mar. 27, 2019). In sum, Mr. Stockton's damage model uses common, class-wide evidence and flows directly from Plaintiffs' theory of liability. *See Comcast*, 569 U.S. at 38; *Nguyen*, 932 F.3d at 818-19.

Plaintiffs also offer a conjoint analysis to estimate the market value that a reasonable consumer may have lost as a result of the undisclosed defect.[24] Conjoint analysis calculates a reasonable, market-based expectation of the difference consumers would pay for a new truck without the defect, compared to what they would pay for a truck if the defect had been disclosed. *See* Gaskin Decl., ¶¶ 19-24, 52-58; Weir Decl., Ex. 1, ¶¶ 16-19. No matter what analysis eventually is adopted, both methodologies are sound, reliable, and supported by usual practices in each expert's respective field.

### 6.   A Class Action Is A Superior Method for Resolving the Litigation

The superiority requirement requires assurance that a class action is "the most efficient and effective means of resolving the controversy." *Moore v. Ulta Salon, Cosmetics & Fragrance, Inc.*, 311 F.R.D. 590, 622 (C.D.Cal. 2015). Rule 23(b)(3) describes several relevant factors, including: the "class members' interests in individually controlling" the litigation; the extent and nature of any previous litigation; the desirability of concentrating the litigation in the particular forum; and the potential difficulties in managing a class action. *See Wolin*, 617 F.3d at 1175–76. A class action is superior to multiple individual actions here for several reasons. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) ("What matters to class certification … is not the raising of common questions—even in droves—but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation.").

---

[24] *See Hadley v. Kellogg Sales Co.*, 324 F.Supp.3d 1084, 1106–07 (N.D.Cal. Aug. 17, 2018); *Miller v. Fuhu Inc.*, No. 2:14-cv-06119-CAS-AS, 2015 WL 7776794, at *21 (C.D.Cal. Dec. 1, 2015); *In re Arris*, 327 F.R.D. at 372–74.

First, class certification is appropriate where individual recoveries would be "dwarfed" by the cost of individual litigation. *Id.*; *see also Rai v. Santa Clara Valley Transp. Auth.*, 308 F.R.D. 245, 265 (N.D.Cal. 2015). This matter involves hundreds of thousands of defective vehicles whose purchase has injured each Plaintiff and class member. *See Wolin*, 617 F.3d at 1176. The costs of proving Plaintiffs' claims are high, encompassing an investment in fees, time, and effort justifiable in the context of a certified class action. *See In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs. & Prods. Liab. MDL*, No. 8:10ML2151 JVS (FMOx), 2012 WL 7802852, at *4 (C.D.Cal. Dec. 28, 2012) (holding that class certification was superior where proving the defect's existence required "extreme complexity" and per-vehicle recovery value was low).

If individual plaintiffs incurred these costs in successive lawsuits, legal expenses would soar at the expense of judicial efficiency. *Rai*, 308 F.R.D. at 265 ("It would be both 'redundant' and a 'wildly inefficient use of limited judicial resources' for each operator to file an individual lawsuit alleging claims for their unpaid wages."); *Tait*, 289 F.R.D. at 486 ("[E]ach member of the class pursuing a claim individually would burden the judiciary, which is contrary to the goals of efficiency and judicial economy advanced by Rule 23."). Most class members would simply not file suit at all, leaving them uncompensated and Ford undeterred. Plainly, that would not do. *See Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 617 (1997) ("The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights.") (citation omitted).

Moreover, class-wide treatment is appropriate because Ford directed the alleged practices to each proposed class member and the relevant state laws governing Ford's conduct are materially identical. The Court could try all eight states together, and "each state's law would determine a defendant's liability for [Class Vehicle] purchases that occurred in that state." *Dzielak,* 2017 WL 6513347, at *16. In *Rikos v. Procter & Gamble Co.,* No. 1:11-cv-226, 2014 WL 11370455, at *15 (S.D.Ohio June 19, 2014), *aff'd*, 799 F.3d 497 (6th Cir. 2015), the district court certified a multistate consumer fraud case when

34

the jury was to be "instructed on, at most, five claims. The Court will provide specific instructions to clarify the elements of these claims."[25] Special verdict forms or jury instructions can account for minor variations, if any. And given the manageability of this litigation, certification could resolve thousands of claims. *See Grays Harbor Adventist Christian Sch. v. Carrier Corp.*, 242 F.R.D. 568, 574 (W.D.Wash. 2007).

Identification of class members will not create manageability issues. *See Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1126 (9th Cir. 2017) (holding that identifiability relates to manageability, not ascertainability). Available records connect each vehicle's assigned Vehicle Identification Number (VIN) to its owner. *See* Weir Decl., Ex. 1, ¶ 53. Plaintiffs have obtained this information and can give notice of this action to Class members via a class action administrator.

## VI   <u>CONCLUSION</u>

Ford sold millions of trucks with a propensity to shimmy for no reason other than Ford's failure to design a sufficient damping system. Though Ford engineers confronted constant reports of shimmy during that time, they buried the truth and attempted to deflect the blame to blameless truck owners. In the end, Ford knew what it was doing by selling trucks with a shimmy—in violation of its internal no-shimmy policy, no less— and Plaintiffs and Class members should obtain the appropriate damages resulting from Ford's actions. And class certification is the most appropriate means of doing so.

---

[25] *See also, e.g., Chapman*, 2023 WL 2746780, at *21 (certifying classes in seven states); *Spence v. Glock, GES.m.b.H.*, 227 F.3d 308, 313 (5th Cir. 2000) (recognizing that subclassing states is an appropriate solution to choice of law issues); *Benson v. Newell Brands, Inc.*, No. 19 C 6836, 2021 WL 5321510, at *10 (N.D.Ill. Nov. 16, 2021) (equating the ICFA to consumer protection laws including Florida, Minnesota, New Jersey); *Steigerwald*, 2016 WL 695424, at *9–10 (noting similar express warranty elements in Colorado, Maine, Minnesota, New Hampshire, New Jersey, Oklahoma, and Texas); *Bank of Am. Home Affordable Modification Prog. (HAMP) Contract Litig.*, MDL No. 10-2193-RWZ, 2013 WL 4759649, at *9 (D.Mass. 2013) (certifying 26 classes under laws of 26 states); *Mednick v. Precor, Inc.*, 320 F.R.D. 140 (N.D.Ill. 2017).

Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Class Certification
Case No. 3:19-cv-01082-AJB-AHG

Respectfully submitted,

Dated: December 1, 2023                    **McCUNE LAW GROUP, APC**

                                  By:  */s/David C. Wright*
                                       David C. Wright
                                       Richard D. McCune
                                       Steven A. Haskins
                                       Mark I. Richards
                                       3281 Guasti Road, Suite 100
                                       Ontario, California 91761
                                       Telephone: (909) 557-1250
                                       Facsimile: (909) 557-1275

                                       Elaine S. Kusel *Pro Hac Vice*
                                       **McCUNE LAW GROUP, APC**
                                       esk@mccunewight.com
                                       One Gateway Center, Suite 1500
                                       Newark, NJ 07102
                                       Telephone: (978) 888-1203

                                       **CAFFERTY CLOBES**
                                       **MERIWETHER & SPRENGEL LLP**
                                       Alex Lee *Pro Hac Vice*
                                       alee@caffertyclobes.com
                                       135 South LaSalle Street, Suite 3210
                                       Chicago, Illinois 60603
                                       Telephone: (312) 782-4880
                                       Facsimile: (909) 557-1275

                                       **CAFFERTY CLOBES**
                                       **MERIWETHER & SPRENGEL LLP**
                                       Bryan L. Clobes *Pro Hac Vice*
                                       bclobes@caffertyclobes.com
                                       205 North Monroe Street
                                       Media, PA 19063
                                       Telephone: (215) 864-2800
                                       Facsimile: (215-864-2810

                                       **SOHN & ASSOCIATES**
                                       Douglas C. Sohn
                                       dsohn@sohnlaw.com
                                       16870 West Bernardo Drive, Suite 400
                                       San Diego, California 92127
                                       Telephone: (619) 237-7646
                                       Facsimile: (858) 759-4299

                                       *Attorneys for Plaintiffs and*
                                       *the Putative Class*

36

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## CERTIFICATE OF SERVICE

I hereby certify that on December 1, 2023, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record, including counsel for Defendant.


Dated: December 1, 2023                    /s/*David C. Wright*
                                           David C. Wright

Certificate of Service
Case No. 3:19-cv-01082-AJB-AHG