UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM LESSIN, CAROL SMALLEY, et al., on behalf of themselves and others similarly situated,<br><br>                              Plaintiffs,<br><br>v.<br><br>FORD MOTOR COMPANY, a Delaware corporation; and Does 1 through 10, inclusive,<br><br>                         Defendants. | Case No.: 19-cv-01082-AJB-AHG<br><br>**ORDER:**<br><br>**(1) GRANTING IN PART AND DENYING IN PART FORD'S MOTION FOR PARTIAL SUMMARY JUDGMENT; and**<br><br>**(2) GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>**(Doc. Nos. 120, 122)** |

Presently pending before the Court are Defendant Ford Motor Co.'s motion for partial summary judgment (Doc. No. 122), and Plaintiffs' motion for class certification (Doc. No. 120). The motions have been fully briefed, (Doc. Nos. 136, 141, 142, 154, 157, 163, 187), and the Parties submitted notices of supplemental authority in connection with their motions. (Doc. Nos. 169, 175, 181, 191.) On August 8, 2024, the Court ordered Plaintiffs to file supplemental briefing on their Opposition to Ford's Motion for Summary Judgment, (Doc. No. 182), which Plaintiffs filed on August 23, 2024, (Doc. No. 183). The

1

Court finds the motions are suitable for determination on the papers and without oral argument in accordance with Local Civil Rule 7.1.d.1. Accordingly, the Court hereby **VACATES** the hearing currently set for **November 14, 2024, at 2:00 p.m.**

## I.    BACKGROUND

Plaintiffs William Lessin, Carol Smalley, Patrick and Sheri Powers, Lloyd Atterson, Brad Nielsen, David Appel, John Kigin, Susanne Hamilton, Steve Selgado, Roger Saddler, Caroline McGee, and David Huffstetler (collectively, "Plaintiffs") bring several causes of action against Ford for alleged latent defects in Ford F-250 and F-350 trucks across four generations: the P131 (Model Year ("MY") 2005–2007), the P356 (MY 2008–2010), the P473 (MY 2011–2016), and the P558 (MY 2017–2019) ("Class Vehicles" or "Vehicle"). (First Amended Consolidated Class Action Complaint ("FACC"), Doc. No. 44, at 7; Doc. No. 120-1 at 11[1].)

In the FACC, Plaintiffs allege the Class Vehicles suffer from one or more defects in their suspension and steering linkage systems, including, but not limited to, abnormal wearing and/or loosening of the track bar bushing, steering damper, the ball joints, control arms, shock absorbers, and/or struts (the "Suspension Defect"). (FACC ¶ 155.) The Suspension Defect may result in severe shaking and oscillation of the steering wheel, which Plaintiffs refer to as the "Death Wobble" or "Shimmy." (*Id.* ¶ 3.) Plaintiffs assert the Shimmy "often causes drivers to lose control of the Class Vehicles and causes difficulty steering during their operation and under normal driving conditions or speeds[,]" exposing drivers and others sharing the road with them to increased risk of accident, injury, or death. (*Id.*)

In their motion for class certification, Plaintiffs allege a similar but broader set of facts: Ford uses a moonbeam axle on the Class Vehicles, which rigidly connects the two front wheel and tire assemblies. (Doc. No. 120-1 at 10.) When one wheel encounters a road

---

[1] Citations to the record refer to the CM/ECF system page number at the top of each page rather than the page numbers at the bottom of each filing.

impact, it excites tramp in the axle. (*Id.*) The resulting camber change induces steering torque due to the gyroscopic effect of the rotating wheels and tires. (*Id.*) Because the wheels are connected, the gyroscopic effect is additive, causing vertical and lateral forces to react through the tires. (*Id.*) When these forces are underdamped, the Shimmy results. (*Id.*) Plaintiffs contend the defect is not the Shimmy itself, but rather, the vehicles' insufficient damping system (the Suspension Defect) that fails to prevent the Shimmy. (Doc. No. 183 at 10.) The Shimmy is self-sustaining and only the driver can eliminate it, often by reducing the Vehicle's speed. (Doc. No. 120-1 at 10.)

In anticipation of the 2005 model year, Ford redesigned the Class Vehicles' front suspension. (*Id.* at 11.) To counteract the Shimmy, Ford installs a steering damper on each Class Vehicle. (*Id.* at 10–11.) However, Plaintiffs assert the design and configuration of the factory-installed steering damper used for the Class Vehicles were insufficient to prevent the Shimmy, and Ford knew this as early as 2002, when a Ford engineer noted the steering damper design would "not help shimmy that much." (Doc. No. 185 at 23 (quoting Doc. No. 124-11 at 3).) By May 2004, Ford was discovering a "new leaking damper every day." (Doc. No. 124-1 (quoting Doc. No. 124-19 at 2).) Indeed, reports of oscillation began immediately after Ford began selling the P131. (Doc. No. 120-1 at 12.) Additionally, between 2004 and 2019, Ford issued nine Technical Service Bulletins ("TSBs") to address "steering wheel oscillation." (*See* Doc. No. 120-38–41, -113, -114, -119, -120, & -123.) In March 2007, Ford recommended replacing all of the then-utilized Tenneco brand dampers with a new damper developed for the P356, but only if the technician could replicate a Shimmy event during a road test. (Doc. No. 120-1 at 13 (citing Doc. No. 120-40).) By 2007, the National Highway Traffic Safety Administration ("NHTSA") had received numerous complaints about the Shimmy, causing it to open an investigation. (*See* Doc. No. 120-42.) NHTSA's testing demonstrated that damper functionality contributed to the Shimmy. (Report of Peter Leiss ("Leiss Report"), Doc. No. 120-165, ¶¶ 42–44.) However, Ford claimed truck owners were "intentionally lowering tire pressures" on their vehicles, and that the Shimmy was "not an indication of a defect in the product produced by Ford."

3

(*See* Doc. No. 120-43 at 2, 17.) Thus, the NHTSA investigation resulted in Ford sending vehicle owners a notice about the "importance of maintaining proper tire pressure to prevent shimmy." (Doc. No. 120-45 at 2.)

For the P356 model, Ford decided to switch the steering damper's manufacturer from Tenneco to Tokico, a Hitachi subsidiary. (Doc. No. 120-1 at 14.) This change led to fewer Shimmy reports, though some reports continued. (*Id.*) The same was true for the P473 model, with reports of Shimmy increasing in 2011. (*Id.*) In 2011, Ford elected to return to Tenneco for damper production for the P558 model, despite its earlier problems. (*Id.*) Indeed, Ford experienced reports of oscillation throughout development of the P558. (Doc. No. 124-1 at 15 (citing Doc. No. 124-45, -46 at 3.) One test driver in August 2015 reported that "the center console was shaking so much if I put my elbows on it when driving it was making my hands move the steering wheel kind of like wheelfight." (Doc. No. 124-65 at 2.) In December 2015, the P558's lead Vehicle Dynamics engineer expressed concern "about releasing a damper considerably worse at all speed than a damper that was called out on a wheel fight issue." (Doc. No. 134-69 at 2.) When Ford began selling the P558 in 2016, reports of Shimmy began coming in. (Doc. No. 120-1 at 17.)

Thereafter, in April 2020, Ford released a "redesigned damper" that Hitachi manufactured for the P473, provided under a customer satisfaction extended warranty program, which Ford claimed would remediate the Shimmy. (Doc. No. 120-1 at 19.) However, Ford's 2020 and 2021 F-250 and F-350 trucks, manufactured and produced with this Hitachi damper as a production part, continued to experience substantial numbers of Shimmy-related warranty claims. (*Id.* at 19–20.)

In May 2022, Ford again released a "revamped" damper, which Ford internally called its "kitchen sink damper." (Doc. No. 124-1 at 20.) Plaintiffs assert this damper was sufficient to prevent the Shimmy during the useful life of the Class Vehicles (the "May 2022 Damper"). (Doc. No. 120-1 at 20.) Ford made the May 2022 Damper "available as a service part for all 2005–2021 F-250 and F-350 4x4 vehicles." (*Id.* at 21.) Plaintiffs assert it is only the installation of this May 2022 Damper that constitutes a feasible and adequate

remedy for the Suspension Defect. (*Id.*)

## II.    FORD'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Ford moves for partial summary judgment on the following claims against the Named Plaintiffs: breach of express warranty for Plaintiffs Appel (IL) (Count 13), Hamilton (ME) (Count 18), Saddler (OH) (Count 25), and Huffstetler (SC) (Count 27); breach of implied warranty of merchantability for Plaintiffs Powers (CA) (Count 5), Nielson (CO) (Count 10), Hamilton (ME) (Count 17), Selgado (NM) (Count 20), Saddler (OH) (Count 24, only as to his 2019 F-350), Huffstetler (SC) (Count 26) and McGee (TX) (Count 29); violation of the Maine Unfair Trade Practices Act ("MUTPA") for Plaintiff Hamilton (ME) (Count 15); and violation of the California Consumers Legal Remedies Act ("CLRA") (Count 2) and common law fraud (Count 3) for Plaintiffs Lessin (CA) and Smalley (CA). (Doc. No. 122.) Ford also moves for dismissal of Saddler's claims as to his 2019 F-350 (Count 24) and Huffstetler (Counts 26 and 27) as a sanction for spoliation of evidence. (*Id.*)

### A.    Legal Standard

A court may grant summary judgment when it is demonstrated there exists no genuine dispute as to any material fact, and that the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The party seeking summary judgment bears the initial burden of informing a court of the basis for its motion and of identifying the portions of the declarations, pleadings, and discovery that demonstrate an absence of a genuine dispute of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A fact is "material" if it might affect the outcome of the suit under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). A dispute is "genuine" as to a material fact if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See Long v. Cnty. of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006).

Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the

movant. *See Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). Where the nonmoving party will have the burden of proof on an issue at trial, the movant may prevail by presenting evidence that negates an essential element of the nonmoving party's claim or by merely pointing out that there is an absence of evidence to support an essential element of the nonmoving party's claim. *See Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000). If a moving party fails to carry its burden of production, then "the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial." *Id.* If the moving party meets its initial burden, the burden then shifts to the opposing party to establish that a genuine dispute as to any material fact actually exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party cannot "rest upon the mere allegations or denials of the adverse party's pleading but must instead produce evidence that sets forth specific facts showing that there is a genuine issue for trial." *See Estate of Tucker ex rel. Tucker v. Interscope Records, Inc.*, 515 F.3d 1019, 1030 (9th Cir. 2008) (internal quotation marks, alterations, and citation omitted).

The evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts placed before a court must be drawn in favor of the opposing party. *See Stegall v. Citadel Broad. Co.*, 350 F.3d 1061, 1065 (9th Cir. 2003). However, "[b]ald assertions that genuine issues of material fact exist are insufficient." *See Galen v. Cnty. of Los Angeles*, 477 F.3d 652, 658 (9th Cir. 2007); *see also Day v. Sears Holdings Corp.*, 930 F. Supp. 2d 1146, 1159 (C.D. Cal. 2013) ("Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment."). Further, a motion for summary judgment may not be defeated by evidence that is "merely colorable, or is not significantly probative . . . ." *See Anderson*, 477 U.S. at 249–50 (citations omitted); *see also Hardage v. CBS Broad. Inc.*, 427 F.3d 1177, 1183 (9th Cir. 2006) (same). If the nonmoving party fails to produce evidence sufficient to create a genuine dispute of material fact, the moving party is entitled to summary judgment. *See Nissan Fire & Marine*, 210 F.3d at 1103.

6

**B.    Discussion**

    **1.    Breach of Express Warranty**

Ford first moves for summary judgment on Plaintiffs Saddler's (OH), Hamilton's (ME), Appel's (IL), and Huffstetler's (SC) claims for breach of express warranty, asserting their claims fail as a matter of law. (Doc. No. 122-1 at 13.) Plaintiffs Saddler, Hamilton, Appel, and Huffstetler do not contest that Ford's 3-year/36,000-mile Limited Warranty applies to their vehicles. (*See* FACC ¶¶ 509 (Saddler), 436 (Hamilton), 379 (Appel), & 532 (Huffstetler).)

    **a.    Saddler (OH)**

Ford argues Saddler's 2015 F-250 was not covered by any Ford warranty at the time of purchase, and thus summary judgment is proper here. (Doc. No. 122-1 at 13–14.) Saddler purchased his 2015 F-250 on January 28, 2018, as a used vehicle with 49,880 miles at the time of purchase. (*See* Doc. No. 122-15.) Thus, Ford asserts Saddler purchased the truck after expiration of the 36,000-mile limit of Ford's Limited Warranty, and has not produced any evidence that his vehicle was covered by any Ford-issued warranty. (Doc. No. 122-1 at 14.)

Plaintiffs do not address this argument in their responsive brief. (*See generally* Doc. No. 183.) "[W]here the non-moving party fails to address an argument raised by the moving party in the opposition brief, the Court may consider any arguments unaddressed by the non-moving party as waived." *Novalk, LLC v. Kinsale Ins. Co.*, 21-cv-01014-BEN-RBB, 2021 WL 4134741, at *2 (S.D. Cal. Sept. 10, 2021); *see Pac. Dawn LLC v. Pritzker*, 831 F.3d 1166, 1178 n.7 (9th Cir. 2016) (noting that "the plaintiffs did not raise that argument to the district court in their . . . opposition to the defendants' motion for summary judgment, so the argument was waived."); *Jenkins v. Cnty. of Riverside*, 398 F.3d 1093, 1095 n.4 (9th Cir. 2005) ("Jenkins abandoned her other two claims by not raising them in opposition to the County's motion for summary judgment.").

Accordingly, the Court **GRANTS** summary judgment as to Saddler's breach of express warranty claim as to his 2015 F-250 (Count 25). The Court further notes it

previously granted Ford's motion to dismiss Saddler's breach of express warranty claim as to his 2019 F-350 without leave to amend, and as such, Saddler no longer has a viable breach of express warranty claim.

### b.    Hamilton (ME) and Appel (IL)

Next, Ford asserts Hamilton's and Appel's express warranty claims fail as a matter of law because they lack evidence of multiple failed repair attempts within the warranty period. (Doc. No. 122-1 at 14.)

An express warranty claim under both Maine and Illinois law requires proof of a breach of the terms of the governing warranty. *See Hasek v. DaimlerChrysler Corp.*, 745 N.E.2d 627, 634 (Ill. App. Ct. 2001) ("In a breach of express warranty action under the UCC, plaintiff must show a breach of an affirmation of fact or promise that was made a part of the basis of the bargain."); *see, e.g.*, *Mazerolle v. DaimlerChrysler Corp.*, No. CV-01-581, 2002 WL 31367215, at *3 (Me. Super. Ct. Sept. 20, 2002) (holding the plaintiffs' breach of warranty claim failed where complaint alleged transmission failed after the warranty had expired).

Ford's Limited Warranty states in part that "Ford and its authorized dealers are entitled to a reasonable time and a reasonable number of attempts within which to diagnose and repair any defect covered by this warranty." (Doc. No. 112-11 at 15 (Ford's Limited New Vehicle Warranty for Model Year 2017 for Plaintiffs Appel and Hamilton's 2017 F-250s).) Ford assert this means that to prove a claim for breach, Plaintiffs must show at least two unsuccessful repair attempts after presentation to a Ford dealer. (Doc. No. 122-1 at 15 (citing *Philippine Nat'l Oil Co. v. Garrett Corp.*, 724 F.2d 803, 808 (9th Cir. 1984), and *Pearson v. DaimlerChrysler Corp.*, 813 N.E.2d 230, 237 (Ill. App. Ct. 2004)).) While the cases cited by Ford do not stand for the proposition that plaintiffs must show at least two unsuccessful repair attempts, Plaintiffs do not dispute this. (*See* Doc. No. 183 at 10–15.)

As to Hamilton, Ford asserts it repaired her vehicle within two repair attempts. (Doc. No. 122-1 at 15.) Hamilton testified that after she first experienced the Suspension Defect in February 2020, she told a Ford dealer but her vehicle was not inspected. (Ford

8

Deposition Excerpts of Suzanne Hamilton ("Ford Hamilton Depo."), Doc. No. 122-5, at 10–11.) Thereafter, she experienced the Shimmy again in late November or early December of 2020, at which time her vehicle received a replacement steering damper under warranty. (*Id.* at 13–15.) Hamilton states she has not experienced the Shimmy since the repair. (*Id.* at 15, 18, 19.) Thus, at most, she brought her Vehicle in for two repair attempts.

The Court agrees with Ford that Plaintiffs' argument is unsupported by Maine law. While Plaintiffs assert Ford's repair during the warranty period was insufficient, neither do they dispute Hamilton has not experienced the Shimmy since the repair under warranty. *See, e.g., Canal Elec. Co. v. Westinghouse Elec. Co.*, 973 F.2d 988, 993 (1st Cir. 1992) ("To insist upon liability for unobserved defects that only such heroic (and hypothetical) inspections may have found would extend a warranty's life well beyond its specified time period, eroding its intended liability-limiting language.").

Similarly, Ford asserts Appel's express warranty claim should be rejected because he does not allege repeated failed repair attempts within the warranty period. (Doc. No. 122-1 at 15–16.) Appel's vehicle had a warranty start date of June 30, 2017. (Doc. No. 122-17 at 3.) Appel purchased his F-250 vehicle used on December 28, 2018, when the vehicle had 5,479 miles on it. (Doc. No. 122-18 at 7–8.) In December 2019, he brought his vehicle in for repair at 17,959 miles after experiencing the Shimmy the month before. (Ford Deposition Excerpts of David Appel ("Ford Appel Depo."), Doc. No. 122-19, at 3–4.) The dealer diagnosed the issue and ordered the part because it was unavailable at the time. (*Id.* at 5.) Appel then received a covered repair in April 2020, when the vehicle was within warranty. (*Id.* at 6, 7.) Because Ford's Limited Warranty has a three-year period, Ford's warranty on Appel's vehicle expired no later than June 30, 2020. Appel does not claim to have experienced the Shimmy again until February 5, 2021, after the end of the vehicle's warranty period. (Doc. No. 122-18 at 6; Ford Appel Depo. at 8–10.) Thus, Ford asserts that because Appel received a covered repair under warranty that resolved the issue until after the express warranty period expired, he cannot show multiple unsuccessful repair attempts within the warranty period. (Doc. No. 122-1 at 16.)

9

Likewise, in Illinois, "[a] promise to repair or replace defective parts is only good during the warranty period, and the latest a breach of warranty can occur is at the very end of that period." *Vapor Power Int'l, LLC v. Polyurethane Specialties Co., LLC*, No. 1–12–0544, 2014 WL 1767478, at \*8 (Ill. App. Ct. Apr. 30, 2014) (citing *Mydlach v. DaimlerChrysler Corp.*, 875 N.E.2d 1047, 1060 (2007)). Indeed, "Illinois law holds that express warranties of limited duration cover only defects that become apparent during the warranty period." *Evitts v. DaimlerChrysler Motors Corp.*, 834 N.E.2d 942, 950 (Ill. App. Ct. 2005). Plaintiffs do not dispute that Ford repaired Appel's vehicle under warranty and he did not experience the Shimmy again until after the express warranty period expired.

Plaintiffs do not dispute these facts put forth by Ford. Rather, Plaintiffs argue the alleged repairs for Hamilton and Appel were illusory because Ford knew the replacement dampers it placed on Plaintiffs' vehicles were equally defective. (Doc. No. 183 at 10.) Specifically, Plaintiffs allege that in April 2018, Ford received a surge of complaints about the Death Wobble for the 2017–2018 Class Vehicles but lacked actual solutions for it. (Doc. No. 185 at 11; Doc. No. 124-81, at 2.) Thus, Ford developed a multi-stage plan for "interim containment action" designed to mitigate customer complaints until a complete solution could be developed. (Doc. No. 185 at 11; Doc. No. 124-97, at 3–4.) Despite multiple attempted solutions for the Death Wobble, Ford continued to receive complaints from 2017–2019 model year vehicle owners. (Doc. No. 185 at 13.) Plaintiffs argue that neither Appel's nor Hamilton's vehicles had the May 2022 damper installed. (*Id.* at 14–15.) Plaintiffs contend that Ford installed previous models of the damper into these vehicles, and as such, "Ford was simply replacing one defective damper with another one." (*Id.* at 15.)

However, Plaintiffs fail to cite any case law for either Illinois or Maine, and the Court finds none, for the proposition that a vehicle repair is insufficient merely because the defendant does not perform the specific repair demanded by the plaintiff. Indeed, it can be inferred from the record that Hamilton's and Appel's repairs were completed satisfactorily

since there is no indication that their vehicles were ever serviced multiple times for the same issue while under warranty.

Based on the foregoing, the Court **GRANTS** Ford's motion for summary judgment of the breach of express warranty claims as to Plaintiffs Hamilton (Count 18) and Appel (Count 13).

### c.    Huffstetler (SC)

Ford additionally argues Huffstetler did not give Ford a "reasonable opportunity" to repair his vehicle to support his express warranty claim as a matter of law. (Doc. No. 122-1 at 17.) Under South Carolina law, "no liability arises until warrantor, after having been given a reasonable opportunity to remedy the defects, fails or refuses to do so." *Morrison v. Chrysler Corp.*, 270 F. Supp. 107, 111 (D. S.C. 1967).

Here, it is undisputed that Huffstetler prevented Ford from repairing his vehicle. Huffstetler first experienced the Shimmy in May 2020. (Ford Deposition Excerpts of David Huffstetler ("Ford Huffstetler Depo."), Doc. No. 122-12, at 8.) That same month, Huffstetler visited a Ford dealer and received a free steering damper replacement under warranty at no charge. (*Id.* at 11.) Later, in December 2020, Huffstetler testified he experienced another incident of the Shimmy. (*Id.* at 12.) At the Ford dealership, the technician stated they thought the incident might be due to the tires' tread depth being out of specification, which "can be a large factor in steering wobble." (*Id.* at 12–13.) However, Huffstetler declined the recommendation to replace his tires and demanded a new vehicle. (*Id.* at 14–15.) He testified there was nothing Ford could have done to fix the truck, and "[t]he only thing that could have satisfied [him] at that point would have been a new truck and assurances that the new truck wouldn't have the same problem[,]" or "a complete refund." (*Id.* at 16–17.)

Plaintiffs do not dispute these facts. Rather, they first respond that South Carolina law only requires Huffstetler to give notice of the defect, and even then, only to "the retail seller who tendered the goods to him." (Doc. No. 183 at 15 (quoting *Thomas v. Louisiana-Pac. Corp.*, 246 F.R.D. 505, 512–13 (D. S.C. 2007)).) Thus, they assert, because there is

11

evidence that notice was given, this satisfies the rule. (*Id.* at 15–16.) However, Plaintiffs misstate *Thomas*. In *Thomas*, the court analyzed the notice requirement for a breach of express warranty claim in the context of a motion for class certification, but did not make any finding that *only* notice is required for a breach of express warranty claim. *See Thomas*, 246 F.R.D. at 511–13. Moreover, the case law of South Carolina supports Ford's position that a warrantor must be given a reasonable opportunity to remedy a defect. For example, in *Morrison*, the court found Chrysler was entitled to judgment as to the plaintiff's breach of express warranty claim where the "record reveal[ed] that Chrysler did repair; no evidence of refusal, or failure to perform [was] present." 270 F. Supp. at 110. The court went on to state that "[i]t is equally clear that under the warranty here involved no liability arises until warrantor, after having been given a reasonable opportunity to remedy the defects, fails or refuses to do so." *Id.* at 11 (citing *Cannon v. Pulliam Motor Co.*, 94 S.E.2d 397, 700 (S.C. 1956)); *see, e.g.*, *Burton v. Chrysler Group LLC*, No. 8:10–00209–JMC, 2012 WL 831843, at *3 (D.S.C. Mar. 12, 2012) (in ruling on a motion to dismiss, the court found complaint sufficiently alleged breach of express warranty where the plaintiff pled in part that "despite repeated attempts, Defendant [was] unable to successfully repair or otherwise remedy the exhaust system defect").

Plaintiffs further argue Huffstetler could not have been the cause of preventing his vehicle's repair because Ford did not have a repair for the vehicle. (Doc. No. 183 at 15–16.) The Court understands Plaintiffs' argument to mean that because the May 2022 damper was not yet available, no sufficient repair existed. Plaintiffs acknowledge that South Carolina law does not address futility as an excuse for presentment, but attempt to rely on case law from California and Florida for the proposition that "where the only available fix is an ineffective one, additional opportunities for presentment would have been futile." (*Id.* (citing *Benkle v. Ford Motor Co.*, No. SA CV 16-1569-DOC (JCGx), 2017 WL 9486154, at *12 (C.D. Cal. Dec. 22, 2017), and *James v. Yamaha Motor Corp.*, No. 15-23750-CIV, 2016 WL 3083378, at *4 (S.D. Fla. May 31, 2016)).) However, because South Carolina law does not address futility, this Court will not apply it here.

Accordingly, the Court finds Huffstetler cannot proceed with his breach of express warranty claim because Ford did not fail to make a covered repair after a "reasonable opportunity" to do so, as required by the warranty. *See Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 525 (1992) ("A manufacturer's liability for breach of an express warranty derives from, and is measured by, the terms of that warranty."). Thus, the Court **GRANTS** Ford's motion for summary judgment as to Huffstetler's breach of express warranty claim (Count 27).

## 2.    Breach of Implied Warranty

Ford next asserts summary judgment should be granted in its favor on the implied warranty claims of Plaintiffs McGee (TX), Hamilton (ME), Nielson (CO), Selgado (NM), P. and S. Powers (CA), and Saddler (OH) because Plaintiffs' testimony shows their vehicles were fit for their ordinary purpose of providing safe and reliable transportation at the time of sale and for years afterward. (Doc. No. 122-1 at 18.) Plaintiffs respond they have alleged material issues of triable fact on their claims, and that Ford's interpretation of the law is too narrow and constructive for each of the relevant states. (Doc. No. 183 at 16.)

### a.    California (Powers)

To state a claim for breach of the implied warranty of merchantability in California, a plaintiff must show that "the product did not possess even the most basic degree of fitness for ordinary use." *In re Toyota RAV4 Hybrid Fuel Tank Litig.*, 534 F. Supp. 3d 1067, 1092 (N.D. Cal. 2021) (quoting *Mocek v. Alfa Leisure, Inc.*, 114 Cal. App. 4th 402, 406 (2003)). California courts have held that the vehicle "need not be perfect in every detail so long as it 'provides for a minimum level of quality.'" *Tae Hee Lee v. Toyota Motor Sales, U.S.A., Inc.*, 992 F. Supp. 2d 962, 980 (C.D. Cal. 2014) (quoting *Am. Suzuki Motor Corp. v. Superior Ct.*, 37 Cal. App. 4th 1291, 1296 (1995)). "The basic inquiry, therefore, is whether the vehicle was fit for driving." *Id.* However, California courts "'reject the notion that merely because a vehicle provides transportation from point A to point B, it necessarily does not violate the implied warranty of merchantability. A vehicle that smells, lurches, clanks, and emits smoke over an extended period of time is not fit for its intended

13

purposes.'" *Keegan v. Am. Honda Motor Co., Inc.*, 838 F. Supp. 2d 929, 946 (C.D. Cal. 2012) (quoting *Isip v. Mercedes-Benz USA, LLC*, 155 Cal. App. 4th 19, 27 (2007)).

Ford asserts the Powers' implied warranty claim fails because undisputed evidence shows their Vehicle was fit for its ordinary purpose; specifically, the evidence shows the Powers' use of the Vehicle did not change after experiencing the Shimmy and they drove the Vehicle for years afterward. (Doc. No. 122-1 at 23.) Patrick Powers purchased his 2019 F-250 in July 2019. (Ford Deposition Excerpts of Patrick Powers ("Ford P. Powers Depo."), Doc. No. 122-6, at 8.) He testified he first experienced the Shimmy in October 2019 and experienced it a few additional times afterward. (*Id.* at 9, 15.) Despite these experiences, Mr. Powers testified the way he used his Vehicle did not change in any way from the time he purchased it. (*Id.* at 16.) Mr. Powers has used his Vehicle to tow his boat "[t]o San Diego, to Long Beach, or to Mexico," (*id.* at 3), and testified the drive from his home in Escondido, California to Baja, Mexico is roughly 530-miles, taking approximately 11 hours, (*id.* at 5). Mr. Powers also continues to transport passengers in his Vehicle, including his girlfriend and two daughters, and allows his daughters to drive the Vehicle. (*Id.* at 4–5, 13–15.) Additionally, Mr. Powers testified he did not experience the Shimmy again after receiving a repair under warranty in September 2021. (*Id.* at 12.) The Powers state they continued driving their Vehicle for more than 36,000 miles while experiencing no accidents. (*See* Doc. No. 122-30 at 7; Ford P. Powers Depo. at 6.) Ultimately, Mr. Powers agreed he is "happy with [his] purchase of the 2019 F-250 truck" and stated that "with the exception of the - - the wobbling of the front, it has been a great truck." (Ford P. Powers Depo at 17.) Moreover, Sheri Powers stated she drove the Vehicle "[m]onthly-ish" both before and after experiencing steering oscillation. (Ford Deposition Excerpts of Sheri Powers, Doc. No. 122-31, at 3–4.) Ms. Powers testified the reason she stopped driving the Vehicle in late 2021 was because she moved away from her home in Escondido, California upon divorcing Mr. Powers. (*Id.* at 5.)

Plaintiffs do not dispute the above facts. (*See generally* Doc. No. 183 at 17.) Rather, they assert that merely because a vehicle provides transportation, it may still violate the

14

implied warranty of merchantability. (*Id.*) They assert the question is whether a vehicle is "in safe condition and substantially free of defects." (*Id.* (quoting *Isip*, 155 Cal. App. 4th at 27).) Plaintiffs rely on *Kulp v. Munchkin, Inc.*, 678 F. Supp. 3d 1158 (C.D. Cal. 2023), which reiterated that "California courts have rejected the argument that unsafe products retaining some functionality satisfy the implied warranties." 678 F. Supp. 3d at 1168 (quoting *Roberts v. Electrolux Home Prods., Inc.*, No. CV 12–1644 CAS (VBKx), 2013 WL 7753579, at \*5 (C.D. Cal. Mar. 4, 2013)). However, Plaintiffs fail to cite any evidence in the record in support of this claim and thus have not met their burden to establish that a genuine dispute as to any material fact actually exists as to whether the Vehicle is in a safe condition. (*See generally* Doc. No. 183 at 17.)

Plaintiffs further rely on *Avedisian v. Mercedes-Benz USA, LLC*, No. CV 12–00936 DMG (CWx), 2013 WL 2285237 (C.D. Cal. May 22, 2013) ("*Avedisian I*"), in which the court restated the *Isip* court's reasoning that a vehicle is fit for its ordinary purpose if it is "in safe condition and substantially free of defects." 2013 WL 2285237, at \*5 (quoting *Isip*, 155 Cal. App. 4th at 27). However, *Avedisian I* is distinguishable here, as the court denied the defendant's motion to dismiss upon a showing that the plaintiff "sustained cuts" and alleged a danger of "lacerated fingers" because of the defect, thus adequately pleading the product was not in a safe condition. *Id.* Moreover, as noted by Ford, the same court later granted summary judgment in the defendant's favor on this same claim because it found the plaintiff "operated the vehicle despite the presence of the defect for most of those 4.5 years." *Avedisian v. Mercedes-Benz USA, LLC*, 43 F. Supp. 3d 1071, 1079 (C.D. Cal. 2014) ("*Avedisian II*"). The court found "no reasonable factfinder could conclude that the defect 'drastically undermined the ordinary operation of the vehicle'" due to the "vehicle's long operational history after the Chrome Defect became apparent" and the plaintiff's husband's testimony "that had he felt any life-threatening risk to his personal safety he would not have driven the vehicle . . . ." *Id.* The Court finds the ruling in *Avedisian II* more persuasive, as similarly here, the Powers continued driving their Vehicle for more than 36,000 miles

and experienced no accidents or injury. (*See* Doc. No. 122-30 at 7; Ford P. Powers Depo at 6.)

Additionally, the Court finds Plaintiffs' reliance on *Brand v. Hyundai Motor America*, 226 Cal. App. 4th 1538 (2014), distinguishable. In *Brand*, the court found "a reasonable jury could conclude that a vehicle sunroof that opens and closes *on its own* creates a substantial safety hazard." 226 Cal. App. 4th at 1547. The plaintiff asserted the defect created a dangerous distraction, describing "how on the freeway the papers in his car suddenly swirled about in the passenger compartment without notice . . . ." *Id.* The plaintiff further testified that after the defect manifested, he returned the vehicle to the dealership for repair after only owning the vehicle for a couple of hours after finalizing the transaction. *Id.* at 1542. The plaintiff never picked up the defective vehicle after delayed repair and instead continued driving his old vehicle. *Id.* at 1543. Here, Plaintiffs fail to cite to any portion of the record that shows the defect created any such dangerous distraction, and the record shows that the Powers continued driving their Vehicle without change. (*See* Doc. No. 183 at 17.)

Based on the foregoing, the Court **GRANTS** Ford's motion for summary judgment as to the Powers' implied warranty claim (Count 5).

### b.    Texas (McGee)

Similar to the law of California, Texas law states "the concept of defect for a breach of the merchantability warranty is that the goods sold are not fit for the ordinary purpose for which the goods are used." *Chandler v. Gene Messer Ford, Inc.*, 81 S.W.3d 493, 503 (Tex. App. 2002). "The ordinary purpose of an automobile is to provide transportation." *Id.*

Ford asserts McGee's implied warranty claim fails because she and her husband have driven their Vehicle for hundreds of thousands of miles, accident free. (Doc. No. 122-1 at 19.) McGee purchased her 2018 F-250 new in February 2018. (Doc. No. 122-23 at 8.) Between March and August 2018, the Vehicle experienced the Shimmy approximately six to eight times. (*Id.* at 5.) Despite this, McGee testified that she and her husband continued

16

to drive the Vehicle regularly all over Texas. (Ford Deposition II Excerpts of Caroline
McGee, Doc. No. 122-24, at 3.) This has included hauling steers in a trailer to different
shows and transporting her grandchildren. (Ford Deposition I Excerpts of Caroline McGee
("Ford McGee Depo. I"), Doc. No. 122-7, at 3–4, 12.) McGee testified she often averaged
putting 20,000 miles on her vehicle per month. (*Id.* at 6.) She further stated that when she
experienced the Shimmy, she did not pull over to the side of the road, but rather "[j]ust
continue[d] driving it." (*Id.* at 9–10.)

Further, until August 2022, McGee used the Vehicle as her primary vehicle, at which
time her husband began using it as his primary vehicle. (*Id.* at 7–8.) Mr. McGee currently
drives the truck a total of approximately 300 miles a day for his daily trip to and from work.
(Ford Deposition Excerpts of Jerry McGee, Doc. No. 122-25, at 4.) As of July 2023, after
over five years of ownership, the Vehicle had approximately 229,000 miles on it. (*Id.* at 5–
6.)

Again, Plaintiffs do not dispute the above facts. (*See* Doc. No. 183 at 17–18.) Rather,
they assert the safety-related defects they allege create a material issue of fact to be decided
by a jury. (*Id.*) Plaintiffs rely on *Adams v. Nissan North America, Inc.*, 395 F. Supp. 3d 838
(S.D. Tex. 2018), in which the court denied the defendant's motion to dismiss the plaintiffs'
breach of implied warranty claims. 395 F. Supp. 3d at 854. The court found the plaintiffs
sufficiently alleged the vehicles were unfit for transportation because the alleged defect, a
reflective dashboard, reflected off the windshield, causing drivers to struggle to see and
obscure their view. *Id.* The court thus found the plaintiffs sufficiently pled the defect
created a "significant safety hazard" which rendered the vehicle "unreasonably dangerous
to operate." *Id.* However, as noted, this case was decided under a Rule 12(b)(6) standard,
which differs from the summary judgment standard before the Court, and the *Adams* court
did not discuss the plaintiffs' use of the vehicle. Moreover, Plaintiffs fail to cite any portion
of the record to support a claim that the Suspension Defect created a "significant safety
hazard" that rendered the Vehicle "unreasonably dangerous to operate."

///

17

Plaintiffs further rely on *Barragan v. General Motors LLC*, No. 4:14–CV–93–DAE, 2015 WL 5734842 (W.D. Tex. Sept. 30, 2015). (Doc. No. 183 at 18.) In *Barragan*, the court found the plaintiffs sufficiently pled that the at-issue vehicle was unsafe for its intended purpose where the alleged defect caused the decedent driver to lose control of the vehicle, which then rolled over, resulting in the deaths of both the driver and her brother. 2015 WL 5734842, at *1, *8. However, unlike Plaintiffs' assertion, the court did not discuss the age or continued use of the vehicle in analyzing the plaintiff's implied warranty claim. *See id.* at *8. The Court finds *Barragan* further distinguishable because it was decided under a Rule 12(b)(6) standard, the driver of the vehicle sustained injury resulting in death, and there was no discussion of the plaintiffs' use of the vehicle after the defect manifested. Plaintiffs offer no evidence to support any similarity between these two cases. (*See* Doc. No. 183 at 18.)

In reply, Ford argues Plaintiffs fail to offer evidence that McGee treated her vehicle as unsafe or to rebut Ford's showing that her vehicle performed safely. (Doc. No. 154 at 8.) The Court agrees. While Plaintiffs argue that asserting a "significant safety hazard" rendering the vehicle "unreasonably dangerous to operate" is sufficient to establish an implied warranty claim, they fail to offer evidence that the Suspension Defect rises to the standard they put forth. Thus, the Court finds Plaintiffs fail to demonstrate a genuine issue of material fact as to whether the alleged defect rendered the vehicle unfit for its "ordinary purpose."

Based on the foregoing, the Court **GRANTS** Ford's motion for summary judgment as to McGee's implied warranty claim (Count 29).

### c.     Maine (Hamilton)

"Merchantable goods are goods that are 'fit for the ordinary purposes for which such goods are used.'" *Jolovitz v. Alfa Romeo Distribs. of N. Am.*, 760 A.2d 625, 629 (Me. 2000). "Since cars are designed to provide transportation, their ordinary purposes are to transport the purchaser along any highway in a safe manner." *Doll v. Ford Motor Co.*, 814 F. Supp. 3d 526, 544 (D. Md. 2011) (applying Maine law).

18

1    Ford asserts Hamilton's consistent and extensive use of her Vehicle throughout her

2    ownership demonstrates she has no implied warranty claim. (Doc. No. 122-1 at 20.)

3    Hamilton purchased her Vehicle in October 2017. (Ford Hamilton Depo. at 7–8.) Since her

4    purchase, she has driven from Maine to Florida and back once a year, even after

5    experiencing the Shimmy. (*Id.* at 18.) As of April 2023, her Vehicle had over 59,000 miles

6    and has not experienced any accidents allegedly due to the Suspension Defect. (*Id.* at 20,

7    8.)

8        In support of its motion, Ford cites *Mazerolle*, which dismissed the plaintiff's

9    implied warranty claim in part because "the complaint demonstrates that the vehicle in

10   question functioned for more than 2 1/2 years without incident . . . ." 2002 WL 31367215,

11   at *5. Ford additionally relies on *Jolovitz*, in which the court found no error in the lower

12   court's judgment in favor of the warrantor. The *Jolovitz* court agreed that "[i]n the absence

13   of a manufacturing defect, and given the fact that reported problems were repaired,

14   replaced, or adjusted, . . . Jolovitz's car was fit for its ordinary purpose and thus did not

15   violate the implied warranty of merchantability." 760 A.2d at 629. However, *Jolovitz* is

16   distinguishable in that this Court has not determined the issue of whether there is a

17   manufacturing defect.

18       Plaintiffs respond that an implied warranty of merchantability claim exists when the

19   product has been used for its ordinary purpose but there are defects that either cause the

20   product to "not work properly" or made the product "unexpectedly harmful." (Doc. No.

21   183 at 19 (quoting *Canning v. Broan-Nutone, LLC*, No. 05-15-B-W, 2007 WL 1112355,

22   at *18 (D. Me. March 30, 2007)).) Plaintiffs assert they have offered sufficient evidence to

23   satisfy either standard. (*Id.*)

24       The Court finds Plaintiffs have produced sufficient evidence of a defect causing the

25   Vehicle to "not work properly." *See Canning*, 2007 WL 1112355, at *18; *Lorfano*, 569

26   A.2d at 197. The evidence cited by both parties in connection with this motion show

27   Hamilton experienced sustained steering oscillation in using the Vehicle, and thus the

28   Court can infer that the Vehicle does "not work properly."

However, Plaintiffs fail to cite any evidence in the record to support their argument that the Suspension Defect causes the Vehicle to be "unexpectedly harmful." The Court reminds Plaintiffs of their burden in opposing summary judgment: the opposing party cannot "rest upon the mere allegations or denials of the adverse party's pleading but must instead produce evidence that sets forth specific facts showing that there is a genuine issue for trial." *Estate of Tucker*, 515 F.3d at 1030 (internal quotation marks, alterations, and citation omitted). Plaintiffs have failed to generate any genuine issue of fact concerning this claim.

Accordingly, the Court **GRANTS** Ford's motion as to a finding that the Vehicle was "unexpectedly harmful" **AND DENIES** Ford's motion as to a finding the Vehicle does "not work properly" under Hamilton's implied warranty claim (Count 17).

### d.    Colorado (Nielsen)

"The case law is consistent that, although a vehicle is operable, it may still be unsafe and unfit for ordinary use." *O'Connor v. BMW of N. Am*, No. 18-cv-03190-CMA-STV, 2020 WL 1303285, at *5 (D. Colo. Mar. 19, 2020) ("*O'Connor II*"). The implied warranty of merchantability requires that the product be "fit for the ordinary purposes for which such goods are used," among other requirements. Colo. Rev. Stat. § 4-2-314(2)(c). In the vehicle context, "[s]ince cars are designed to provide transportation, the implied warranty of merchantability is simply a guarantee that they will operate in a safe condition and substantially free of defects." *Carlson v. Gen. Motors Corp.*, 883 F.2d 287, 297 (4th Cir. 1989); *see Trust Dep't of First Nat'l Bank of Santa Fe, Colo. Branch v. Burton Corp.*, No. 11–cv–01629–REB–CBS, 2013 WL 4884483, at *6 (D. Colo. Sept. 11, 2013) (the warranty of merchantability implies that goods are fit for their ordinary purposes).

Ford argues Nielson also continuously used his Vehicle, and thus cannot show his Vehicle was "unsafe and unfit for ordinary use." (Doc. No. 122-1 at 21 (citing *O'Connor II*, 2020 WL 1303285, at *5).) Nielsen purchased his Vehicle new on October 6, 2017. (Doc. No. 122-26 at 3.) He testified he first experienced steering oscillation in January 2019. (Ford Deposition Excerpts of Brad Nielsen, Doc. No. 122-4, at 15.) After January

20

2019, Nielsen states he did not experience the Shimmy again until November 26, 2022, although "[t]here could have been that one time in '21 that it happened." (*Id.* at 23–24.) He additionally testified that he was able to drive his Vehicle after the November 26 incident, and that at that time, the Vehicle had about 110,000 miles on it. (*Id.* at 29.) Moreover, he drives between 1,500 to 2,000 miles per month in the winter months, totaling roughly 15,000 to 20,000 miles per year. (*Id.* at 11–12.) Nielson also states he continues to use his Vehicle to tow both a 24-foot trailer and a 9,000-pound tractor. (*Id.* at 14.) As of April 2023, his Vehicle had about 115,000 miles. (*Id.* at 5.) Further, Nielson testified that each time the Shimmy occurred, he was able to apply his brakes, pull his Vehicle over to the side of the road and stop, and was able to control the steering wheel to get to the side of the road. (*Id.* at 16–17, 26–27, 30.)

In response, Plaintiffs rely on *O'Connor v. BMW of North America*, 18-cv-03190-CMA-STV, 2020 WL 2309617 (D. Colo. Jan. 7, 2020) ("*O'Connor I*"), in which the court denied the motion to dismiss the plaintiffs' implied warranty claim. The *O'Connor I* court stated that "[w]hile Plaintiffs do not allege that their engines have in fact instantaneously failed, Plaintiffs nevertheless demonstrate that their vehicles have otherwise manifested the excessive oil consumption defect such that the risk of engine failure is not purely hypothetical." 2020 WL 2309617, at *11. The court noted the alleged defect was "likely to cause catastrophic engine failure, which could result in life-threatening accidents and unreasonable safety hazards." *Id.* at *9. Plaintiffs assert that while none of them "has experienced a catastrophic failure, each has experienced the defect in such a way that the risk of catastrophe is 'not purely hypothetical.'" (Doc. No. 183 at 18.) However, Plaintiffs again fail to cite to any evidence in the record to indicate that the "risk of catastrophe is not 'purely hypothetical.'" Plaintiffs have failed to generate any genuine issue of fact concerning this claim. Accordingly, the Court **GRANTS** Ford's motion for summary judgment as to Nielsen's implied warranty claim (Count 10).

///

///

21

1

### e.    New Mexico (Selgado)

2    "Any implied warranty of merchantability in this case requires that the product must

3    be fit for the ordinary purposes for which such goods are used." *Daniell v. Ford Motor Co.,*

4    *Inc.*, 581 F. Supp. 728, 731 (D.N.M. 1984). A plaintiff must demonstrate that the product

5    is defective, and that the defect "constitutes an unreasonable risk of injury." *Bellman v.*

6    *NXP Semiconductors USA, Inc.*, 248 F. Supp. 3d 1081, 1155 (D.N.M. 2017).

7    Ford asserts Selgado's claim fails for similar reasons, as Selgado's own admissions

8    "make it impossible to prove that his vehicle 'is not safely operable' and has 'many serious

9    mechanical and physical defects.'" (Doc. no. 122-1 at 22 (quoting *Two Old Hippies, LLC*

10    *v. Catch the Bus, LLC*, 784 F. Supp. 2d 1200, 1212 (D. N.M. 2011)).) Selgado purchased

11    his Vehicle new on March 4, 2018, when the Vehicle had 14 miles on the odometer. (Doc.

12    No. 122-28 at 7.) He first experienced the Shimmy in or around December 2020. (Ford

13    Deposition Excerpts of Steve Selgado, Doc. No. 122-29, at 9–10.) He eventually received

14    a free steering damper replacement under warranty, on or around August 24, 2022. (*Id.* at

15    14.) Selgado states he has not experienced the Shimmy again since the replacement. (*Id.* at

16    15.) Moreover, he states that after experiencing the Shimmy, his use of the Vehicle did not

17    change. (*Id.* at 16–17.) As of April 2023, he had approximately 39,000 miles on the Vehicle

18    and states he continues to use it to go hunting and to pull a camping trailer to go camping.

19    (*Id.* at 3.) Additionally, he has not experienced an accident due to the Suspension Defect.

20    (*Id.* at 6–7.) Selgado testified he does not use the Vehicle "too often" but when he does,

21    "it's to long places." (*Id.* at 5.) He states the reason he does not use his Vehicle as his

22    primary vehicle is because of the gas usage, rather than due to any defect. (*Id.*)

23    In response, Plaintiffs do not dispute any of the above facts or cite to any evidence

24    of their own, but argue the Suspension Defect constitutes an unreasonable risk of injury.

25    (Doc. No. 183 at 19.) However, because Plaintiffs do not cite to any evidence in the record,

26    they fail to generate any genuine issue of material fact as to whether the Suspension Defect

27    amounts to an "unreasonable risk of injury." Accordingly, the Court **GRANTS** Ford's

28    motion for summary judgment as to Selgado's implied warranty claim (Count 20).

### f.    Ohio (Saddler)

"To maintain a breach of implied warranty in tort claim, the plaintiff 'must allege that (1) a defect existed in a defendant's product that made it unfit for its ordinary, intended use; (2) the defect existed at the time the product left the defendant's possession; and (3) the defect was the proximate cause of the plaintiff's injuries.'" *Szep v. Gen. Motors LLC*, 491 F. Supp. 3d 280, 292 (N.D. Ohio 2020) (quoting *Mooradian v. FCA US, LLC*, No. 1:17-CV-1132, 2017 WL 4869060, at *7 (N.D. Ohio Oct. 27, 2017)). Ohio courts have held that to satisfy this element "[w]ith respect to consumer vehicles, plaintiffs 'must adequately allege that their vehicles are not fit for safe driving and reliable transportation.'" *Id.* at 292 (quoting *Mooradian*, 2017 WL 4869060, at *7) (internal quotation marks omitted). Ohio courts have "declined to find a vehicle merchantable, [when] the vehicle has required numerous repairs over a relatively short time-span, or has suffered from a major safety defect." *Mooradian*, 2017 WL 4869060, at *7.

Ford argues Saddler's tortious breach of implied warranty claim for his 2019 F-350 fails because he cannot show his truck is "not fit for safe driving and reliable transportation." (Doc. No. 122-1 at 24 (quoting *Szep*, 491 F. Supp. at 292).) Ford further asserts Saddler is unable to show numerous repairs over a relatively short time-span or a major safety defect. (*Id.*) Saddler purchased his new 2019 F-350 in September 2018, when the Vehicle had 8 miles on the odometer. (Doc. No. 122-14 at 7.) He first experienced the Shimmy when his Vehicle had approximately 70,000 miles on it. (Ford Deposition Excerpts of Roger Saddler, Doc. No. 122-3, at 3.) He received a customer satisfaction program repair, and did not experience the Shimmy again for an additional 20,000 miles. (*Id.* at 7.) He further testified that when he did experience the Shimmy, he "slowed down and got off the side of the road and once it - - once we stopped the vehicle, everything was fine. . . . And we just continued our trip." (*Id.* at 4.) Additionally, after experiencing the Shimmy, he continued to "travel all over the place in terms of going to different states with [his] family between August of 2020 and January of 2021[.]" (*Id.* at 7.) Saddler testified that he ceased towing his camper with the Vehicle between August 2020 and January 2021,

23

1    but "not because of the truck. . . . I'd have probably hooked that camper up and took off if

2    we could have." (*Id.* at 7–9.) Rather, Saddler explained it was due to the winter season and

3    the closure of campgrounds due to COVID-19. (*Id.*) When he traded in his Vehicle in

4    January 2021, it had over 100,000 miles on the odometer. (Doc. No. 122-14 at 8.)

5         Plaintiffs respond that Ohio law provides for implied warranty in tort in cases where

6    a plaintiff has incurred purely economic loss and the plaintiff is not in privity with the

7    manufacturer. (Doc. No. 183 at 20 (citing *Caterpillar Fin. Servs. Corp. v. Harold Tatman*

8    *& Son's Ents., Inc.*, 50 N.E.3d 955, 963 (Ohio Ct. App. 2015)).) However, Plaintiffs'

9    failure to provide evidence of an economic loss or develop this argument further is fatal to

10   this argument. Moreover, Plaintiffs' citation to paragraphs 15 through 140 of the Leiss

11   Report in support of this argument spans over thirty-four pages. It bears repeating the

12   familiar maxim: "judges are not like pigs, hunting for truffles buried in briefs." *Indep.*

13   *Towers of Wash. v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003). "Nor are they

14   archaeologists searching for treasure. Put simply, the Court is not obligated to paw over

15   files in order to make a party's claim." *Krause v. Nev. Mut. Ins. Co.*, No. 2:12-CV-00342-

16   JCM, 2014 WL 99178, at *2 (D. Nev. Jan. 3, 2014).

17        Plaintiffs further assert they proffer evidence satisfying the breach of implied

18   warranty elements. (Doc. No. 183 at 20.) However, as discussed above and fatal to their

19   argument, they fail to cite to any evidence in the record, and thus are unable to generate

20   any genuine issue of material fact as to whether the alleged defect caused economic loss or

21   whether the Vehicle was fit for safe driving and reliable transportation. Accordingly, the

22   Court **GRANTS** Ford's motion for summary judgment as to Saddler's implied warranty

23   claim, only as to his 2019 F-350 (Count 24).

### 3.    Statute of Limitations

25        Next, Ford argues both Lessin's (CA) and Smalley's (CA) claims under the CLRA

26   and for California common law fraudulent concealment are time-barred because they did

27   not bring their claims within the three-year statute of limitations. (Doc. No. 122-1 at 25);

28   *see* Cal. Civ. Code § 1783 (setting a three-year statute of limitations for actions under the

CLRA); Cal. Civ. Proc. Code § 338(d) (setting three-year statute of limitations for fraud running from "the discovery, by the aggrieved party, of the facts constituting the fraud"). Plaintiffs argue the discovery rule and fraudulent concealment tolling postpones the accrual of these Plaintiffs' CLRA and fraudulent concealment claims.[2] (Doc. No. 183 at 21.) "Whether the statute of limitations bars a claim is generally a question of fact." *Galvez v. Ford Motor Co.*, No. 2:17-cv-02250-KJM-KJN, 2018 WL 4700001, at *3 (E.D. Cal. Sept. 30, 2018) (citing *E-Fab, Inc. v. Accts., Inc. Servs.*, 153 Cal. App. 4th 1308, 1320 (2007)). "The statute of limitations issue becomes a question of law, however, when the facts yield only one reasonable conclusion." *Id.*

Here, Lessin purchased his Vehicle on July 23, 2010, (*see* Doc. No. 122-32 at 7), and filed his claim nine years later on June 10, 2019, (*see* Complaint, Doc. No. 1). Similarly, Smalley purchased her Vehicle on March 11, 2012, (*see* Doc. No. 122-33 at 8), and filed her first claim seven years later on October 18, 2019, (*see Smalley et al. v. Ford Motor Co.*, No. 2:19-cv-02104, Compl., Dkt. 1 (E.D. Cal.)). It is apparent from the face of both complaints that their claims are time-barred unless saved by tolling. Because a plaintiff bears the burden of proving tolling at trial, Plaintiffs bear the burden of establishing a triable issue as to tolling to survive summary judgment. *See Anagnostellis v. Pitney Bowes Inc.*, No. CV 12-239 PSG MRWX, 2013 WL 8840335, at *2 (C.D. Cal. Mar. 5, 2013).

### a.    Discovery Rule Tolling

The discovery rule postpones accrual of a claim until "the plaintiff discovers, or has reason to discover the cause of action." *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1024 (9th Cir. 2008) (quoting *Norgart v. Upjohn Co.*, 21 Cal. 4th 383, 397 (1999)). To

---

[2] In its motion for summary judgment, Ford also argues equitable estoppel does not apply, citing the FACC which asserts Ford is estopped from relying on any statutes of limitations. (Doc. No. 122-1 at 27 (citing FACC ¶¶ 212–15).) Plaintiffs do not address this argument in their opposition. (*See generally* Doc. No. 183.) Accordingly, the Court finds this argument waived. *See Novalk, LLC*, 2021 WL 4134741, at *2 ("[W]here the non-moving party fails to address an argument raised by the moving party in the opposition brief, the Court may consider any arguments unaddressed by the non-moving party as waived.")

successfully invoke the discovery rule, a plaintiff must show "(1) the time and manner of discovery and (2) the inability to have made earlier discovery despite reasonable diligence." *Goldstein v. Gen. Motors LLC*, 517 F. Supp. 3d 1076, 1091 (S.D. Cal. 2021) (quoting *In re Conseco Ins. Co. Annuity Mktg. & Sales Pracs. Litig.*, No. C-05-04726 RMW, 2008 WL 4544441, *8 (N.D. Cal. Sept. 30, 2008)). "[A]t the summary judgment stage, the sufficiency of Plaintiffs' allegations are no longer reviewed in the abstract, but are tested in light of the evidence submitted by the parties." *Mortkowitz v. Texaco Inc.*, 842 F. Supp. 1232, 1238 (N.D. Cal. 1994).

The threshold question is the time and manner of the discovery that the problems with Lessin's and Smalley's Vehicles might be the result of wrongdoing. Ford asserts Lessin and Smalley had "reason to discover" the Suspension Defect after first experiencing the effects of the defect. (Doc. No. 122-1 at 26–27.) Plaintiffs respond that "the mere fact that they experienced the Death Wobble does not, as a matter of law, establish inquiry notice." (Doc. No. 183 at 20–21.) Plaintiffs contend their discovery was delayed until June 13, 2018 for Lessin, and July 25, 2019 for Smalley, the respective dates of the final failed attempts to remedy the Suspension Defect. (*Id.* at 22.)

The record contains the following evidence regarding Lessin's awareness of the Suspension Defect: the first time Lessin "noticed that there was some wobble or oscillation in the steering wheel" was "sometime in 2014[,] [c]ould have been '15." (Ford Deposition Excerpts of William Lessin ("Ford Lessin Depo."), Doc. No. 122-8, at 5–6.) Lessin further testified that "for the first four years or so [2010–2014]," "there was something going on, I believe, but it wasn't drastic like this wobble that goes on now. It was just a feeling that there was something not right." (*Id.* at 5.) In February 2016, Lessin brought his Vehicle in to Kearny Ford for a regular service, and states he waited until this regular service visit to raise the issue of the Shimmy. (Plaintiffs' Deposition Excerpts of William Lessin ("Pl. Lessin Depo."), Doc. No. 141-5, at 3–4.) Thereafter, Lessin testified he experienced the Shimmy six to eight more times before taking his Vehicle in a second time to Mossy Ford in April 2018. (*Id.* at 6–7, 10.) At this time, Lessin learned from a service technician that

there had been cases of other trucks having issues with the "Death Wobble." (*Id.* at 10.) To repair the Suspension Defect, Mossy Ford recommended that Lessin have several of the Vehicle's suspension components replaced, to which he agreed. (*Id.* at 8.) Lessin then brought the Vehicle in to Mossy Ford again in May and June 2018, though Plaintiffs fail to provide evidence of the reason for these visits or what occurred. (*Id.* at 11.) Lessin contacted his attorney thereafter. (*Id.*)

Similarly, Smalley testified she first experienced steering oscillation within the first year she owned the Vehicle, sometime between March 2012 and March 2014. (Ford Deposition Excerpts of Carol Smalley ("Ford Smalley Depo."), Doc. No. 122-9, at 3–4 (stating she experienced the Shimmy between March 2012 and March 2013); Plaintiffs' Deposition Excerpts of Carol Smalley ("Pl. Smalley Depo."), Doc. No. 141-6, at 3 (testifying that she mentioned the shaking when bringing the Vehicle in for an oil change within "the first year or two" that she owned the vehicle, between 2012 and 2014).) She also testified that she experienced the Shimmy approximately eight to ten times within that two-year span. (Ford Smalley Depo at 5.) Smalley states she raised concerns about the shaking during a visit to Ford for an oil change,[3] but the Ford invoice did not mention the shaking. (Pl. Smalley Depo. at 5.) She testified that "we just trusted that they did go through the vehicle, and there was nothing wrong other than the tires needed to be rotated." (*Id.*) Thereafter, she brought her Vehicle in to Auburn Ford in March 2017, where "they told us they fixed the problem" by replacing the radiator, brakes, and rotors. (*Id.* at 7.) Smalley experienced the Shimmy again in the beginning of 2019. (*Id.* at 7–8.)

Next, the Court must determine whether Plaintiffs provided sufficient evidence demonstrating that Lessin and Smalley exercised due diligence in seeking to uncover the facts giving rise to their claims. To fulfill this prong, "[a] plaintiff must plead that, despite diligent investigation of the circumstances of the injury, he or she could not have

---

[3] Plaintiffs fail to provide the date of this visit. (*See* Doc. No. 183 at 22–23.)

reasonably discovered facts supporting the cause of action within the applicable statute of limitations period." *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 809 (2005). Plaintiffs allege several facts related to their inability to discover the alleged defect.

First, Plaintiffs argue that several TSBs issued by Ford between 2005 and 2018 prevented Lessin and Smalley from discovering the defect, and thus were not at fault for failing to discover it. (Doc. No. 183 at 23–24.) Specifically, they assert the Ford mechanics' explanations to Plaintiffs Smalley and Lessin that the oscillations resulted from various reasons unrelated to the defect "was the direct result of Ford's fraudulent efforts to prevent [Plaintiffs] from discovering the defect." (*Id.* at 23.) Plaintiffs contend Ford issued these TSBs to dissuade its dealership mechanics from investigating customer complaints about the Suspension Defect beyond merely checking their tire pressure. (*Id.*) Several TSBs recommend that Ford mechanics begin the vehicle inspection by setting tire pressures, and go on to recommend further actions. For example, TSB 04-26-1 recommends the following steps after setting tire pressures: "inspect the steering damper. . . . If leaks are present, install a new steering damper and continue with this TSB. If no leaks are present, continue with this TSB." (Doc. No. 120-38 at 2.) The TSB goes on to recommend "check[ing] torques on the steering system fasteners . . . adjust to specification as required." (*Id.*) The TSB then provides instructions for "steering gear mesh load adjustment" and "replacement of redundant control steering wheel." (*Id.* at 2–3.) In TSB 06-15-1, the Service Procedure Summary directs mechanics to "[s]et tire pressure and road test vehicle to evaluate vehicle before proceeding with further repairs. If issue is resolved, do not proceed with the rest of this TSB." (Doc. No. 120-39 at 2.) The TSB then goes on to recommend further repairs if the issue is not solved by setting tire pressure. (*Id.*; *see* Doc. No. 120-40, -41.) Other TSBs do not direct the mechanics to end their repairs after adjusting tire pressure. (*See* Doc. No. 120-113.)

Plaintiffs further assert that NHTSA's 2007 testing demonstrated that damper functionality contributed significantly to the Shimmy. (Leiss Report ¶¶ 42–44.) However, Ford shifted the blame to truck owners, claiming they were "intentionally lowering the tire

28

pressures" on their vehicles, thereby causing the Shimmy. (Doc. No. 120-43 at 17.) Ford did not disclose to vehicle owners and NHTSA that it had internally already recognized the need for a damper with more damping power, and the inadequacy of its damper design. (Doc. No. 124-34 at 2; Doc. No. 124-11 at 3.) Consequently, NHTSA closed its investigation pursuant to Ford's promise to mail vehicle owners a notice about the "importance of maintaining proper tire pressure to prevent shimmy." (Doc. No. 120-45 at 2.) Ultimately, Plaintiffs contend that "[g]iven the technical (and unseen) nature of the Defect and Ford's fraud, Lessin and Smalley could have only suspected wrongdoing on Ford's part after multiple failed repair attempts." (Doc. No. 183 at 24.)

Courts in this circuit have found that California plaintiffs are not charged with a duty to reasonably investigate until the alleged defect manifests in their vehicles. *See Goldstein*, 517 F. Supp. 3d at 1092 (where the plaintiffs pled when they first noticed the defect, finding "[t]hese facts are sufficiently detailed to provide Defendants notice of the time at and manner in which Plaintiffs . . . discovered the Defect"); *In re Gen. Motors LLC CP4 Fuel Pump Litig.*, 393 F. Supp. 3d 871, 884 (N.D. Cal. 2019) (finding "Plaintiffs did not have reason to discover the defects in their vehicles until they experienced adverse effects resulting from those defects"); *Galvez*, 2018 WL 4700001, at *5 (finding the plaintiff's claim began accruing "[a]t the very least" where the defect manifested for a third time, "particularly considering that Galvez at that time regarded the check engine light as a safety concern that rendered the truck unreliable"); *Philips v. Ford Motor Co.*, No. 14–CV–02989–LHK, 2015 WL 4111448, at *8 (N.D. Cal. July 7, 2015) (finding plaintiffs were charged with a duty to investigate and presumptive knowledge of the defect when the defect manifested in their vehicles); *Plumlee v. Pfizer, Inc.*, No.: 13–CV–00414–LHK, 2014 WL 4275519, at *7–9 (N.D. Cal. Aug. 29, 2014) (finding plaintiff's claim accrued when she stopped using prescription medication because she did not believe it was working and thus was provided circumstances to cause suspicion of wrongdoing); *Herremans v. BMW of N. Am., LLC*, No. CV 14-02363 MMM PJWX, 2014 WL 5017843, at *5 (C.D. Cal. Oct. 3, 2014) (concluding the plaintiff failed to allege reasonable diligence when the

defendant repaired the leak in her car's water pump while under warranty, but plaintiff alleged delayed discovery until the second time she required a repair).

The Court finds Lessin's duty to reasonably investigate arose when the Shimmy manifested in his Vehicle, at the latest in 2015, when he "noticed that there was some wobble or oscillation in the steering wheel." Moreover, the Court does not find persuasive that either the issuance of TSBs or the NHTSA's investigation prevented Lessin from reasonably investigating the defect. Thus, Lessin's claims became time-barred in 2018, after the three-year statute of limitations ran. Because he filed his claim in June 2019, the Court **GRANTS** the motion for summary judgment as to Lessin's CLRA and fraudulent concealment claims.

As to Smalley, her duty to reasonably investigate arose when the Shimmy manifested in her Vehicle, at the latest in March 2014. However, the Court finds Ford prevented Smalley from reasonably investigating the defect. During one visit to a Ford dealership for an oil change—although the date is not provided—Smalley raised her concerns about the Shimmy but the Ford invoice did not mention the Shimmy. She testified that "we just trusted that they did go through the vehicle, and there was nothing wrong other than the tires needed to be rotated." (Pl. Smalley Depo. at 5.) Thereafter, she brought her Vehicle in to Auburn Ford in March 2017, where "they told us they fixed the problem" by replacing the radiator, brakes, and rotors. (*Id.* at 7.) Due to these representations by Ford, the Court finds Smalley was unable to have made earlier discovery despite reasonable diligence until the beginning of 2019, when she experienced the Shimmy again. Because she thereafter filed her claim in October 2019, the Court **DENIES** the motion for summary judgment as to Smalley's CLRA and fraudulent concealment claims.

### b.    Fraudulent Concealment Doctrine

Under the fraudulent concealment doctrine, the statute of limitations is tolled "where a defendant, through deceptive conduct, has caused a claim to grow stale." *Aryeh v. Canon Bus. Sols., Inc.*, 55 Cal. 4th 1185, 1192 (2013) (internal citation omitted). This doctrine is available only if the plaintiff shows: "(1) the substantive elements of fraud, and (2) an

excuse for late discovery of the facts." *Cmty. Cause v. Boatwright*, 124 Cal. App. 3d 888, 900 (1981). To establish an excuse for late discovery, the plaintiff must show "(1) when the fraud was discovered; (2) the circumstances under which it was discovered; and (3) that the plaintiff was not at fault for failing to discover it or had no actual or presumptive knowledge of facts sufficient to put him on inquiry." *Id.*; *see also Grisham v. Philip Morris U.S.A., Inc.*, 40 Cal. 4th 623, 637 (2007) (explaining fraudulent concealment tolling "will last as long as a plaintiff's reliance on the misrepresentations is reasonable"). A plaintiff "must point to some fraudulent concealment, some active conduct by the defendant 'above and beyond the wrongdoing upon which the plaintiff's claim is filed, to prevent the plaintiff from suing in time.'" *Lukovsky v. City & Cnty. of San Francisco*, 535 F.3d 1044, 1052 (9th Cir. 2009) (quoting *Guerrero v. Gates*, 442 F.3d 697, 706 (9th Cir. 2006)). Like the discovery rule, fraudulent concealment requires a plaintiff to plead facts describing the manner or circumstances under which plaintiff discovered defendant's fraud.

Here, the factual basis for the alleged fraudulent concealment does not differ from the grounds of Plaintiffs' claims. Plaintiffs' claims rely in part upon Ford's allegedly defective product and failure to warn of the product's defects. For example, in their opposition, Plaintiffs address the specifics of Ford's alleged fraud as it relates to their fraudulent concealment causes of action. (*See* Doc. No. 183 at 23–24.) However, these allegations are not sufficient for fraudulent concealment because the fraudulent concealment factual basis "must differ from any cause of action for fraud that is pled." *Jaeger v. Howmedica Osteonics Corp.*, No. 15-cv-00164-HSG, 2016 WL 520985, at *11 (N.D. Cal. Feb. 10, 2016). Therefore, Plaintiffs fail to "point to some fraudulent concealment, some active conduct by [Ford] 'above and beyond the wrongdoing upon which'" Plaintiffs' actions are based. *Lukovsky*, 535 F.3d at 1052. Therefore, Plaintiffs fail to adequately plead that fraudulent concealment applies to extend the accrual of their causes of action.

///

///

### 4.    Hamilton's MUTPA Claim

The Maine Unfair Trade Practices Act ("MUTPA") provides that "[a]ny person who purchases or leases goods, services or property, . . . primarily for personal, family or household purposes and thereby suffers any loss of money or property . . . may bring an action either in the Superior Court or District Court for actual damages, restitution and for such other equitable relief, including an injuction, as the court determines to be necessary and proper." Me. Rev. Stat. Ann. tit. 5 § 213(1).

Ford argues Hamilton cannot maintain a claim under the MUTPA because she admits she purchased her vehicle for her business, rather than for "personal, family or household purposes." (Doc. No. 122-1 at 28.) Plaintiffs respond that Ford's interpretation of MUTPA is too narrow. (Doc. No. 183 at 25.) Specifically, Plaintiffs assert the Court should look to the statute's plain language, where the Maine Legislature has defined "person" in the MUTPA to include "natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations and any other legal entity." (*Id.* at 26 (quoting Me. Rev. Stat. Ann. tit. 5 § 206).) Plaintiffs assert thus that Ford's attempt to distinguish between "personal" and "business" use are legally irrelevant because "[w]hat concerned the legislature was not the identity of the 'person' using an item, but whether an item was purchased for 'use' or for resale purposes[.]" (*Id.*) Plaintiffs also purport that Hamilton's vehicle use constitutes "personal" use because she occasionally uses her vehicle for other purposes. (*Id.* at 26–27.) Plaintiffs do not cite any case law in support of either argument.

The MUTPA provides a private right of action "*only* for those who have purchased goods, services or property 'primarily for personal, family or household purposes.'" *C-B Kentworth, Inc. v. Gen. Motors Corp.*, 706 F. Supp. 952, 957 (D. Me. 1988) (citing Me. Rev. Stat. Ann. tit. 5 § 213(1)).

First, the Court finds Plaintiffs reading of Maine law unavailing. Maine courts have consistently held that "persons" who use their products purchased for business purposes cannot bring MUTPA claims. *See In re Static Random Access Memory (SRAM) Antitrust Litig.*, No. 07–md–01819 CW, 2010 WL 5094289, at *3 (N.D. Cal. Dec. 8, 2010) (applying

32

Maine law and holding the plaintiffs, purchasers of the product, did not carry their burden of establishing the product was used for personal, family, or household purposes where witness testimony showed the product "was used for scheduling appointments, inventory and electronic medical records"). Indeed, in *Sanford v. National Association for the Self-Employed, Inc.*, 640 F. Supp. 2d 82 (D. Me. 2009), the court dismissed the MUTPA claim of two former members of a non-profit association because the at-issue membership was purchased "primarily for self-employment or small business purposes." 640 F. Supp. 2d at 90. Similarly, in *Douglas v. Lalumiere*, 2:20-cv-00227-JDL, 2021 WL 4468906 (D. Me. Sept. 29, 2021), the court found no allegation that the plaintiff used his property for personal, family, or household purposes where he "rented out the house portion" of his property and "used the garage portion for his business." 2021 WL 4468906, at *5. The Court thus finds Plaintiffs' argument unsupported by law.

Accordingly, the Court turns to the factual allegations to determine whether Hamilton used the Vehicle for "personal, family or household purposes." Here, Hamilton stated throughout her deposition that her F-250 is her business vehicle. (Ford Hamilton Depo. at 3 ("It's my business vehicle").) She stated she uses her Vehicle primarily "[t]o haul horses. To purchase anything I need at the store for grain, shavings . . . ." (*Id.*) She further stated she uses it as her primary vehicle in Florida, and when asked whether those trips to Florida were for personal or business reasons, she stated, "[s]o generally, the entire Florida experience is business, okay. . . . I mean, even if I go to the grocery store. I mean, it's, you know, it's one big business adventure for four months." (*Id.* at 3–4.) She also testified that her Vehicle is registered in her business's name. (*Id.* at 4–6.) Hamilton reiterated that she purchased her truck for use for her business. (*Id.* at 21–22.)

Based on the foregoing facts, the Court finds Hamilton did not purchase her Vehicle "primarily for personal, family or household purposes." *C-B Kentworth*, 706 F. Supp. at 957. Accordingly, the Court **GRANTS** summary judgment as to this claim.

///

///

33

## 5.    Spoliation – Saddler and Huffstetler

Finally, Ford argues Plaintiffs Saddler's[4] and Huffstetler's claims should be dismissed as a sanction because they knowingly disposed of their vehicles while this litigation was pending and while they were under a duty to preserve legal evidence. (Doc. No. 122-1 at 28–29.) Fords asserts the physical state of the vehicles is a component of its defense, and both the implied and express warranty claims turn on the physical attributes of the vehicles. (*Id.* at 30.) Ford asserts this has severely prejudiced it because it has been deprived of any opportunity to inspect the at-issue vehicles and prepare a defense. (*Id.* at 31.) Plaintiffs respond that Ford's spoliation argument is untimely and thus should be denied. (Doc. No. 183 at 27.) Plaintiffs further argue Ford has not been prejudiced because it does not need to inspect each Plaintiffs' vehicle to adequately prepare a defense in a design defect case. (*Id.* at 29–31.) Plaintiffs finally assert that if the Court is inclined to award sanctions, it should consider lesser sanctions, including an adverse inference. (*Id.* at 31–32.) Because the Court previously granted summary judgment as to Saddler's remaining claims above, it need not determine whether his claims should be dismissed on these grounds. (*See supra* §§ II.B.1.a & II.B.2.f.)

Huffstetler disposed of his Vehicle on July 16, 2021, after he was first named Plaintiff in the Consolidated Amended Complaint in December 2020. (*See* Doc. No. 33; Doc. No. 122-13 at 7.) Huffstetler testified that although he "was requested to keep the truck in case Ford wanted to inspect it," he sold it because he was "scared to drive it, and it was sitting here waiting on this lawsuit." (Ford Huffstetler Depo. at 4.) He further testified that he did not notify Ford or give Ford an opportunity to inspect his Vehicle before he sold it in June 2021. (*Id.* at 6.)

District courts may impose sanctions under their inherent power to manage their own affairs so as to achieve the orderly and expeditious disposition of cases. *In re Napster, Inc.*

---

[4] Ford notes Saddler only disposed of his 2019 F-350 while the lawsuit was pending, so this motion is only directed to his tortious implied warranty claim for his 2019 F-350. (Doc. No. 122-1 at 29 n.9.)

*Copyright Litig.*, 462 F. Supp. 2d 1060, 1066 (N.D. Cal. 2006) (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991)). "Spoliation is the 'destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence, in pending or future litigation.'" *Kearney v. Foley & Lardner, LLP*, 590 F.3d 638, 649 (9th Cir. 2009) (citation omitted); *see also Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001) ("Spoliation refers to the destruction or material alteration of evidence or to the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation.").

Courts have imposed sanctions on parties for the spoliation of evidence by either instructing the jury that it may draw an adverse inference to the party responsible for destroying the evidence, excluding witness testimony proffered by the party responsible for destroying the evidence and based on the destroyed evidence, or dismissing the claim of the party responsible for destroying the evidence. *In re Napster*, 462 F. Supp. 2d at 1066 (citations omitted). "The sanction should be designed to: (1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party." *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999) (internal citations and quotation marks omitted). To decide which specific spoliation sanction to impose, courts generally consider three factors: "(1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party." *Reinsdorf v. Skechers U.S.A., Inc.*, 296 F.R.D. 604, 626 (2013) (quoting *Apple, Inc. v. Samsung Elecs. Co., Ltd.*, 888 F. Supp. 2d 976, 992 (N.D. Cal. 2012) ("*Apple II*") (internal quotation marks omitted)).

Every party has a duty to preserve relevant evidence it knows or should know is "relevant to a claim or defense of any party or that may lead to the discovery of relevant evidence." *Compass Bank v. Morris Cerullo World Evangelism*, 104 F. Supp. 3d 1040,

1051 (S.D. Cal. 2015); *see In re Napster*, 462 F. Supp. 2d at 1067. "The duty to preserve arises not only during litigation, but also extends to the period before litigation when a party should reasonably know that evidence may be relevant to anticipated litigation." *Compass Bank*, 104 F. Supp. 3d at 1051 (citations omitted). The duty to preserve arises as soon as a potential claim is identified. *In re Napster*, 462 F. Supp. 2d at 1067.

In dismissing a case as a sanction, the court must consider "(1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions." *Leon v. IDX Sys., Corp.*, 464 F.3d 951, 958 (9th Cir. 2006). The Court need not make explicit findings on each factor but a finding of "willfulness, fault, or bad faith" is necessary before dismissal is proper. *Id.* Dismissal as a sanction is warranted if the spoliation of relevant evidence is due to willfulness or bad faith. *Id.* However, the court must also consider "less severe alternatives" to dismissal. *Id.*; *John B. Hull, Inc. v. Waterbury Petroleum Prods.*, 845 F.2d 1172, 1176 (2d Cir. 1988) (since dismissal is a "drastic remedy," it "should be imposed only in extreme circumstances, usually after consideration of alternative, less drastic sanctions."). A party's destruction of evidence is willful if the party has "some notice that the documents were potentially relevant to the litigation before they were destroyed." *Id.* at 959 (citing *United States v. Kitsap Physicians Serv.*, 314 F.3d 995, 1001 (9th Cir. 2002)).

### a.    Willfulness, Fault, or Bad Faith

Ford argues Huffstetler knowingly disposed of his vehicle and thus acted willfully. Ford further asserts "bad faith" is not required, only that the parties acted with a "conscious disregard of [their] obligations." (Doc. No. 122-1 at 30 (citing *Apple, Inc. v. Samsung Elecs. Co.*, 881 F. Supp. 2d 1132, 1138 (N.D. Cal. 2012) ("*Apple I*")).) Plaintiffs do not contest that Huffstetler willfully spoliated evidence, but rather argues Ford's motion is untimely, which the Court addresses below.

Here, the Consolidated Class Action Complaint alleging a suspension defect, in which Huffstetler joined the instant case, was filed on December 18, 2020. (Doc. No. 33.)

36

1    Therefore, based on Plaintiffs' belief of a suspension defect, Huffstetler had a duty to
2    preserve the alleged suspension components. Moreover, Huffstetler knew he was involved
3    in litigation as a plaintiff representative in a class action concerning his vehicle's
4    suspension system, and knew Ford had requested he keep the Vehicle in case it needed to
5    inspect it. Therefore, Huffstetler knew he had a duty to preserve his Vehicle especially in
6    the midst of litigation. (*See* Ford Huffstetler Depo. at 4.) Accordingly, the Court finds this
7    amounts to willful spoliation of relevant evidence.

8         **b.    Prejudice**

9         Ford asserts it is severely prejudiced because it has been deprived of any opportunity
10   to inspect the at-issue vehicle and prepare a defense. Ford argues this is particularly true
11   with Huffstetler, "where the cause of the second steering oscillation was possibly due to
12   his tires, not the suspension issue at all." (Doc. No. 122-1 at 31.) However, Ford does not
13   cite evidence to support this assertion. Plaintiffs respond that Ford does not need to inspect
14   each Plaintiffs' vehicle to prepare a defense because proof of the defect's existence does
15   not depend on the characteristics of any single vehicle. (Doc. No. 183 at 30.) Specifically,
16   Plaintiffs assert "drastic sanctions (like summary judgment) are not warranted in [design
17   defect] cases because the alleged defect will be apparent in other products of the same
18   design." (*Id.* at 29–30.) Plaintiffs further argue there is no evidence indicating that
19   Huffstetler's vehicle was unique or novel compared to any other Class Vehicle. (*Id.* at 30.)

20        The prejudice inquiry "looks to whether the [spoliating party's] actions impaired
21   [the affected party's] ability to go to trial or threatened to interfere with the rightful decision
22   of the case." *Leon*, 464 F.3d at 959 (quoting *United States ex rel. Wiltec Guam, Inc. v.*
23   *Kahaluu Const. Co.*, 857 F.2d 600, 604 (9th Cir. 1988) (citation omitted)).

24        Plaintiffs rely on *North v. Ford Motor Co.*, 505 F. Supp. 2d 1113 (D. Utah 2007),
25   which found "this case is one where the potential prejudice to a defendant from the loss of
26   an allegedly defective product is much less because the alleged defect is a defect in design
27   rather than in manufacturing." 505 F. Supp. 2d at 1116. However, the *North* court
28   ultimately found prejudice due to the alleged spoliation of the evidence but that it was

37

"lessened by the fact that there is other evidence available, such as the Highway Patrol photographs, field diagram measurements, and witness statements." *Id.* at 1117. No such "other evidence" exists here, and Plaintiffs do not assert otherwise. Moreover, *Jenkins v. Tristar Products, Inc.*, No.: 20-cv-1637-LAB-KSC, 2023 WL 3394747 (S.D. Cal. Jan. 25, 2023), a products liability action, is also distinguishable because the court found no actual evidence of spoliation, and the product at issue was still available and was produced for inspection, despite alleged missing and damaged pieces. 2023 WL 3394747, at *6. However, the court noted that because the plaintiff alleged the injury was caused by a design flaw and not a manufacturing flaw, exemplar products could be used. *Id.*; *see Tripp v. Ford Motor Co.*, No. CIV.A. 95–2661, 1996 WL 377122, at *3 (E.D. Pa. July 3, 1996) (design defect products liability action in which the court held "Ford can defend the claims based on those components of the Festiva that [plaintiffs] allege are defective and through expert analysis of other Festiva models").

The Court finds this case is closer akin to *Victorino v. FCA US LLC*, No.: 16cv1617-GPC(JLB), 2017 WL 4541653 (S.D. Cal. Oct. 11, 2017) ("*Victorino I*"), in which the court found FCA was prejudiced without the ability to inspect the allegedly defective part. 2017 WL 4541653, at *7. There, however, the court found the prejudice was mitigated because FCA inspected or visually viewed the allegedly defective part prior to the spoliation of evidence, and thus found an adverse inference was the more appropriate sanction. Here, Ford is prejudiced without the ability to inspect the Vehicle for the alleged defect. This is particularly true for Huffstetler's remaining implied warranty claim, which requires a showing that the Vehicle is not fit for its ordinary purpose. *See Walters v. Maytag Corp.*, No. 3:07-CV-03669-JFA, 2008 WL 11349737, at *2–3 (D.S.C. June 17, 2008) ("For purposes of the implied warranty of merchantability, goods are merchantable if they are fit for the ordinary purposes for which the goods are used." (internal quotation marks and citation omitted)).

///

///

38

### c.    Timeliness

Plaintiffs contend the Court should deny Ford's motion for sanctions because it is untimely since Ford knew Huffstetler sold his vehicle in June 2021 since at least January 2023, when Huffstetler informed Ford through his verified response to Ford's First Set of Interrogatories that he had sold his Vehicle. (Doc. No. 183 at 27; *see* Doc. No. 122-13 at 7.) Thus, according to Plaintiffs, Ford waited several months to raise the spoliation issue. (Doc. No. 183 at 27.) Ford responds that the Federal Rules of Evidence do not set a specific cutoff for seeking discovery sanctions, and that courts have granted sanctions at the summary judgment stage. (Doc. No. 154 at 12–13.)

District courts have held that an unreasonable delay can render a spoliation motion untimely. *Victorino I*, 2017 WL 4541653, at *10; *see Cottle-Banks v. Cox Commc'ns, Inc.*, No. 10cv2133–GPC (WVG), 2013 WL 2244333, at *16 (S.D. Cal. May 21, 2013) (finding spoliation motion untimely when filed almost nine months after discovery of the spoliation); *Goodman v. Praxair Servs., Inc.*, 632 F. Supp. 2d 494, 506–08 (D. Md. 2009) (spoliation motion "should be filed as soon as reasonably possible after discovery of the facts that underlie the motion."); *Montoya v. Orange Cnty. Sheriff's Dep't*, No. SAVC 11-1922 JGB(RNBx), 2013 WL 6705992, at *6 (C.D. Cal. Dec. 18, 2013) (finding that "[w]aiting over five months to file a sanctions motion seeking dispositive relief three months after the motion cut-off deadline could be considered unreasonable delay").

The record demonstrates Ford knew by January 2023 that Huffstetler disposed of the Vehicle, yet failed to raise the spoliation motion until roughly eleven months later, in December 2023. However, the Court finds there was no time limit for Ford to raise its spoliation claim, and the limit to bring dispositive motions was still open. Further, it is common for parties to raise spoliation issues within their dispositive motions. Moreover, there is no prejudice to Plaintiffs in Ford's "delay" in raising this issue at this juncture.

### d.    Appropriate Sanction

Having shown by a preponderance of the evidence that Huffstetler's Vehicle should have been preserved, was willfully lost, is relevant to the claims alleged, and that its

39

absence may be prejudicial to aspects of Ford's defense, the Court must determine what, if any, sanction is appropriate.

"A trial court's discretion regarding the form of a spoliation sanction is broad, and can range from minor sanctions, such as the awarding of attorneys' fees, to more serious sanctions, such as dismissal of claims or instructing the jury that it may draw an adverse inference." *Apple I*, 881 F. Supp. 2d at 1135. "Any remedy applied to a spoliator should be designed to: (1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore the prejudiced party to the same position he would have been absent the wrongful destruction of evidence by the opposing party." *Id.* at 1136 (quoting *Victor Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497, 521, 534 (D. Md. 2010) (internal quotation marks omitted)). In considering what, if any, spoliation sanction to impose, "courts generally consider three factors: '(1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party.'" *Apple II*, 888 F. Supp. 2d at 992 (quoting *Nursing Home Pension Fund v. Oracle Corp.*, 254 F.R.D. 559, 563 (N.D. Cal. 2008)).

Ford requests terminating sanctions. "A finding of 'willfulness, fault, or bad faith' is required for dismissal to be proper.'" *Id.* (quoting *Anheuser-Busch, Inc. v. Nat. Beverage Distribs.*, 69 F.3d 337, 348 (9th Cir. 1995)). In addition, the court "must consider 'less severe alternatives' than outright dismissal." *Id.* (quoting *U.S. for Use and Ben. of Wiltec Guam, Inc. v. Kahaluu Const. Co., Inc.*, 857 F.2d 600, 604 (9th Cir. 1988)). The availability of less drastic sanctions, the lack of any evidence of bad faith, and the public policy favoring resolution on the merits weigh strongly against terminating sanctions. Ford's request for terminating sanctions is **DENIED**.

In considering lesser sanctions, the Court must consider what remedy is available to counter the loss or destruction of the Vehicle, which left Ford without any evidence that may or may not have provided a defense to Huffstetler's individual claims.

40

An adverse inference is an instruction to the trier of fact that "evidence made unavailable by a party was unfavorable to that party." *Lewis v. Ryan*, 261 F.R.D. 513, 521 (S.D. Cal. 2009) (citing *Nursing Home Pension Fund*, 254 F.R.D. at 563). Under the circumstances, an evidentiary sanction in the form of an adverse inference instruction that permits the trier of fact to conclude the Vehicle may have revealed unfavorable facts is appropriate for summary judgment and trial. This will leave the credibility determination up to the jury to weigh testimony of Huffstetler. Moreover, the Court **DISMISSES** Huffstetler's claim for relief that relies upon specific damages relating his Vehicle, and **DENIES** the motion as to general damages as to the Class Vehicles as a whole. Ford's motion is thus **GRANTED IN PART**.

### C.    Conclusion

Based on the foregoing, the Court **ORDERS** the following as to Ford's motion for summary judgment:

- Breach of express warranty claims as to Plaintiffs Saddler (Count 25), Hamilton (Count 18), Appel (Count 13), and Huffstetler (Count 27) is **GRANTED**;

- Breach of implied warranty claims as to Powers (Count 5), McGee (Count 29), Nielson (Count 10), Selgado (Count 20), and Saddler (Count 24) is **GRANTED**;

- Breach of implied warranty claims as to Hamilton (Count 17) is **GRANTED IN PART AND DENIED IN PART**;

- CLRA and fraudulent concealment claims as to Plaintiff Lessin (Counts 2 & 3) is **GRANTED**;

- CLRA and fraudulent concealment claims as to Smalley (Counts 2 & 3) is **DENIED**;

- MUTPA claim as to Hamilton (Count 15) is **GRANTED**.

Finally, Ford's motion for sanctions related to spoliation of Huffstetler's Vehicle is **GRANTED IN PART**.

///

19-cv-01082-AJB-AHG

## III.     PLAINTIFFS' MOTION TO CERTIFY CLASS

### A.     Legal Standard

Class actions are the "exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979)). To depart from this rule, the "class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *E. Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977) (citation and internal quotation marks omitted). The proponent of class treatment, usually the plaintiff, bears the burden of demonstrating the propriety of class certification. *Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1067 (9th Cir. 2014). This burden requires the plaintiff to provide sufficient facts to satisfy the four requirements of Rule 23(a) and at least one subsection of Rule 23(b) of the Federal Rules of Civil Procedure. *Zinser v. Accufix Res. Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001).

Under Rule 23(a), a case is appropriate for certification as a class action if: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). These requirements are commonly referred to as numerosity, commonality, typicality, and adequacy. "If the court finds the action meets the requirements of Rule 23(a), the court then considers whether the class is maintainable under Rule 23(b)." *Algarin v. Maybelline, LLC*, 300 F.R.D. 444, 451 (S.D. Cal. 2014).

Under Rule 23(b)(3), Plaintiffs must demonstrate that (1) the questions common to the class predominate over any questions that affect only individual members; and (2) a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. *See* Fed. R. Civ. P. 23(b)(3). These requirements are commonly known as predominance and superiority.

///

42

When entertaining a class certification motion, the court is obligated to conduct a rigorous analysis of whether the requirements of Rule 23 are satisfied. *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 161 (1982). While the court must not go on a freewheeling inquiry into the merits of the plaintiff's claims, "[t]he class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011) (quoting *Falcon*, 457 U.S. at 160). Accordingly, "[m]erits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466 (2013). The court must therefore limit its inquiry "to those aspects relevant to making the certification decision on an informed basis." *Astiana v. Kashi Co.*, 291 F.R.D. 493, 499 (S.D. Cal. 2013).

## B.    Discussion

Plaintiffs seek to certify the following class:

**Nationwide Class** (Magnuson Moss-Warranty Act, 15 U.S.C. § 2301, *et seq.*): All persons who purchased or leased a 2005–2019 Ford F-250 or F-350 4x4 truck ("Class Vehicle") from an authorized Ford dealership within the United States primarily for personal, family, or household purposes.

(Doc. No. 120 at 2.)   Plaintiffs also move to certify the following subclasses of "[a]ll persons who purchased or leased a Class Vehicle from an authorized Ford dealership within the [respective states] primarily for personal, family, or household purposes":

1. **California Sub-Class**: represented by Plaintiffs Lessin, S. and P. Powers, and Smalley for claims under the CLRA and by Smalley for fraudulent concealment/omission;
2. **Arizona Sub-Class**: represented by Plaintiff Atterson for claims for fraudulent concealment/omission and breach of express warranty;
3. **Colorado Sub-Class**: represented by Plaintiff Nielsen for claims under Colorado's Consumer Protection Act and for fraudulent concealment;
4. **Illinois Sub-Class**: represented by Plaintiff Appel for claims under Illinois's Consumer Fraud and Deceptive Trade Practices Act and for fraudulent concealment;
5. **Indiana Sub-Class**: represented by Plaintiff Kigin for claims under Indiana's

43

Deceptive Consumer Sales Act;

6. **Maine Sub-Class**: represented by Plaintiff Hamilton for claims for fraudulent concealment and breach of implied warranty;

7. **New Mexico Sub-Class**: represented by Plaintiff Selgado for claims under New Mexico's Unfair Practices Act, for fraudulent concealment, and breach of express warranty;

8. **South Carolina Sub-Class**: represented by Plaintiff Huffstetler for breach of implied warranty;

9. **Texas Sub-Class**: represented by Plaintiff McGee under Texas's Deceptive Trade Practices Act and for breach of express warranty.

(*Id.* at 2–4.)[5] Plaintiffs also move the Court for an order appointing MLG and CC as class counsel. (*Id.* at 5.)

Ford asserts Plaintiffs' motion fails because individualized issues preclude a finding of commonality and predominance, Plaintiffs' damages methodologies are not classwide, that Named Plaintiffs lack typicality, and that a classwide trial would be unmanageable and not superior to alternative adjudication methods. (*See* Doc. No. 136.) The Court will address each requirement of Rule 23 in turn, with a focus on these issues.

### 1.    Rule 23(a) Requirements

The Court will first start with an analysis of whether Plaintiffs have satisfied the Rule 23(a) elements of numerosity, commonality, typicality, and adequacy.[6]

///

///

---

[5] For the sake of judicial efficiency, the Court omits arguments pertaining to claims and parties to which it granted Ford's summary judgment above.

[6] The Ninth Circuit does not require courts to apply ascertainability as an independent threshold requirement to class certification, and the parties do not address it in their briefs. *See True Health Chiropractic, Inc. v. McKesson Corp.*, 896 F.3d 923, 929 (9th Cir. 2018) ("We held that there is no free-standing requirement above and beyond the requirements specifically articulated in Rule 23." (citing *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1125 n.4 (9th Cir. 2017) ("[Defendant-Appellant] cites no other precedent to support the notion that our court has adopted an 'ascertainability' requirement. This is not surprising because we have not."))).

44

### a.    Numerosity

Under Rule 23(a)(1), a lawsuit may only proceed via a class if the "class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Here, Plaintiffs assert the class is sufficiently numerous because Ford sold over 767,000 Class Vehicles in the states where certification is sought over the Class Period. (Doc. No. 120-1 at 32.) Ford does not contest this element. (*See generally* Doc. No. 136.) Accordingly, the Court finds this requirement has been satisfied. *See Knutson v. Schwan's Home Serv., Inc.*, No. 3:12-cv-0964-GPC-DHB, 2013 WL 4774763, at *6 (S.D. Cal. Sept. 5, 2013).

### b.    Commonality

The commonality factor "requires the plaintiff to demonstrate that the class members 'have suffered the same injury,'" which "does not mean merely that they have all suffered a violation of the same provision of law." *Dukes*, 564 U.S. at 350 (quoting *Falcon*, 457 U.S. at 157). The "claims must depend on a common contention" and that common contention must be "of such a nature that it is capable of classwide resolution . . . ." *Id.* The commonality requirement of Rule 23(a)(2) is construed less rigorously, for example, than the "predominance" requirement of Rule 23(b)(3). *Id.* Indeed, for purposes of Rule 23(a)(2), even a single common question will suffice. *Id.* at 359. A plaintiff need not show commonality across a class with regard to all questions of law or fact. *See Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952, 957 (9th Cir. 2013); *see also Falco v. Nissan N. Am. Inc.*, No. CV 13-00686 DDP, 2016 WL 1327474, at *4 (C.D. Cal. Apr. 5, 2016). Rather, a plaintiff meets the requirements of Rule 23(a)(2) by showing that the class has in common "a single significant issue of law or fact." *Abdullah*, 731 F.3d at 957 (internal quotation marks omitted).

Plaintiffs assert commonality is satisfied because each class member's claim shares a common factual basis, because each owns (or leases) a Class Vehicle subject to the Suspension Defect. (Doc. No. 120-1 at 33.) They further contend that because the Suspension Defect is uniform, every class member has suffered the resulting economic loss caused by overpaying for their vehicles. (*Id.* (citing *Tait v. BSH Home Appliances Corp.*,

45

289 F.R.D. 466, 474–75 (C.D. Cal. 2012) (finding commonality "[b]ecause the claims of all prospective class members involve the same alleged defect and found in [the product] containing the same key components"); *Alger v. FCA US LLC*, 334 F.R.D. 415, 423–24 (E.D. Cal. 2020) (finding the commonality standard "easily met in cases indistinguishable from the case here: where 'claims of all prospective class members involve the same alleged defect, covered by the same warranty, and found in vehicles of the same make and model") (internal quotation marks and citation omitted); and *Yamada v. Nobel Biocare Hldg. AG*, 275 F.R.D. 573, 578 (C.D. Cal. 2011) (commonality met where "[t]he claims of all prospective class members involve the same device with the same alleged defect, marketed using the same alleged material omissions and misrepresentations, and covered by the same warranty")).)

Ford argues in its motion that Plaintiffs' class definition, limited to persons who purchased or leased their vehicles for "personal, family or household purposes," precludes a finding of commonality and predominance because the Court cannot adjudicate the purpose for which customers purchased their vehicles on a class-wide basis. (Doc. No. 136 at 22.) However, Ford does not appear to substantively dispute that common facts Plaintiffs put forward satisfy the commonality requirement, instead focusing its challenge on Plaintiffs' ability to satisfy the predominance requirement of Rule 23(b)(3). (*Id.* at 22–24.) Accordingly, the Court finds Rule 23(a)(2) satisfied.

### c.    Typicality

Rule 23(a)(3)'s typicality requirement provides that "a class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Falcon*, 457 U.S. at 156 (quoting *E. Tex. Motor Freight Sys.*, 431 U.S. at 403) (internal quotation marks omitted). The purpose of the requirement is "to assure that the interest of the named representative aligns with the interests of the class." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). "[T]he typicality requirement is 'permissive' and requires only that the representative's claims are 'reasonably co-extensive with those of absent class members; they need not be substantially identical.'" *Rodriguez*

46

*v. Hayes*, 591 F.3d 1105, 1124 (9th Cir. 2010) (internal citations omitted). However, a court should not certify a class if "there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it." *Hanon*, 976 F.2d at 508 (internal quotation marks and citation omitted).

Plaintiffs next assert typicality is satisfied because each Plaintiff alleges the same defect as Class Members. (Doc. No. 120-1 at 33.) Plaintiffs assert they also incurred the same damages in the form of the cost of repair necessary to restore their vehicles to a condition absent the Defect. (*Id.* at 33–34.) Ford challenges the typicality of Plaintiffs Kigin, Hamilton, and Huffstetler, and asserts no class representative exists for P131 and P473 model purchasers.

### i.    Kigin

Ford asserts Kigin is not typical of the class because he did not purchase his Vehicle from an authorized Ford dealership, which the class definition requires. (Doc. No. 136 at 47.) Indeed, Kigin testified that he purchased the Vehicle at Dorsett Auto Sales. (Ford Deposition Excerpts of John Kigin, Doc. No. 142-48, at 7–8.) In response, Plaintiffs assert the Court should provisionally certify classes for Illinois, contingent upon the substitution of plaintiffs that purchased their trucks from Ford dealerships. (Doc. No. 157 at 22.)

As long as the proposed class satisfies the requirements of Rule 23, the court may certify the class conditioned upon the substitution of another named plaintiff. *See Kremens v. Bartley*, 431 U.S. 119, 135 (1977) (where named plaintiffs' claims were determined to be moot, ordering substitution of class representatives); *Gibson v. Local 40*, 543 F.2d 1259, 1263 (9th Cir. 1976) ("In any event, failure of proof as to the named plaintiffs would not bar maintenance of the class action or entry of judgment awarding relief to the members of the class."). Moreover, several circuit courts have held that named plaintiffs may litigate on behalf of "out-of-state, nonparty class members with claims subject to different state laws" so long as the requirements of standing (as to the named plaintiffs) and predominance are met. *Langan v. Johnson & Johnson Consumer Cos., Inc.*, 897 F.3d 88, 93 (2d Cir. 2018); *see, e.g.*, *In re Asacol Antitrust Litig.*, 907 F.3d 42, 48–49 (1st Cir. 2018) (finding

47

the named plaintiff had standing to adjudicate the class members' claims, stating "the claims of the named plaintiffs parallel those of the putative class members in the sense that, assuming a proper class is certified, success on the claim under one state's law will more or less dictate success under another state's law"). Thus, while the Court finds Kigin is not typical of the class, this does not defeat certification of the Indiana subclass. Moreover, the Court will grant Plaintiffs leave to substitute another class representative for the Indiana class.

### ii.    Hamilton

Next, Ford asserts Hamilton is not a typical representative because she lacks standing both under the MUTPA and under Plaintiffs' own class definitions because she purchased and uses her Vehicle predominantly for business purposes. (Doc. No. 136 at 47.) As discussed above, *supra* § II.B.2.c, the Court finds Hamilton uses her Vehicle predominantly for business purposes, and thus Hamilton does not fit the requirements of the class definition. However, the Court finds this does not defeat certification of the Maine subclass. If Plaintiffs so choose, the Court will grant Plaintiffs leave to substitute another class representative for the Maine class.

### iii.    Huffstetler

Ford argues Huffstetler is non-typical because he knowingly disposed of his Vehicle without notifying Ford while this litigation was pending and while he was under a duty to preserve evidence. (Doc. No. 136 at 47.) However, Ford fails to cite case law to support this argument. Plaintiffs assert that because the design defect is common to all Class Vehicles and existed at the point of sale, there is no additional relevant information that Ford could obtain from inspecting Huffstetler's Vehicle. (Doc. No. 157 at 22.) The Court finds Huffstetler's claims are "reasonably co-extensive with those of absent class members," *Rodriguez*, 591 F.3d at 1124, and Ford has not shown "there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it." *Hanon*, 976 F.2d at 508 (internal quotation marks and citation omitted). Accordingly, the Court finds Huffstetler meets the typicality requirements.

48

### iv.    P131 and P473 Purchasers

Finally, Ford asserts no class representatives exists for the P131 (MY 2005–2007) purchasers, and thus Plaintiffs lack typicality as to this platform. (Doc. No. 136 at 47 (citing *Wiener v. Dannon Co., Inc.*, 255 F.R.D. 658, 666 (C.D. Cal. 2009), and *Cholakyan v. Mercedes-Benz, USA, LLC*, 281 F.R.D. 534, 557 (C.D. Cal. 2012)).) Ford further argues that if summary judgment is granted as to Saddler for his P473 2015 F-250, as the Court did above, no class representative exists for the P473 platform either. (*Id.* at 47–48.) Plaintiffs do not address this argument in reply. (*See generally* Doc. No. 157.)

The cases cited by Ford are distinguishable to the facts here. In *Cholakyan*, the court found the plaintiff failed to demonstrate typicality because he sought to represent not only current owners of the class vehicle, but former owners as well. 281 F.R.D. at 557. The court noted "[t]he fact that former owners can avail themselves of a different set of remedies than current owners undercuts the typicality of his claims." *Id.* The court additionally found evidence that the plaintiff's vehicle had a sunroof which had mechanical problems, while others did not, which alone could have caused the water leak defect at issue. *Id.*

Moreover, in *Wiener*, the plaintiff sought to represent a class of purchasers of three products, having only purchased one of the three products himself. 255 F.R.D. at 666. The court noted the defendant made different health benefit claims between two of the products, "the advertising and marketing of the two products [was] separate[,]" and "[t]hese differences lead to a substantial divergence in the evidence required to prove the claims with regard to" the two products. *Id.*

Here, there are eleven remaining Plaintiffs, residing in seven states and representing owners of two out of the four Class Vehicles. This group of Plaintiffs is typical of the class. Plaintiffs allege that all Class Vehicles were sold with a Suspension Defect—an insufficient damping system—which oftentimes caused the vehicle to Shimmy. Differences in the vehicle model do not alter the conclusion that all Class Members suffered a similar injury based on the same course of conduct. Moreover, the Court is not

49

convinced that variations in the exact vehicle model owned make Plaintiffs atypical. Small variations in the underlying injury do not preclude a finding of typicality.

Accordingly, Plaintiffs have satisfied the typicality requirement.

### d. Adequacy

Rule 23(a)(4) requires the class representative to "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). In assessing this requirement, courts within the Ninth Circuit apply a two-part test, asking the following questions: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members? and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class? *See Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003).

Plaintiffs assert their interest align with those of absent class members. (Doc. No. 120-1 at 35.) Additionally, class counsel assert they are qualified and have rigorously prosecuted and protected class members' interests, and will continue to do so. (*Id.* at 34–35.) Ford reiterates the same arguments here as it did under typicality. (*See* Doc. No. 136 at 47.) These arguments have been addressed under the "typicality" requirement, and the Court finds no deficiencies as to adequacy. Thus, based on the foregoing, the Court finds Plaintiffs have demonstrated the adequacy requirement of Rule 23(a)(4).

### 2. Rule 23(b)(3) Requirements

A class may be certified pursuant to Rule 23(b)(3) if the district court "finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 944 (9th Cir. 2009).

In the instant matter, Plaintiffs seek to certify a class pursuant to Rule 23(b)(2) and/or 23(b)(3). (Doc. No. 120 at 2.) However, Plaintiffs have waived their request to certify an injunctive relief class under Rule 23(b)(2) by failing to address it in their brief. (*See generally* Doc. No. 120-1); *Zango, Inc. v. Kapersy Lab, Inc.*, 568 F.3d 1169, 1177 n.8 (9th Cir. 2009) ("arguments not raised by a party in opening brief are waived").

### a.   Predominance

"The predominance inquiry focuses on 'the relationship between the common and individual issues' and 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *Vinole*, 571 F.3d at 944 (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998)). The predominance inquiry also includes consideration of whether "adjudication of common issues will help achieve judicial economy." *Id.* at 945 (quoting *Zinser*, 253 F.3d at 1189) (internal quotation marks omitted).

Plaintiffs assert their theories of liability present common legal and factual questions that predominate over their individual issues. (Doc. No. 120-1 at 36.) They further assert there is little difference in the state laws governing their claims, and thus certification is proper. (*Id.*) In opposition, Ford offers several distinct bases as to why Plaintiffs cannot satisfy the predominance requirement. (Doc. No. 136 at 22–44.)

### i.   Class Definition

As an initial matter, Ford argues Plaintiffs' class definition—limited to persons who purchased or leased their vehicles for "personal, family or household purposes"—precludes a finding of predominance because it requires the Court to answer the question of why each customer purchased their Vehicle. (Doc. No. 136 at 22 (citing *Corder v. Ford Motor Co.*, 283 F.R.D. 337, 341 (W.D. Ky. 2012)).) In *Corder*, the court analyzed a motion for class certification raising claims under the Kentucky Consumer Protection Act, pursuant to which "it also must be shown that the good at issue was purchased primarily for personal, family, or household purposes." 343 F.R.D. at 341. The court found "the need to determine the primary purpose for each customer's purchase requires an individualized inquiry that threatens to overwhelm any trial on the matter" and thus found individualized issues predominated. *Id.*; *see Arabian v. Sony Elecs., Inc.*, No. 05-CV-1741 WQH (NLS), 2007 WL 627977, at *14 (S.D. Cal. Feb. 22, 2007) (noting the CLRA only affords remedies to those who "purchase or lease, any goods or services for personal, family, or household purposes" and finding "this legal requirement will require an individual examination of the purpose for which each laptop was acquired[,]" thus holding individual issues

51

predominated); *In re OnStar Contract Litig.*, 278 F.R.D. 352, 381 (E.D. Mich. 2011) (same). Plaintiffs assert the instant case is distinguishable from *Corder* because the plaintiff did not argue that data could be used to eliminate commercial purchases, or that class members could submit registration or tax forms. (Doc. No. 157 at 19.) Instead, the *Corder* plaintiff suggested the court use "questionnaires [or] claim forms" to resolve the primary use inquiry, but the court found this did not allow Ford to litigate the issue before the jury, as it was an element of the claim. *Corder*, 283 F.R.D. at 344.

Ford asserts that, similar to *Corder*, the Sourcebooks for F-250 and F-350 4x4 vehicles show that "[c]ommerical customers are expected to make up about 20% of the Super Duty market," and "[s]mall business customers are expected to account for 30% of the Super Duty market." (Doc. No. 136 at 23 (quoting Doc. No. 142-6 at 15 (MY 2016 Sourcebook)); *see* Doc. No. 142-33 at 15 (MY 2008 Sourcebook) (same); Doc. No. 142-34 at 11 (MY 2012 Sourcebook) (same).) Moreover, Ford argues this problem cannot be solved by filtering data, because although "fleet" codes in Ford's vehicle sales data could theoretically be used to identify commercial purchasers, over a quarter of "retail" purchasers admit to using their Vehicles "almost daily" for business. (Doc. No. 135 at 23 (citing Doc. No. 135-4 at 7–11).)

Plaintiffs reply that courts within the Ninth Circuit have reached the opposite conclusion, and that Plaintiffs here can make a *prima facie* case using common evidence. (Doc. No. 157 at 19.) Plaintiffs cite *In re MyFord Touch Consumer Litigation*, No. 13-cv-03072-EMC, 2016 WL 7734558 (N.D. Cal. Sept. 14, 2016), in which the court rejected the same predominance argument and identified several "simple" ways this question could be resolved during the administration phase. 2016 WL 7734558, at *24. For example, the court asserted "class members may be required to submit a copy of the vehicle title showing it was taken in a personal name; a record showing that the car is not registered as a commercial vehicle, and a declaration under oath or document showing that they did not take a business tax deduction on their vehicle." *Id.* The court noted that "[t]his showing, while individualized, is relatively simple and will not defeat predominance." *Id.*

52

Similarly, in *Aguayo v. U.S. Bank*, NO. 08-CV-2139 W (LSP), 2015 WL 13344755 (S.D. Cal. Jan. 15, 2015), the court noted that "[i]f, to make a prima facie showing on a given question, the members of the proposed class will need to present evidence that varies from member to member, then it is an individual question. If the same evidence will suffice for each member to make a prima facie showing, then it becomes a common question." 2015 WL 13344755 at *8 (quoting *Blades v. Monsanto Co.*, 400 F.3d 562, 566 (8th Cir. 2005)). The court noted that while the Rees-Levering Act, under which the plaintiff brought his claim, covers only vehicles purchased primarily for personal or family use, it was "satisfied that at this stage in the litigation the class may establish its prima facie case with the use of generalized proof." *Id.* at *9. Specifically, the court stated that "every form conditional sales contract has a section entitled 'Primary Use for Which Purchase,'" in which the purchaser notes whether they purchased the vehicle for personal, family or household; business; or agriculture. *Id.* Moreover, U.S. Bank's computer systems could segregate contracts purchased for personal use, as opposed to commercial use. *Id.*

Plaintiffs assert that similarly here, commercial purchasers (fleet and chassis-cab purchasers) can be excluded from the notice process using Ford's data, leaving only retail purchasers to receive notice and an opportunity to submit proof that their vehicle purchases were primarily for personal use. (Doc. No. 157 at 19.) The Court agrees, and finds Plaintiffs' class definition does not preclude a finding of predominance.

## ii.    Existence of a Common Defect

Plaintiffs assert the nature and existence of the Suspension Defect predominates over all other questions here, and they intend to use common evidence, including documents, depositions, and records of Class Vehicle inspections to show the Suspension Defect is common to all Class Vehicles at the point of sale. (Doc. No. 120-1 at 37.) They further assert "[t]he fact that the defect exists in multiple generations does not prevent certification, because 'the question is not whether every single aspect of the design is common—only those aspects that allegedly caused the problem.'" (*Id.* (quoting *Speerly v. Gen. Motors, LLC*, 343 F.R.D. 493, 525 (E.D. Mich. 2023).)

53

1    Ford argues Plaintiffs cannot carry their burden of showing common issues

2  predominate over the question of defect. (Doc. No. 136 at 25.) Specifically, Ford contends

3  the Suspension Defect is not subject to common evidence and field performance varies

4  across the class. (*Id.* at 25–28.)

5    First, Ford argues Plaintiffs do not define the Suspension Defect, and their

6  engineering expert, Peter Leiss, testified no objective criteria exists to identify whether a

7  Class Vehicle has a defect related to oscillation. (*Id.* (citing Deposition of Peter Leiss

8  ("Leiss Depo."), Doc. No. 142-41, at 50–51 (stating he does not believe there is "one kind

9  of objective criteria you could give to someone" to determine "this is where a vehicle that

10  is susceptible to shimmy . . . actually has a shimmy defect")).) Indeed, Mr. Leiss stated that

11  kinematics, compliance, vehicle architecture, and field performance "are all pieces of the

12  puzzle" that are considered in an "assessment as to whether a vehicle that is susceptible to

13  shimmy crosses the line and becomes defective[.]" (Leiss Depo. at 50.) Additionally, Ford

14  contends the vehicle design and its manufactured components, including the steering

15  damper, changed greatly over the fifteen model years at issue. (Doc. No. 136 at 25.) Mr.

16  Leiss testified that while the purported defect is the general "front suspension" design of

17  the Class Vehicles, he acknowledges the front suspensions, including geometry,

18  kinematics, frame, damper, and caster angle, are not the same across the Class Vehicles.

19  (*Id.*; *see* Leiss Depo. at 6, 11, 24–26, 27, 28–29, 30–31, 49–51; Leiss Report ¶ 27.) Even

20  within a platform, differences exist in geometry and kinematics, including caster angle,

21  whether the vehicle has a short or long wheel base, whether it has a heavy-duty package,

22  and whether it has a single or dual rear wheel. (Doc. No. 136 at 25–26; *see* Expert Report

23  by Robert Pascarella ("Pascarella Report"), Doc. No. 142-2, ¶ 35; Leiss Depo. at 11, 12–

24  15.) Further, Mr. Leiss testified that while the caster settings for every Class Vehicle within

25  the four generations were within the same range, each Class Vehicle would not be built

26  with the same caster angle. (Leiss Depo. at 10–11.) Thus, those Class Vehicles that have

27  lower caster settings within the acceptable range are less susceptible than those that have

28  higher caster settings. (*Id.* at 12–13.) Ford contends Plaintiffs offer no standard for

quantifying a "sufficient" amount of damping, nor do they describe how "insufficient" damping can be determined with classwide evidence. (Doc. No. 136 at 26.)

As to the P558 damper, Ford asserts the Suspension Defect was due to manufacturing variability of that damper, and that the root cause of the Suspension Defect in other generations differed. (Pascarella Report ¶¶ 43–44, 63–64; Deposition of Matthew List, Doc. No. 142-12, at 4–5 (stating he did not "remember anyone suggesting that all the dampers should be replaced because . . . it wasn't like the defect was in all dampers to my recollection); Deposition of Thomas Nilles ("Nilles Depo."), Doc. No. 142-16, at 10 (stating "the introduction of air into the steering dampers" did not occur on all Tenneco dampers and Ford "found both good and bad dampers in the population").)

In reply, Plaintiffs assert the models are "substantially similar" and the defect remains the same across all four generations. (Doc. No. 157 at 10.) Moreover, Mr. Leiss states that all Class Vehicles have similar components and locations of those components, and a common design. (Leiss Report ¶¶ 18, 20.) Thus, all class members suffered the same injury from the same defect, which derives from a substantially similar design. (Doc. No. 157 at 10.) Plaintiffs further contend that while Ford used a different damper in each generation, each differed in minor ways, and all were similarly deficient in preventing the Shimmy. (*Id.* at 11; *see* Doc. No. 160-1 at 14–15 (Ford presentation to NHTSA stating that both "Tenneco and Hitachi dampers have similar design/specifications").) Indeed, Plaintiffs assert "[p]erhaps the single fact most illustrative of the defect's commonality is that Ford developed a uniform fix for it." (Doc. No. 157 at 11.) Additionally, the steering dampers were fully interchangeable. (*See, e.g.*, Pascarella Report at 17–20 (noting that vehicle performance testing was done in part by substituting different steering dampers on the same vehicle).) This is further supported by Mr. Leiss's expert report, in which he stated "the latest steering damper released as a service part is identified for use in 2005–2022 vehicle[s], which encompasses the P131, P356, P473, and P558 trucks." (Leiss Report ¶ 20.)

In general, courts have found consumer fraud claims amenable to class-wide

treatment where the claims were premised on the existence of a common, class-wide defect present in all of the relevant products at the time of sale. *See Wolin v. Jaguar Land Rover N.A., LLC*, 617 F.3d 1168, 1173 (9th Cir. 2010) (finding commonality and predominance where all "vehicles were sold with an alignment defect," even though the defect had not manifested in all class vehicles). By contrast, courts have found class treatment inappropriate where "the relevant components of a device differ" across class members such that "proof that one device is defective may not lend itself to establishing that another device is defective*." Grodzitsky v. Am. Honda Motor Co., Inc.*, No. 2:12–cv–01142–SVW–PLAx, 2014 WL 718431, at *5 (C.D. Cal. Feb. 19, 2014). Similarly, courts have denied class certification where the evidence suggested the defect may be the result of an "isolated" manufacturing defect, rather than a ubiquitous defect that exists in all of the relevant products purchased by the class. *Arabian v. Sony Elecs. Inc.*, No. 05-CV-1741 WQH (NLS), 2007 WL 627977, at *13 (S.D. Cal. Feb. 22, 2007). It is Plaintiffs' burden to "affirmatively demonstrate" that common issues predominate over individual issues regarding a class-wide defect. *See Dukes*, 564 U.S. at 350.

The Court finds Plaintiffs have met their burden to establish that common questions predominate over individual questions here. The theory of Plaintiffs' case is that all Class Vehicles came with the Suspension Defect, resulting in the Shimmy. While Ford argues there are differences in the various models and model years of the Class Vehicles, it does not explain how those differences undercut Plaintiffs' ability to demonstrate the Suspension Defect by common proof. *See Aberin*, 2021 WL 1320773, at *8.

Ford relies on *Butler v. Porsche Cars North America, Inc.*, No. 16-CV-2042-LHK, 2017 WL 1398316 (N.D. Cal. Apr. 19, 2017), in which the court found individualized issues predominated over common questions where the defect was "a result of a manufacturing abnormality that is not ubiquitous across the class." 2017 WL 1398316, at *9. In *Butler*, the court found significant that the plaintiff failed to clearly articulate what was defective about the class vehicles' wiring harness's design, and the expert report on which the plaintiff relied was "ambiguous as to the precise cause and nature of the defect .

56

. . ." *Id.* at *7. Indeed, the plaintiff's expert "identified three factors as probable or possible contributors to the wiring harness defect" but failed to "explain the extent to which of these factors contribute to the defect, and Plaintiff also does not explain whether and to what extent Plaintiff believes that all three of these factors, as opposed to only one or two, makes the wiring harness's design defective." *Id.* The plaintiff also failed to produce an expert to opine on the nature or cause of the defect. *Id.* Moreover, a subsequent investigative report found that the defect was the result of a "unique" manufacturing abnormality, not a design defect. *Id.*

Here, however, Plaintiffs' expert, Mr. Leiss, provides that Ford identified a list of 14 characteristics as either causing or driving the propensity of the Class Vehicles to enter into Shimmy, and that their solution focused on the damper. (Leiss Report ¶ 58.) The damper does not cause Shimmy, but rather provides damping to the system in order to prevent the Shimmy. (*Id.*) "Without a sufficiently robust damper, the oscillations will still occur as if there is no damper at all." (*Id.*; *see also id.* ¶¶ 27, 81, 95.) Thus, unlike in *Butler*, Plaintiffs have clearly articulated what was defective about the Class Vehicles—an insufficient damping system—that was not the result of a "unique" manufacturing abnormality. Indeed, this case is akin to *Aberin*, in which the court found that common questions as to the defect predominated over individualized questions despite Honda's assertion of material differences in the models of the class vehicles. 2021 WL 1320773, at *8.

Moreover, Ford's argument as to the varying rates of manifestation are unavailing. Ford asserts that field performance differences exist across all dampers, and that there are "significant differences in performance across different platforms, models, and model years . . . ." (Doc. No. 136 at 27.) However, Ninth Circuit precedent forecloses this argument. Where the injury alleged is a design defect, the Ninth Circuit has "held that proof of the manifestation of a defect is not a prerequisite to class certification." *Wolin*, 617 F.3d at 1173. This is because the injury occurred at the point of sale—when a putative member drove her car off the lot—not when the vehicle experiences the Shimmy. *See Butler*, 2017

57

WL 1398316, at *6 ("In general, courts have found consumer fraud claims amenable to class-wide treatment where the claims were premised on the existence of a common, class-wide defect present in all of the relevant products at the time of sale."). Thus, Ford's argument that there was no common defect does not defeat predominance for Plaintiffs' claims under Rule 23(b)(3).

### iii. Consumer Protection and Fraudulent Concealment Claims

Plaintiffs' motion seeks certification for subclasses asserting six states' consumer protections statutes, all of which are fraud-based claims: the CLRA (Count 2), the Colorado Consumer Protection Act ("CCPA") (Count 8), the Illinois Consumer Fraud and Deceptive Business Practice Act ("ICFA") (Count 11), the Indiana Deceptive Consumer Sales Act ("IDCSA") (Count 14), the New Mexico Unfair Trade Practices Act ("NMUTPA") (Count 19), and the Texas Deceptive Trade Practices Act ("DTPA") (Count 28). (Doc. No. 136-1 at 2.) Each of the consumer protection statutes at issue apply to omissions. *See Daugherty v. Am. Honda Motor Co., Inc.*, 144 Cal. App. 4th 824, 835 (2006); CCPA, Colo. Rev. Stat. § 6-1-105(1)(u); ICFA, 815 ILCS § 505/2; IDCSA, Ind. Code § 24-5-0.5-3(a); NMUTPA, N.M. Stat. § 57-12-2(D)(14); DTPA, Tex. Bus. & Com. Code § 17.46(b). Plaintiffs additionally seek certification for subclasses asserting claims for fraudulent concealment under five states' common law: California (Count 3), Arizona (Count 6), Colorado (Count 9), Illinois (Count 12), and New Mexico (Count 21). (Doc. No. 136-1 at 8.)

### Ford's Omissions

Plaintiffs assert Ford's omissions are established by common proof. (Doc. No. 120-1 at 37.) Specifically, Plaintiffs assert Ford omitted key information about the Suspension Defect from truck owners and the public, and that if Ford had disclosed the information, consumers would have received the information through communications with dealer sales agents and a nationwide advertising campaign designed to reach most Americans. (*Id.* at 37–38.) Plaintiffs further contend that "Ford's disclosures would also have been effective on the window sticker, on Ford's website, or on dealer websites." (*Id.* at 38.) In response,

Ford asserts Plaintiffs fail to identify any uniform disclosure that Ford should have made to every member of the class. (Doc. No. 136 at 28.)

In an omissions case such as this, where plaintiffs contend they and the class members purchased or leased their vehicles from an authorized dealer, (*see* Doc. No. 120 at 2–4 (setting forth proposed Rule 23(b)(3) class definition)), the Ninth Circuit has found this to be sufficient to show that a class member would have been aware of a disclosure had it been made by the defendant's authorized dealer. *See Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1226 (9th Cir. 2015) ("*Daniel I*") ("Plaintiffs presented evidence that they interacted with and received information from sales representatives at authorized Ford dealerships prior to purchasing their Focuses. This is sufficient to sustain a factual finding that Plaintiffs would have been aware of the disclosure if it had been made through Ford's authorized dealerships."); *Salas v. Toyota Motor Sales, U.S.A., Inc.*, No. CV 15-8629 FMO (Ex), 2019 WL 1940619, at *9 (C.D. Cal. Mar. 27, 2019) (same); *see also Baranco v. Ford Motor Co.*, 294 F. Supp. 3d 950, 967–68 (N.D. Cal. 2018) ("Plaintiff Nicolau alleges she purchased her vehicle from an authorized Ford dealership[.] Though she does not specifically allege that she received information or promotional information from Ford or its agents at the dealerships, the Court can plausibly draw an inference in her favor that she could have received such information had Ford publicized the defect through the dealer, as it is highly improbable that she purchased her vehicle from a dealership without any exchange of information whatsoever (or at least an opportunity for such an exchange.)"). Indeed, "all class members received the same information from defendant[] regarding the purported defect – which is to say, no information[.]" *Keegan v. Am. Honda Motor Co., Inc.*, 284 F.R.D. 504, 533 (C.D. Cal. 2012).

Moreover, Ford does not explain why the absence of any representations about the Suspension Defect would be a predominance issue. If, as Ford asserts, there is a disconnect between the alleged Suspension Defect and the alleged omission, individual issues would not predominate. Rather, Plaintiffs' claims would fail on a classwide basis. *See In re Arris Cable Modem Consumer Litig.*, 327 F.R.D. 334, 365 (N.D. Cal. 2018). Additionally, the

59

absence of any representations about the Suspension Defect in particular does not mean that individual issues predominate. *Id.* Thus, Ford's argument that Plaintiffs did not identify a uniform disclosure does not defeat predominance of Plaintiffs' consumer protection and fraudulent concealment claims.

## **Variations in Ford's Knowledge**

As part of Plaintiffs' consumer protection and fraudulent concealment claims, Plaintiffs allege Ford knew for "nearly two decades" of the Shimmy and its root causes and that Ford unlawfully failed to disclose this fact. (Doc. No. 120-1 at 11.) Regarding the P131, Plaintiffs principally rely on Ford's internal emails discussing the Shimmy issue as early as 2003; TSBs published beginning 2004 regarding "steering wheel oscillation"; and evidence of consumer complaints about the Shimmy to the NHTSA with respect to certain Class Vehicle models. (*Id.* at 11–14.) For example, as Ford approached its redesign in anticipation of the 2005 model year, it acknowledged that Shimmy was a previous issue and could be again. (*See* Doc. No. 124-13; Doc. No. 124-14 (email thread dated mid-2003 discussing shimmy).) Moreover, Ford employees understood the dampers were failing as early as 2004. (*See* Doc. No. 124-16, -17, -18, -19 (email threads discussing "leaking dampers" and noting "we are seeing a new leaking damper every day"). Regarding the P356 and P473 models, Plaintiffs assert that while the change from Tenneco to Tokiko dampers led to fewer reports of the Shimmy, some reports continued. (*See* Doc. No. 124-35.) Indeed, Ford employees were aware that its trucks would exhibit the Shimmy outside of the warranty window. (*See* Doc. No. 124-37.)

Ford responds that its knowledge cannot be proven using common evidence because Ford's knowledge varied across the 15-year class period. (Doc. No. 136 at 28–29.) The Court agrees in part. Ford's employees testified they were aware of the Shimmy as to vehicles not part of this action beginning in 1999, leading to development of the P131, and with the P558—the latest generation at issue—but that there were no significant issues in the P356 or P473. (Deposition of Ronald Perri, Doc. No. 142-10, at 6; *see* Deposition of Jack Barry, Doc. No. 142-28, at 5 (stating the report rates of shimmy for the P356 and P131

were similar after resolving the issue of under-inflated tire pressure).) Mr. Leiss further
testified that the testing he reviewed does not show that "Ford actually knew of an issue
with shimmy prior to the sale of the Super Duty Trucks to consumers[.]" (Doc. No. 142-
41 at 47–48.) Additionally, Ford's evidence indicates that warranty claims differed across
the four generations. (*See* Doc. No. 135-7.) Ford's evidence further indicates that for some
models, the Shimmy may have been due to manufacturing variabilities from the Tenneco
dampers, resulting in lower damping. (Nilles Depo. at 7–8.)

Based on the foregoing, the Court concludes that common evidence cannot establish
when Ford learned of the Suspension Defect for all Class Vehicles. *See Philips v. Ford
Motor Co.*, No. 14-CV-02989-LHK, 2016 WL 7428810, at *17 (N.D. Cal. Dec. 22, 2016)
("Plaintiffs allege and have produced evidence that w*ell before the beginning of the class
period*, Ford knew that the EPAS systems were defective because they included unreliable
relays.") (emphasis added); *In re Myford Touch Consumer Litig.*, No. 13-cv-03072-EMC,
2016 WL 6873453, at *3–4 (N.D. Cal. Nov. 22, 2016) ("There is too much variability in
the material facts throughout the class period to permit a class-wide inference with respect
to Ford's knowledge of and state of mind about the depth and quality of MFT's defects.");
*Beaty v. Ford Motor Co.*, C17-5201 TSZ, 2021 WL 3109661, at *12 (W.D. Wash. July 22,
2021) (holding the evidence "does not sufficiently demonstrate that Ford knew of a PSR
defect in all of the Class Vehicles at or around the same time, or that Ford's knowledge of
one Class Vehicle's PSR defect can be reasonably imputed to all other Class Vehicles'
PSRs."); *Kondash v. Kia Motors Am., Inc.*, 347 F.R.D. 197, 211 (S.D. Ohio 2020) ("[T]here
is a significant amount of case law, in and out of the automotive context, that stands for the
proposition that knowledge of defect in one model line does not establish knowledge of a
defect in a different model line.").

Accordingly, the Court finds common questions predominate as to the P131 and
P538 models. The Court further **DENIES** the motion for class certification as to the P356
and P473 models as individual issues predominate over common questions as to Ford's
knowledge.

61

**Materiality**

A defendant has an obligation to disclose under the CLRA and similar consumer protection statutes of other states based on "failure to disclose a fact . . . when the defendant has exclusive knowledge of material facts not known or reasonable accessible to the plaintiff . . . ." *Tait*, 289 F.R.D. at 480. "[A] fact can give rise to a duty to disclose and an actionable omission if it implicates safety concerns that a reasonable consumer would find material." *Mui Ho v. Toyota Motor Corp.*, 931 F. Supp. 2d 987, 997 (N.D. Cal. 2013) (citing *Falk v. Gen. Motors Corp.*, 496 F. Supp. 2d 1088, 1096–97 (N.D. Cal. 2007); *Daugherty*, 144 Cal. App. 4th at 836). The Ninth Circuit has recognized that, as to CLRA claims, "[i]f the misrepresentation or omission is not material as to all class members, the issue of reliance 'would vary from consumer to consumer' and the class should not be certified." *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1022–23 (9th Cir. 2011), *abrogated on other grounds by Comcast*, 569 U.S. 27.

Plaintiffs assert the Suspension Defect's materiality can be resolved through common proof. (Doc. No. 120-1 at 38.) Specifically, Plaintiffs contend there are at least three sources of evidence demonstrating materiality to an objectively reasonable consumer, including: (1) consumer complaints both to Ford and the NHTSA's consumer complaint database; (2) Ford dealers' concerns about oscillation reports affecting sales; and (3) the combined existing qualitative evidence with a consumer survey. (*Id.* at 38–39.)

Ford first responds that materiality requires individualized analysis because it depends on the probability of the Shimmy manifesting. (Doc. No. 136 at 32.) Specifically, Ford argues the risk of the Shimmy manifesting in the Class Vehicles differs based on Model Year, vehicle model (F-250 or F-350), and design platform. (*Id.* citing Report of Kristin Lennox, Doc. No. 142-3, at 8, 15–19).) Thus, asserts Ford, the materiality to a consumer of any risk necessarily depends on the probability that a problem will occur. (*Id.* (citing *McVicar v. Goodman Glob.*, No.: SA CV 13-1223-DOC (RNBx), 2015 WL 4945730, at *13 (C.D. Cal. Aug. 20, 2015)).) However, the defect Plaintiffs allege is in the design and use of an insufficient damper system, which the Court held is common to the

62

entire class of vehicles. *See supra* § III.B.2.ii; *see also Keegan*, 284 F.R.D. at 530. Plaintiffs are thus correct that "[t]he frequency of manifestation is irrelevant; the defect's existence at the point of sale is the predominantly common fact in this litigation." (Doc. No. 157 at 12.)

The Court finds *McVicar*, as relied upon by Ford, distinguishable. In *McVicar*, the court found the plaintiffs did not satisfy the predominance requirements as to materiality of their CLRA claims because the "[d]efendants have presented a consumer survey showing that consumers would not have changed their behavior if they had been confronted with a disclosure regarding the propensity of the coils to leak refrigerant." 2015 WL 4945730, at *12. Additionally, one plaintiff "testified that if he had known that the evaporator coils failed only 1–2 % of the time, he would consider the product reliable." *Id.* The court further noted that the plaintiffs failed to offer proof "that no member of the putative class would have purchased" the product, beyond the declarations of the named plaintiffs. *Id.* at *13. Here, however, Ford offers no similar study that putative class members would not have changed their behavior had they known of the Suspension Defect, and Plaintiffs have offered substantial evidence beyond the declarations of named plaintiffs. While Ford points to consumer surveys which reflect high levels of satisfaction with their vehicles, this does not show that putative class members would have paid less for their vehicles had they known of the propensity for the Vehicle to Shimmy. (*See* Doc. No. 136 at 33–34.) Further, Ford's assertion that Plaintiffs are "wrong on the merits" because Plaintiffs have no class-wide evidence of an elevated safety risk do not establish that individualized issues predominate, but rather go solely to the merits of whether Plaintiffs can prove their claims. (*Id.* at 34.)

Moreover, Plaintiffs' claim is not that each and every Class Vehicle exhibited the Shimmy; it is that as a result of the Suspension Defect, Class Vehicles had a likelihood of doing so, and that a reasonable consumer would have behaved differently had they known of this propensity. Ford argues that Plaintiffs will have difficulty proving this assertion. But it would be error to "equate a 'rigorous analysis' with an in-depth examination of the

63

underlying merits. . . . The district court is required to examine the merits of the underlying claim in this context, only inasmuch as it must determine whether common questions exist; not to determine whether class members [can] actually prevail on the merits of their claims." *Ellis*, 657 F.3d at 983 n.2 (citing *Dukes*, 564 U.S. at 351 n.6); *id.* ("To hold otherwise would turn class certification into a mini-trial"); *United Steel, Paper & Forestry, Rubber, Mfg. Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO, CLC v. ConocoPhillips Co.*, 593 F.3d 802, 810 (9th Cir. 2010) ("What a district court may not do is to assume, arguendo, that problems will arise, and decline to certify the class on the basis of a mere potentiality that may or may not be realized"). Thus, the Court finds unpersuasive Ford's arguments that Plaintiffs own separate class vehicles that they are not suing over, and that many Plaintiffs still drive their trucks regularly. (*See* Doc. No. 136 at 33.)

## **Causation/Reliance**

Ford also argues Plaintiffs cannot prove proximate cause or reliance with class-wide evidence for their fraud-based claims. (*Id.* at 35.) Ford contends that for common law fraud in Arizona, Illinois, and New Mexico, and for the statutory consumer fraud claims in Illinois, Indiana, and New Mexico, there is no presumption or inference of reliance or causation available. (*Id.*; *see also id.* n.11.) Plaintiffs respond that while there are some states in which they must demonstrate causation, the question is whether common evidence showing the materiality of the omission creates a common path for proving causation and reliance, thus permitting a class resolution. (Doc. No. 157 at 14–15 (citing *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 1018–22 (C.D. Cal. 2015), *Tershakovec v. Ford Motor Co.*, 546 F. Supp. 3d 1348, 1380 (S.D. Fla. 2021), *aff'd in part, vacated in part, rev'd in part*, 79 F.4th 1299 (11th Cir. 2023)).)

**Arizona**: Regarding common law fraud claims, Arizona does not presume reliance and indeed requires actual reliance. *Hoexter v. Simmons*, 140 F.R.D. 416, 423–24 (D. Ariz. 1991); *Siemer v. Assocs. First Cap. Corp.*, No. CV97–281TUCJMRJCC, 2001 WL 35948712, at *18–26 (D. Ariz. Mar. 30, 2001) (discussing Arizona's requirement of individualized proof of reliance and finding common issues do not predominate). Plaintiffs

64

rely on *In re Arizona Theranos, Inc., Litigation*, 308 F. Supp. 3d 1026 (D. Ariz. 2018),
asserting that reliance on a class-wide basis can be proven based on the intentionality of
Ford's omissions. (Doc. No. 157 at 15.) However, the court in *In re Arizona Theranos*
stated an omission is actionable if it "is material and 'made with intent that a consumer rely
thereon'" in the context of Arizona's Consumer Fraud Act, but did not extend this to
Arizona's common law fraud claim. 308 F. Supp. 3d at 1040. The Court does not find case
law extending the presumption of reliance to Arizona's common law fraud claims, and
Plaintiffs provide none. Accordingly, the Court **DENIES** Plaintiffs' motion for class
certification as to its Arizona sub-class for common law fraud.

**California**: The CLRA allows plaintiffs to establish materiality and reliance (i.e.,
causation and injury) by showing that a reasonable person would have considered the
defendant's representation material. *In re ConAgra*, 90 F. Supp. 3d at 982–83. Thus, a
California class suing under the state's CLRA need not show individualized reliance if it
can establish the materiality of Ford's omission to a reasonable consumer. *See Forcellati
v. Hyland's, Inc.*, No. CV 12–1983–GHK (MRWx), 2014 WL 1410264, at *9 (C.D. Cal.
Apr. 9, 2014) ("As such, whether or not Defendants' claims are misleading is an objective,
classwide inquiry for purposes of the . . . CLRA. It is simply a matter of common sense
that consumers who purchased Defendants' products did so in reliance on Defendants'
claims that the products provided effective relief from cold and flu symptoms.").

Similarly, where plaintiff alleges common law fraud based on concealment:

[T]he elements . . . are: (1) the defendant must have concealed or suppressed
a material fact, (2) the defendant must have been under a duty to disclose the
fact to the plaintiff, (3) the defendant must have intentionally concealed or
suppressed the fact with intent to defraud the plaintiff, (4) the plaintiff must
have been unaware of the fact and would not have acted as he did if he had
known of the concealed or suppressed fact, and (5) as a result of the
concealment or suppression of the fact, the plaintiff must have sustained
damage.

*Linear Tech. Corp. v. Applied Materials, Inc.*, 152 Cal. App. 4th 115, 131, (2007) (quoting

65

*Mktg. West, Inc. v. Sanyo Fisher (USA) Corp.*, 6 Cal. App. 4th 603, 612–13 (1992)). Here, Plaintiffs have sufficiently shown the materiality of Ford's omissions and Ford does not dispute whether it had a duty to disclose. Thus, the Court may presume reliance for the Class.

Ford asserts Plaintiffs' claims under California common law fraud fail because the presumption of reliance arises only if there are uniform representation, and "no evidence exists of 'uniform' statements here." (Doc. No. 136 at 36 (citing *Osborne v. Subaru of Am. Inc.*, 198 Cal. App. 3d 646, 661 (1988)).) However, as discussed above, Plaintiffs need not present evidence of a uniform statement because Plaintiffs allege Ford omitted key information from purchasers.

Additionally, Ford argues even in states where an inference of reliance is recognized, those inferences are rebuttable with evidence. (Doc. No. 136 at 36.) To this point, Ford asserts the inference is rebutted because Plaintiffs who purchased their class vehicles after experiencing the alleged defect belie the notion that they "relied" on any omission by Ford. (*Id.*) Plaintiffs respond that they do not allege the trucks were rendered worthless by the defect, but that they would have paid less for their vehicles had they known of the defect. (Doc. No. 157 at 16.) Because Ford does not offer evidence to rebut this inference, the Court finds the predominance requirement met for Plaintiffs' claims under the CLRA and for California's common law fraud.

**Colorado**: "In order to prove a private cause of action under the CCPA, a plaintiff must show: '(1) [that] the defendant engaged in an unfair or deceptive trade practice; (2) that the challenged practice occurred in the course of defendant's business, vocation or occupation; (3) that it significantly impacts the public as actual or potential consumers of the defendant's goods, services, or property; (4) that the plaintiff suffered . . . injury in fact to a legally protected interest; and (5) that the challenged practice caused the plaintiff's injury.'" *HealthONE of Denver, Inc. v. UnitedHealth Grp., Inc.*, 805 F. Supp. 2d 1115, 1120 (D. Colo. 2011) (quoting *Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*, 62 P.3d 142, 146–47 (Colo. 2003)).

66

Regarding their fraudulent concealment claim, Plaintiffs must show that questions of law or fact common to the class would predominate in resolving the following elements:

> (1) the concealment of a material existing fact that in equity and good conscience should be disclosed; (2) knowledge on the part of the party against whom the claim is asserted that such a fact is being concealed; (3) ignorance of that fact on the part of the one from whom the fact is concealed; (4) the intention that the concealment be acted upon; and (5) action on the concealment resulting in damages.

*First Interstate Bank of Fort Collins, N.A. v. Piper Aircraft Corp.*, 744 P.2d 1197, 1200 (Colo. 1987). Colorado courts have held that at the class certification stage, "reliance may be inferred from circumstantial evidence where the defendant concealed a material fact from plaintiff." *Maxwell v. United Servs. Automobile Assoc.*, 342 P.3d 474, 481 (Colo. Ct. App. 2014) (quoting *BP Am. Prod. Co. v. Patterson*, 263 P.3d 103, 110 (Colo. 2011)). As noted above, the Court finds materiality can be met through common proof.

Ford does not contest these elements as to Plaintiffs' Colorado claims. However, as above, Ford asserts an inference of reliance is rebuttable with evidence because Plaintiffs who purchased their class vehicles after experiencing the alleged defect belie the notion that they "relied" on any omission by Ford. (Doc. No. 136 at 36.) Because Ford does not offer evidence to rebut this inference, the Court finds the predominance requirement met for Plaintiffs' claims under the Colorado Consumer Protection Act and Colorado's common law fraud.

**Illinois**: An ICFA claim requires: "(1) a deceptive act or practice by the defendant, (2) the defendant's intent that the plaintiff rely on the deception, (3) the occurrence of the deception in a course of conduct involving trade or commerce, and (4) actual damage to the plaintiff that is (5) a result of the deception." *De Bouse v. Bayer*, 922 N.E.2d 309, 313 (Ill. 2009) (citing *Zekman v. Direct Am. Marketers, Inc.*, 695 N.E.2d 853, 860 (Ill. 1998)). The last two elements of the claim require a showing that the allegedly deceptive act "proximately caused any damages" suffered by the plaintiff. *Id.* (citing *Oliveira v. Amoco Oil Co.*, 776 N.E.2d 151, 160 (Ill. 2002)). Moreover, courts have held "that the reliance

67

and materiality inquiries do not preclude certification of the class on predominance grounds." *In re ConAgra*, 90 F. Supp. 3d at 996 (citing *Cozzi Iron & Metal, Inc. v. U.S. Office Equip., Inc.*, 250 F.3d 570, 576 (7th Cir. 2001) ("[T]he Illinois Supreme Court has repeatedly held that, unlike a claim for common law fraud, reliance is not required to establish a consumer fraud claim . . . .")). However, "an ICFA plaintiff must show that defendant's deception proximately caused his or her damage." *Id.*

Illinois courts have concluded that causation is susceptible of class-wide proof where the representation being challenged was made to all putative class members and that individualized inquiries concerning causation do not predominate if plaintiffs are able to adduce sufficient evidence that the representation was material. *Id.* at 997. Here, the Court finds this case similar because the alleged omission was uniform across the putative class and Plaintiffs have produced sufficient evidence at this point that the representation was material.

However, under common law actions for fraud and negligent misrepresentation under Illinois law, reliance is not presumed for the entire class and each individual plaintiff is required to prove that they relied on the alleged misrepresentation or omission. *Katz v. Comdisco, Inc.*, 117 F.R.D. 403, 412 (N.D. Ill. 1987).

Thus, the Court finds Plaintiffs have met the predominance required for their claims under the ICFA and **DENIES** Plaintiffs' motion for class certification as to their Illinois common law fraud sub-class.

**Indiana**: Under the Indiana Deceptive Consumer Sales Act, a consumer is required to show that she relied to her detriment on a deceptive act by the defendant. *Hoosier Contractors, LLC v. Gardner*, 212 N.E.3d 1234, 1240 (Ind. 2023); *see Shea v. Gen. Motors LLC*, 567 F. Supp. 3d 1011, 1024 (N.D. Ind. 2021) (dismissing IDCSA claim for failure to allege reliance). Plaintiffs fail to cite, and the Court does not find, any case law of Indiana in which reliance may be presumed. Because this creates individualized issues for the Class, the Court **DENIES** Plaintiffs' motion for class certification as to its Indiana sub-class under the IDCSA.

68

**Maine**: While neither party addresses Plaintiffs' claim for fraudulent concealment under Maine's common law, the Court finds class certification inappropriate here. "Individual reliance is an element of fraud, negligent misrepresentation, and breach of express warranty." *Larsen v. Vizio, Inc.*, SACV 14-01865-CJC(JCGx), 2017 WL 11633132, at *8 (C.D. Cal. Apr. 27, 2017) (listing cases). Maine's law does not allow a presumption of reliance. *See Sanford v. Nat'l Ass'n for the Self-Employed, Inc.*, 264 F.R.D. 11, 15–16 (D. Me. 2010) (discussing cases and finding individual issues of reliance defeat predominance); *Millett v. Atlantic Richfield Co.*, No. Civ.A. CV–98–555, 2000 WL 359979, at *12 (Me. Mar. 2, 2000) (denying class certification on predominance grounds because "plaintiffs would still have to show, on an individual basis, that they relied on the misrepresentation and omissions made by the defendants and that they suffered an injury as a result of their reliance"); *Larsen v. Vizio, Inc.*, No.: SACV 14–01865–CJC(JCGx), 2017 WL 3084273, at *6 (C.D. Cal. June 26, 2017). Accordingly, the Court **DENIES** Plaintiffs' motion for class certification as to its Maine sub-class for common law fraud.

**New Mexico**: Under New Mexico's Unfair Practices Act, a plaintiff "need not allege or prove that she relied on [a d]efendant's purported deceptive conduct in order to recover[.]" *Smoot v. Physicians Life Ins. Co.*, 87 P.3d 545, 551 (N.M. App. 2003). Indeed, the New Mexico Court of Appeals noted, "there appears to be a national trend to interpret consumer protection statutes, like the [Unfair Practices Act] . . . , such that plaintiffs need not prove reliance." *Id.* However, a plaintiff must establish "a causal connection between the deceptive practice and the claimant's damages[.]" *Id.* at 550. This causal connection "requires a nexus between a defendant's conduct and a plaintiff's loss[.]" *Id.* (internal quotation marks and citation omitted). Moreover, where a defendant is under a duty to disclose in an omissions case, the class may be afforded the benefit of a presumption of reliance. *Porcell v. Lincoln Wood Prods., Inc.*, 713 F. Supp. 2d 1305, 1322 (D.N.M. 2010). Here, because Ford does not challenge that it had a duty to disclose, the class may be presumed to have relied on Ford's omission.

Regarding New Mexico's common law claim for fraud, Ford points to *Farber v.*

69

*Public Service Co. of New Mexico*, 1990 WL 257286 (D.N.M. Dec. 3, 1990), which held that in a state law claim of negligent misrepresentation, common issues did not predominate over individual ones. 1990 WL 257286, at *4. Specifically, the court noted that "[r]eliance is an essential element of a claim for negligent misrepresentation under New Mexico law" and thus "the question of proving individual reliance defeats the commonality requirement." *Id.* Plaintiffs have not cited any cases for an opposing proposition, and the Court finds none.

Thus, the Court finds the predominance requirement met for Plaintiffs' sub-class under New Mexico's Unfair Practices Act and **DENIES** its motion for class certification as to New Mexico's common law fraud sub-class.

**Texas**: To prove a claim under the TDTPA, a plaintiff must establish that defendant violated the specific prohibitions of Texas Business and Commercial Code Annotated §§ 17.46 and 17.50; one of these is using deceptive representations in connection with goods or services. The Texas Supreme Court has held that a plaintiff can prove a "false, misleading, or deceptive act" as defined in the TDTPA by demonstrating "an act or series of acts which has the capacity or tendency to deceive an average or ordinary person, even though that person may have been ignorant, unthinking, or credulous." *Spradling v. Williams*, 566 S.W.2d 561, 562–64 (Tex. 1978).

While the TDTPA requires a showing that defendant's misrepresentation was a cause in fact of plaintiff's injury, the Texas Supreme Court has held that reliance and causation can be proved on a class-wide basis when appropriate. *See Henry Schein, Inc. v. Stromboe*, 102 S.W.3d 675, 693 (Tex. 2003) ("This does not mean, of course, that reliance or other elements of their causes of action cannot be proved classwide with evidence generally applicable to all class members; classwide proof is possible when classwide evidence exists."). Thus, the Court finds the predominance requirement met for Plaintiffs' sub-class under Texas's TDTPA.

### iv.    Implied Warranty of Merchantability Claims

Next, Plaintiffs seek to certify implied warranty claims under Maine and South

70

Carolina law.[7] Ford asserts Plaintiffs cannot show that the manifestation of the defect or merchantability of the Class Vehicles can be established by common evidence. (Doc. No. 136 at 37.)

Manifestation of the alleged defect is an element for implied warranty claims under Maine and South Carolina law. *See Lorfano*, 569 A.2d at 197; *Cole*, 484 F.3d at 729 ("[T]he Fourth Circuit . . . held that there is no recovery for breach of implied warranties under South Carolina law where a vehicle had never manifested the alleged defect."). Plaintiffs do not address the manifestation argument in reply. (*See generally* Doc. No. 160.)

In circuits which require proof of a defect for a plaintiff's claim, courts often find that individualized issues predominate. *See Payne v. FujiFilm U.S.A., Inc.*, No. 07–385 (GEB), 2010 WL 2342388, at *6 (D.N.J. May 28, 2010) ("Because the great majority of the proposed class has not experienced any malfunction with the FinePix 3800 camera . . . , the question of whether a defect exists in this case will need to be determined based on facts that are particular to each individual proposed class member."); *Chin v. Chrysler Corp.*, 182 F.R.D. 448, 455 (D.N.J. 1998) (holding individualized issues predominated in part because "most of the potential class members have never experienced [the defect] [and] [p]roving a class-wide defect where the majority of class members have not experienced any problems with the alleged defective product, if possible at all, would be extremely difficult").

However, district courts within the Ninth Circuit are split as to "whether a design defect [that] is 'substantially certain' to manifest is a 'merits' issue that can be answered in 'one stroke' and is therefore suitable for class certification." *Sonneveldt v. Mazda Motor of Am., Inc.*, No. 8:19-cv-01298-JLS-KES, 2023 WL 1812157, at *6–7 (C.D. Cal. Jan. 25, 2023) (quoting *Keegan*, 284 F.R.D. at 536) (discussing cases); *see Victorino v. FCA US LLC*, No.: 16cv1617-GPC(JLB), 2019 WL 5268670, at *5 (S.D. Cal. Oct. 17, 2019) ("[O]n

---

[7] As discussed above, *supra* § II.B.2, the Court grants the motion for summary judgment as to the Named Plaintiffs' implied warranty claims under California, Colorado, New Mexico, Ohio, and Texas law.

class certification, Plaintiff does not have to demonstrate a manifestation of a current defect or that there is a substantial certainty of manifestation in the future on a claim for breach of warranty claim."); *Wolin*, 617 F.3d at 1173 (holding "proof of the manifestation of a defect is not a prerequisite to class certification." (citing *Blackie v. Barrack*, 524 F.2d 891, 901 (9th Cir. 1975) ("[N]either the possibility that a plaintiff will be unable to prove his allegations, nor the possibility that the later course of the suit might unforeseeably prove the original decision to certify the class wrong, is a basis for declining to certify a class which apparently satisfies the Rule."))). *But see Quackenbush*, 2021 WL 6116949, at *6–7 (holding the plaintiffs did not meet the predominance requirement because, while "[c]ommon proof of the defect's occurrence exists," that common proof only showed "occurrence rates of less than 15% in putative class vehicles . . . ."); *Torres v. Nissan N. Am. Inc.*, No. CV 15–03251 RGK (FFMx), 2015 WL 5170539, at *5 (C.D. Cal. Sept. 1, 2015) (holding the plaintiffs did not satisfy the predominance requirement of Rule 23(b)(3) because the plaintiffs "failed to provide evidence that all class members are substantially certain to experience a malfunction from the alleged defect").

Indeed, in *Victorino v. FCA US LCC*, 326 F.R.D. 282 (S.D. Cal. 2018), the court noted that "district courts are divided as to whether determining class certification of a breach of the implied warranty under California law requires a class representative plaintiff to demonstrate, with evidence, an inherent defect which is 'substantially certain to result in malfunction during the useful life of the product.'" 326 F.R.D. at 299. While the Court in the instant case analyzes the substantive laws of Maine and South Carolina, they similarly require manifestation of the defect. Moreover, the court in *Victorino* agreed with *Keegan*'s reasoning that under federal procedural law on class certification, "the district court should not determine the merits of any claims." *Id.*

The Court holds that Plaintiffs are not required at this class certification stage to demonstrate, with evidence, manifestation of the defect. Thus, the Court finds predominance is met here.

As to merchantability, Ford asserts the evidence about vehicle design and

72

performance are not common as it varies across platform, model, and model year. (Doc. No. 136 at 38.) Ford further asserts Plaintiffs have failed to present evidence (much less common evidence) proving that an alleged defect prevented all class vehicles from providing safe, reliable transportation. (*Id.* at 39.) To this point, Ford contends Plaintiffs' continued use of their vehicles, even after experiencing the Shimmy, confirms their trucks provided safe, reliable transportation. (*Id.*) Plaintiffs reply that common evidence can establish that the Class Vehicles were not sold in a safe condition, substantially free of defects, and no individual issues of fact exist. (Doc. No. 157 at 14.)

For the states at issue, Plaintiffs must show the Class Vehicles "did not possess even the most basic degree of fitness for ordinary use." *Mocek v. Alfa Leisure*, 114 Cal. App. 4th 402, 406 (2003); *see Jolovitz*, 760 A.2d at 629; *Carlson*, 883 F.2d at 298.

Here, Plaintiffs have alleged from the beginning of litigation that the Class Vehicles contain a design defect that was inherent in all Class Vehicles at the time of sale. Plaintiffs' expert has also opined that the defect was present at the time of sale in all Class Vehicles as "a result of choices Ford made in the design and development of the class vehicles." (Leiss Report ¶ 92.) Plaintiffs' theory of the case is that the Class Vehicles had an insufficient damping system at the time of sale. Moreover, Plaintiffs have presented evidence common to the proposed class that they intend to use to prove their claims. At trial, Plaintiffs will have to prove that all Class Vehicles had a defect at the time of sale. If Plaintiffs fail to demonstrate a defect in all vehicles at the time of sale, all class claims will fail in one fell swoop. *See Amgen*, 568 U.S. at 1191 (Rule 23(b)(3) requires a showing that there are questions common to the class predominate, not that the answer to the questions will be in favor of the class, a merits question . . . a class claim "will prevail or fail in unison.").

Thus, predominance has been met on breach of the implied warranty of merchantability under Rule 23(a)(3).

### v. Express Warranty Claims

Plaintiffs further seek certification of express warranty claims under Arizona, New

73

Mexico, and Texas law.[8] Ford asserts Plaintiffs do not present any arguments about these claims, waiving the argument. (Doc. No. 136 at 40.) Ford further argues that issues of presentment, multiple unsuccessful repair attempts, notice of breach, and damages raise individualized issues. (*Id.* at 40–41.) In reply, Plaintiffs assert Ford's waiver argument is "nonsensical," as all of their claims are rooted in whether the Class Vehicles have a common defect. (Doc. No. 157 at 18 n.11.) Plaintiffs also contend the issues raised by Ford can be addressed by reviewing Ford's records, and that Plaintiffs' damage models can each credit Ford for adequate repairs. (*Id.* at 18 (citing *In re MyFord Touch Consumer Litig.*, No. 13-cv-03072-EMC, 2016 WL 7734558, at *24 (N.D. Cal. Sept. 14, 2016) ("*MyFord Touch*")).)

To recover for breach of express warranty, a plaintiff must show they presented their vehicle for repairs before their applicable warranty expired. (Doc. No. 136 at 40 n.18.) Some courts have held that "an individualized inquiry would be necessary to determine whether each member of the class was within the time and mileage limits of his/her original express warranty, or any extended warranty." *In re OnStar Contract Litig.*, 278 F.R.D. 352, 386 (E.D. Mich. 2011); *Parkinson v. Hyundai Motor Am.*, 258 F.R.D. 580, 595 (C.D. Cal. 2008) (finding "a host of individual questions regarding warranty coverage preclude a finding that common questions of law and fact predominate[,]" including "whether the class member ever even attempted to make a warranty claim or was denied coverage"). However, others have found that issues of presentment and multiple unsuccessful repair attempts can be found through Ford's records. *MyFord Touch*, 2016 WL 7734558, at *25. As the court noted in *MyFord Touch*:

> If Ford has no record that a particular consumer took his or vehicle in for repair twice, then the fact finder can presume that the consumer did not do so. A consumer may rebut that presumption by producing proof that he or she took the vehicle in for two repairs, from his or her own records. As the consumer has the burden of proof, if he/she is not able to produce such proof,

---

[8] As discussed above, *supra* § II.B.1, the Court grants the motion for summary judgment as to Plaintiffs' express warranty claims under Illinois, Maine, Ohio, and South Carolina law.

1    then he or she will not recover. The inquiry will turn on records and is
2    relatively simple. It does not defeat predominance.

3    *Id.*   The Court finds this also applies to notice of breach, as this, too, can be reflected in
4    Ford's records.

5          As to damages, the Court addresses this below.

6                            **vi.    Nationwide Class**

7          Plaintiffs bring their Magnuson Moss-Warranty Act ("MMWA") claim under
8    "Michigan Breach of Warranty Law, or, alternatively, the Breach of Warranty Laws of the
9    50 states." (FACC § VII.A.) In their motion for class certification, Plaintiffs do not address
10   their Nationwide Class under the MMWA. (*See generally* Doc. No. 120-1.) Ford next
11   argues Plaintiffs' nationwide MMWA claim cannot be certified because the MMWA
12   depends on establishing state-law express and implied warranty claims, and thus the
13   MMWA claim cannot be certified for the same reasons argued by Ford for the state
14   warranty claims. (Doc. No. 136 at 42.) Ford further asserts a proposed nationwide class
15   necessarily invokes the express and implied warranty laws of all fifty states, and "Plaintiffs
16   must demonstrate that the differences in state laws implicated by the putative class action
17   are nonmaterial." (*Id.*) Plaintiffs do not respond in their reply brief. (*See generally* Doc.
18   No. 157.)

19         "Plaintiff must demonstrate that the differences in state laws implicated by the
20   putative class action are nonmaterial." *Kas v. Mercedes-Benz USA, LLC*, No. CV 11-1032-
21   VBF(PJWx), 2011 WL 13238744, at *3 (C.D. Cal. Aug. 23, 2011) (citing *In re Paxil Litig.*,
22   212 F.R.D. 539, 545 (C.D. Cal. 2003)). Moreover, "variations in state law do not
23   necessarily preclude a 23(b)(3) action, but class counsel should be prepared to demonstrate
24   the commonality of substantive law applicable to all class members." *Hanlon v. Chrysler
25   Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1988). Because Plaintiffs have failed to address any
26   predominance issues arising from this claim, the Court **DENIES** Plaintiffs' motion to
27   certify a Nationwide Class.

28

1

### vii.    Statute of Limitations Defenses

2          Ford next argues its statute of limitations defenses present additional individualized
3  issues which would preclude a finding of predominance. (Doc. No. 136 at 42.) The
4  proposed classes include vehicles sold as far back as 2004 (for the 2005 model year trucks),
5  but Plaintiffs initiated this suit on June 10, 2019, fifteen years later. (*Id.*) Ford asserts this
6  far exceeds the two- to six-year periods of all applicable statutes of limitations, which also
7  vary on when claims accrue. (*Id.*) Plaintiffs respond that when "one or more of the central
8  issues in the action are common to the class and can be said to predominate, the action may
9  be considered proper for class certification even though other important matters will have
10 to be tried separately, such as . . . some affirmative defenses peculiar to some individual
11 class members." (Doc. No. 157 at 20–21 (quoting *True Health Chiropractic*, 896 F.3d at
12 931).)

13        "The possibility of individual questions regarding statute of limitations is not fatal
14 to class certification when there is a sufficient nucleus of common questions." *Pace v.
15 Quintanilla*, 308 F.R.D. 644, 648 (C.D. Cal. 2015) (listing cases). "This is particularly so
16 when the issues surrounding the statute of limitations defense are susceptible to common
17 proof." *Id.* (citing *In re Linerboard Antitrust Litig.*, 305 F.3d 145, 163 (3d Cir. 2002)
18 (finding that common questions predominated over individualized questions where
19 plaintiffs' theory of tolling was focused on defendants' concealment of information, not on
20 the putative class members' actions); and *Tait*, 289 F.R.D. at 486 (holding that defendant's
21 statute of limitations defense did not raise sufficient individual inquiries to defeat class
22 certification where plaintiffs' arguments to rebut the defense raised common questions of
23 law and fact)).

24        Moreover, numerous cases have held that "[p]redominance is not defeated because
25 the doctrines used by Plaintiff for 'tolling the statute of limitations,' such as the doctrine
26 of fraudulent concealment, involve proof 'common to the defendants,' namely, 'the act of
27 concealing' defendant's wrong." *Alger*, 334 F.R.D. at 430 (quoting *Tait*, 289 F.R.D. at
28 485). Indeed, "[c]ourts have been nearly unanimous . . . in holding that possible differences

in the application of a statute of limitations to individual class members, including the
named plaintiffs, does not preclude certification of a class action." *Tait*, 289 F.R.D. at 485.
However, a number of courts have found otherwise. *See Stearns v. Select Comfort Retail
Corp.*, 763 F. Supp. 2d 1128, 1152 (N.D. Cal. 2010) (granting motion to strike class
allegations where the "proposed class encompasses individuals who purchased their
mattresses as long as twenty years ago"); *O'Connor v. Boeing N. Am., Inc.*, 197 F.R.D.
404, 414 (C.D. Cal. 2000) (holding the statute of limitations issues precluded a finding that
common issues predominated over individual issues where the statute of limitations
defense "was the subject of a weighty summary judgment motion . . . [which] proved
substantially successful" and "raise[d] substantial individual questions that vary among
class members"); *Lucas v. Breg, Inc.*, 212 F. Supp. 3d 950, 971 (S.D. Cal. 2016) (holding
that resolving issues regarding statute of limitations where both the discovery rule and
fraudulent concealment doctrines were raised "are not susceptible to generalized proof").

Based on the foregoing, the Court finds statute of limitations defenses do not defeat
class certification, and that the predominance requirement is met here.

### viii.    Arbitration Agreements

Ford asserts that whether it can compel arbitration as to any proposed class member
is another individual issue precluding certification. (Doc. No. 136 at 43.) Specifically, Ford
asserts some purchase agreements contain arbitration clauses and, if the purchaser received
financing from Ford Motor Credit, those agreements may have been assigned to Ford
Motor Credit, an indirect subsidiary of Ford, thereby allowing Ford to enforce arbitration
under third-party beneficiary and equitable estoppel principles. (*Id.*) Plaintiffs respond that
courts routinely reject this argument that certain class members may have binding
arbitration and/or class action waivers. (Doc. No. 157 at 21.) They further argue that any
such clauses or waivers are unenforceable because Ford (1) is not a party to those
agreements, and (2) has waived any rights by engaging in this litigation. (*Id.* at 21–22
(citing *In re Toyota Motor Corp. Hybrid Brake Mktg., Sales, Pracs. & Prods. Liab. Litig.*,
828 F. Supp. 2d 1150, 1159 n.5 (C.D. Cal. 2011)).)

77

1       The decisions cited by Plaintiffs, along with others, suggest that class certification

2 is not precluded by the existence of an arbitration defense as to some putative class

3 members. *Herrera v. LCS Fin. Servs. Corp.*, 274 F.R.D. 666, 681 (N.D. Cal. 2011) ("The

4 fact that some members of a putative class may have signed arbitration agreements or

5 released claims against a defendant does not bar class certification."); *Davis v. Four*

6 *Seasons Hotel Ltd.*, No. 08–00525 HG–BMK, 2011 WL 4590393, at *3 (D. Haw. Sept. 30,

7 2011) (adopting the reasoning in *Herrera*).

8       However, other districts in the Ninth Circuit have decided class certification is

9 properly denied based upon the existence of an arbitration agreement. *See Conde v. Sensa*,

10 No.: 14-cv-51 JLS WVG, 2018 WL 4297056, at *11 (S.D. Cal. Sept. 10, 2018) (finding

11 plaintiff did not satisfy the predominance requirement because, if certified, "the Court will

12 be forced to determine which of the class members may be subject to the arbitration

13 provision . . . and those who are not").

14       Here, Ford has not provided any evidence of what percentage of class members

15 would be subject to the arbitration provision. Rather, Ford cites to one contract signed by

16 Plaintiff Powers, which includes the arbitration provision. (*See* Doc. No. 136 at 43 n.24.)

17 Indeed, this is unlike the cases cited by Ford. For example, in *Conde*, the defendants

18 asserted that approximately 84% of the putative class were subject to the arbitration clause,

19 and this was not contested by the plaintiff. 2018 WL 4297056, at *11. To be clear, the court

20 in *Herrera* did not identify how many potential class members may be subject to an

21 arbitration provision, and thus the extent of "some" members of the putative class being

22 subject to arbitration agreements is unclear. 274 F.R.D. at 681. That said, the district court

23 in *Pablo v. ServiceMaster Global Holdings Inc.*, No. C 08–03894 SI, 2011 WL 3476473

24 (N.D. Cal. Aug. 9, 2011), directly addressed *Herrera*'s proposition and determined that

25 class certification was not proper under the circumstances presented in its case because,

26 "[a]lthough it is not clear how many putative class members signed arbitration agreements,

27 the evidence . . . support[ed] an inference that a significant number did." 2011 WL

28 3476473, at *3.

78

1
2
3
4
5
6
7

Moreover, Ford's reliance on *O'Connor v. Uber Techs.*, 904 F.3d 1087 (9th Cir. 2018), is distinguishable, as there, the Ninth Circuit reversed class certification because the district court improperly concluded that the arbitration agreements were not enforceable. 904 F.3d at 1094. Although the court noted that the class "includes drivers who entered into agreements to arbitrate their claims and to waive their right to participate in a class action with regard to those claims[,]" the basis for reversal was that "the question whether those agreements were enforceable was not properly for the district court to answer." *Id.*

8
9

Based on the foregoing, the Court finds that the issue of arbitration agreements does not preclude class certification.

10

### ix.    Used Truck Purchasers

11
12
13
14
15
16
17
18

Ford further contends another individualized issue for used purchasers is whether the truck still had the original damper when acquired. (Doc. No. 136 at 43 (citing *Tomassini v. FCA US LLC*, 326 F.R.D. 375, 389 (N.D.N.Y. 2018)).) Plaintiffs do not address this argument in reply. (*See* Doc. No. 157.) However, Ford does not support its contention with evidence that used purchasers commonly replace the original damper. Moreover, for used purchasers who replace the original damper at an authorized Ford dealership, Ford's own records will likely assist with that determination. Thus, the Court finds this issue does not preclude a finding of predominance.

19

### x.    Damages

20
21
22
23
24
25

Ford's final predominance argument is that Plaintiffs' damages models fail to satisfy the requirements set forth in *Comcast*.[9] (Doc. No. 136 at 44.) Although individual damages calculations alone do not make class certification inappropriate under Rule 23(b)(3), *see Leyva v. Medline Indus., Inc.*, 716 F.3d 510, 514 (9th Cir. 2013), the U.S. Supreme Court has held the plaintiff bears the burden of providing a damages model showing that

26
27
28

---

[9] Ford also argues that actual injury is an element of each of Plaintiffs' claims. (Doc. No. 136 at 44 (citing *In re Toyota Motor Corp. Hybrid Brake Mktg., Sales Pracs. & Prods. Liab. Litig.*, 288 F.R.D. 445, 449–50 (C.D. Cal 2013)).) However, this argument is repetitive of its argument as to manifestation, discussed above.

79

"damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." *Comcast*, 569 U.S. at 35. The damages model "must measure only those damages attributable to" the plaintiff's theory of liability. *Id.* If the plaintiff does not offer a plausible damages model that matches their theory of liability, "the problem is not just that the Court will have to look into individual situations to determine the appropriate measure of damages; it is that Plaintiffs have not even told the Court what data it should look for." *MyFord Touch*, 2016 WL 7734558, at *15.

### Stockton's Methodology[10]

Here, Plaintiff's theory is that all Class Vehicles inherently had an insufficient damping system at the time of sale and the benefit-of-the-bargain theory purports to "make the Class whole by restoring the difference between the amount purchasers paid for the vehicle, and its actual market value with the defect intact." (Doc. No. 120-1 at 21.) According to Plaintiffs' damages expert, Mr. Stockton, the damages can be calculated in the context of a "repair cost model" which calculates purchasers' overpayment in the context of the cost to remedy the Suspension Defect at acquisition. (Stockton Report ¶¶ 37, 40.)

First, Ford argues Stockton's methodology ignores consumers' expectations and the actual bargain struck by proposed class members, specifically, because Ford's New Vehicle Limited Warranty disclaims that any vehicle would be defect-free. (Doc. No. 136 at 45.) However, courts have held this is a merits question that should not be resolved at class certification. *See Nguyen*, 932 F.3d at 822 n.8. Moreover, Ford's reliance on *Davidson v. Apple, Inc.*, No. 16-CV-04942-LHK, 2019 WL 2548460, at *14 (N.D. Cal. June 20, 2019), is unavailing here. In *Davidson*, the court found that "Plaintiffs' damages model fails to satisfy *Comcast* because the second [choice-based conjoint] survey did not account

---

[10] Ford's arguments as to the applicability of Stockton's damages model to fraud claims, accounting for wear and tear, identifying purchasers primarily for personal, household, or family use, and supply-side factors have been previously addressed in regard to Ford's *Daubert* motions and Ford does not make any arguments as to how these issues go to predominance. (*See* Doc. No. 201 at 13–16.)

for Apple's one-year warranty period and its effect on class damages." 2019 WL 2548460, at *14. However, the court noted that under Apple's one-year warranty, a purchaser could replace their iPhone for free if the defect manifested within the warranty period, but the second survey omitted this material information. *Id.* Instead, "the survey informed respondents that the defect would always cost $ 149 to repair[,]" which conflicted with Plaintiffs' theory of liability. *Id.*

Next, Ford asserts Stockton's methodology ignores the probability that the alleged defect will manifest. (Doc. No. 136 at 45.) However, Plaintiffs' "theory is that the defect was inherent in each of the Class Vehicles at the time of purchase, regardless of when and if the defect manifested." *Nguyen*, 932 F.3d at 819–20. As such, the damages model is consistent with Plaintiffs' liability theory. *See In re Honda Idle Stop Litig.*, --- F.R.D. ----, No. 2:22-cv-04252-MCS-SK, 2024 WL 4438933, at *13 (C.D. Cal. Oct. 3, 2024).

Finally, Ford asserts Stockton does not account for customers who received a free repair. (Doc. No. 136 at 45.) Ford relies upon *In re Toyota Motor Corp. Hybrid Brake*, 288 F.R.D. 445, in which the court held the benefit-of-the-bargain model was insufficient because "Toyota presented substantial evidence that the updated software installed in the Class Vehicles as part of the national recall rectified any actual or perceived problem with the braking performance of the ABS. *Id.* at 449. Moreover, the plaintiffs "did not even retain an expert to render an opinion on the safety and performance of the ABS post-recall." *Id.* at 449–50. Here, however, Ford has not offered any evidence of the extent free repairs were given or that the free repair rectified the problem.

Accordingly, the Court finds Stockton's damages model is consistent with Plaintiffs' liability theory.

///
///
///
///
///

81

### Gaskin & Weir's Methodology[11]

As to Gaskin and Weir, Ford asserts their conjoint analysis pools its data from stated preferences rather than actual prices, which is not economically proper. (Doc. No. 136 at 46.) However, Ford does not assert how this defeats predominance, and it did not raise this issue in its *Daubert* motion. Moreover, while Ford's expert, David Harless, asserts a conjoint study is unnecessary because real-world data on used vehicle values exist to evaluate Plaintiffs' claims, (Doc. No. 142-1 ¶¶ 103–14), numerous courts have approved of conjoint analysis surveys. *See Vizcarra v. Unilever U.S., Inc.*, 339 F.R.D. 530, 553 (N.D. Cal. 2021); *Miller v. Fuhu Inc.*, No. 2:14-cv-06119-CAS-AS, 2015 WL 7776794, at *21 (C.D. Cal. Dec. 1, 2015); *see, e.g.*, *McMorrow v. Mondelez Int'l, Inc.*, No. 17-CV-2327-BAS-JLB, 2021 WL 859137, at *7 (S.D. Cal. Mar. 8, 2021) (applying choice-based conjoint survey); *Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*, 326 F.R.D. 592, 616 (N.D. Cal. 2018) (same).

Moreover, Ford argues Gaskin and Weir "admit their conjoint analysis would generate average damages percentage without identifying whether different portions of the putative class were systematically different." (Doc. No. 136 at 46.) Ford contends the conjoint analysis cannot "independently identify" damages differences or "identify different portions of the class that need to be treated differently." (*Id.* (quoting Ford's Deposition Excerpts of Steven P. Gaskin, Doc. No. 142-53, at 32–33).) Plaintiffs respond that Ford misunderstands how these experts address the defect's manifestation. (Doc. No. 157 at 24.) Specifically, Plaintiffs assert "[t]he alleged damages arise because of the 'systematic presence of the defect, which comes with a risk.'" (*Id.* (quoting Plaintiffs' Deposition Excerpts of Colin B. Weir ("Pl. Weir Depo."), Doc. No. 163-13, at 6–7).) Indeed, Weir goes on to state that "there may be other damages that arise because of the

---

[11] Ford's arguments as to unperformed survey and supply-side analysis have been previously discussed in regard to Ford's *Daubert* motions and Ford does not make any arguments as to how these issues go to predominance. (*See* Doc. No. 201 at 4–13.)

19-cv-01082-AJB-AHG

manifestation, but the overpayment is due simply to the presence versus the absence of the defect, not necessarily its manifestation." (Pl. Weir Depo. at 7.) The Court finds Gaskin's and Weir's methodologies are consistent with Plaintiffs' liability theory.

### b.    Superiority

If a court finds that the proposed class or subclass satisfies the commonality and predominance requirements of Rule 23(b)(3), the court must also determine whether a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. Fed R. Civ. P. 23(b)(3). To determine whether a class action is superior to alternative methods of adjudicating a case, a court considers: (1) the class members' interests in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already brought by or against proposed class members; (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (4) the likely difficulties in managing the class. Fed. R. Civ. P. 23(b)(3)(A)–(D). Consistent with the aim of the Federal Rules of Civil Procedure to promote judicial economy, a class action is the superior method for resolution "[w]here classwide litigation of common issues will reduce litigation costs and promote greater efficiency." *Valentino v. Cartier-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996).

Plaintiffs assert the superiority requirement is satisfied because individual recoveries would be "dwarfed" by the cost of individual litigation. (Doc. No. 120-1 at 42 (quoting *Dukes*, 564 U.S. at 350).) The Court agrees, as class members' interest in individually controlling the litigation is low given that many members likely stand to recover relatively little compared to the costs of individual litigation.

Plaintiffs further argue class-wide treatment is appropriate because the relevant state laws governing Ford's conduct are materially identical. (*Id.*) Ford responds that due to the material differences in state law, the factual differences between and within each Class Vehicle generation, and the numerous claims at issue, this case would be unmanageable for class certification. (Doc. No. 136 at 48.) Plaintiffs at most seek to certify 10 sub-classes under the laws of eight states. Moreover, the differences in laws can be handled at trial

83

through different jury instructions based on each of the separate state subclasses, and multiple courts have certified similar classes. *Cf. In re Packaged Seafood Prods. Antitrust Litig.*, 332 F.R.D. 308, 346 (S.D. Cal. 2019) (certifying thirty-two statewide classes); *In re Static Random Access Memory Antitrust Litig.*, 264 F.R.D. 603, 617 (N.D. Cal. 2009) (certifying twenty-seven statewide damages classes in addition to nationwide injunctive relief class); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 583, 608–13 (N.D. Cal. 2010) (certifying twenty-four statewide damages classes in addition to nationwide injunctive relief class).

Additionally, the court is neither aware of any concurrent litigation in this case, nor a reason why this particular forum would be ill-suited to resolving Plaintiffs' class action. Managing this class action would not present undue difficulties in light of the greater burden and inefficiency of trying the cases individually. *See Wolin*, 617 F.3d at 1176 ("Forcing individual vehicle owners to litigate their cases, particularly where common issues predominate for the proposed class, is an inferior method of adjudication.").

Based on a review of the superiority factors as a whole, the Court finds the superiority requirement satisfied.

## C.    Conclusion

Based on the foregoing, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiffs' motion for class certification, and certifies classes for Arizona, California, Colorado, Illinois, Maine, New Mexico, South Carolina, and Texas. The certified classes may pursue the following claims:

1. **Arizona**: Breach of Express Warranty;
2. **California**: (1) violation of the CLRA, and (2) common law fraudulent concealment;
3. **Colorado**: (1) violation of the Colorado Consumer Protection Act, and (2) common law fraudulent concealment;
4. **Illinois**: violation of the Illinois Consumer Fraud and Deceptive Trade Practices Act;
5. **New Mexico**: (1) Breach of Express Warranty, and (2) violation of New Mexico's Unfair Practices Act;
6. **South Carolina**: Breach of Implied Warranty; and
7. **Texas**: (1) violation of the Texas Deceptive Trade Practices Act, and (2) Breach of

19-cv-01082-AJB-AHG

Express Warranty.

The Court further **GRANTS** Plaintiffs' motion to appoint MLG and CC as class counsel. In addition, the Court **DENIES WITH LEAVE TO AMEND** the remaining classes.

Finally, the Court directs counsel of their duty under Doc. No. 102, Page 3, item 4, "Within three (3) days of a ruling on the motion for class certification, the parties must jointly contact the Court via email (at efile_goddard@casd.uscourts.gov) to arrange a further case management conference."

**IT IS SO ORDERED.**

Dated:  November 7, 2024

Hon. Anthony J. Battaglia
United States District Judge